1    Jeff D. Friedman (173886)
     HAGENS BERMAN SOBOL SHAPIRO LLP
2    715 Hearst Avenue, Suite 202
     Berkeley, California 94710
3    Telephone: (510) 725-3000
     Facsimile: (510) 725-3001
4    jefff@hbsslaw.com

5    Steve W. Berman
     Thomas E. Loeser (202724)
6    HAGENS BERMAN SOBOL SHAPIRO LLP
     1301 Fifth Avenue, Suite 2900
7    Seattle, Washington 98101
     Telephone: (206) 623-7292
8    Facsimile: (206) 623-0594
     steve@hbsslaw.com
9    toml@hbsslaw.com

10    *Attorneys for Plaintiffs*

11

12

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 14   SOUND APPRAISAL and SAVAGE<br>15   APPRAISAL SERVICES, INC., on behalf of<br>themselves and all others similarly situated, | CV No. **09 1630** |
| 16           Plaintiffs, | **CLASS ACTION COMPLAINT**<br>(Violations of 18 U.S.C. § 1962; 12 U.S.C. |
| 17     vs. | § 2607; Cal. Bus. & Prof. Code § 17200,<br>*et seq.*; Unjust Enrichment; Breach of |
| 18 | Fiduciary Duty) |
| 19   WELLS FARGO BANK N.A. and<br>20   VALUATION INFORMATION<br>TECHNOLOGY, LLC, d/b/a RELS<br>VALUATION, | **DEMAND FOR JURY TRIAL** |
| 21 | |
| 22         Defendants. | |

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

I.     NATURE OF THE ACTION ........................................................................... 1

II.    JURISDICTION AND VENUE ...................................................................... 3

III.   THE PARTIES .............................................................................................. 3

IV.    SUBSTANTIVE ALLEGATIONS ............................................................... 4

    A.    The Appraisal Business ...................................................................... 4

    B.    Federal Law Requires Appraisal Independence ................................. 5

    C.    The Incentives for Mortgage Brokers and Lenders to Pressure Appraisers ................. 6

    D.    Wells Fargo ........................................................................................ 7

    E.    Wells Fargo and Rels Valuation Corrupt the Appraisal System ....................... 7

    F.    The Suspension of Honest Appraisers ............................................... 8

    G.    The Suspension or Blacklisting of Plaintiff Sound Appraisal ...................... 9

    H.    The Suspension of Savage Appraisal Services ................................ 11

    I.    Examples of Other Appraisers Being Subject to Pressure and Blacklisted ........ 12

    J.    The Wells Fargo Brokerage Network ............................................... 14

    K.    Investigations and Legal Action Relating to Wells Fargo's Practices ............... 15

V.     CLASS ACTION ALLEGATIONS ............................................................ 16

    A.    Class Definition ................................................................................ 16

    B.    Numerosity ....................................................................................... 16

    C.    Commonality .................................................................................... 17

    D.    Typicality ......................................................................................... 17

    E.    Adequacy .......................................................................................... 17

    F.    The Prerequisites to Maintaining a Class Action for Injunctive Relief are Readily Apparent ........................................................ 17

    G.    Common Questions Predominate, and the Class Action Device Is Superior .............. 18

VI.     CAUSES OF ACTION ................................................................................................. 18

FIRST CAUSE OF ACTION  Violation of RICO (18 U.S.C. § 1962(c)(d)) ...................................... 18

     A.     The Enterprises.................................................................................................. 19

          1.     The Wells Fargo Brokerage Enterprise ........................................................... 19

          2.     Alternative Enterprise Allegations:  The Wells Fargo Enterprise.................... 20

     B.     The Defendants' Use of the U.S. Mails and Interstate Wire Facilities ...................... 22

     C.     Conduct of the RICO Enterprises' Affairs ................................................................. 24

     D.     The Defendants' Pattern of Racketeering Activity ..................................................... 24

     E.     Damages Caused by the Defendants' Scheme ............................................................. 25

SECOND CAUSE OF ACTION  VIOLATION OF CALIFORNIA UNFAIR
     COMPETITION LAW  (California Business and Professions Code § 17200, *et seq.*).......... 26

THIRD CAUSE OF ACTION  INTERFERENCE WITH PROSPECTIVE
     ECONOMIC ADVANTAGE ................................................................................................. 27

PRAYER FOR RELIEF.................................................................................................................... 28

JURY DEMAND ............................................................................................................................... 28

1       Plaintiffs Sound Appraisal and Savage Appraisal Services, Inc. ("Plaintiffs"), by and

2   through their attorneys, on behalf of themselves and all others similarly situated, bring this Class

3   Action Complaint against Defendants and allege, based upon personal knowledge as to their own

4   acts, and as to all other matters upon information and belief, as follows:

5                           I.      NATURE OF THE ACTION

6       1.      The independence and integrity of the real estate appraisers who determine the value

7   of home loan collateral is vitally important.  Appraisals are intended to provide borrowers and

8   lenders with an independent and accurate assessment of the true value of the property underlying a

9   loan.

10      2.      Federal and state laws exist to protect the integrity of the appraisal process so that

11  appraisers can provide borrowers and lenders with an independent and accurate assessment of the

12  value of a home.  Lenders are prohibited from pressuring appraisers into compromising their

13  independence and producing a report that is not based on the appraiser's objective opinion.

14      3.      Wells Fargo's mortgage originations increased exponentially during the lending

15  boom during 2000 – 2006.  The company incentivized employees to fund as many loans as quickly

16  as possible.  Wells Fargo's top-performing employees were rewarded with all-expense-paid trips

17  including helicopter rides, wine-tasting, horseback riding in Puerto Rico, and a private Jimmy

18  Buffet concert in the Bahamas.[1]

19      4.      Subprime loans in particular have increased Wells Fargo's profits through increased

20  interest rates, increased origination fees and other fees, and through the packaging of mortgage-

21  backed securities that are at the heart of the financial woes now plaguing our economy.

22      5.      Wells Fargo has embraced a host of practices that victimize consumers and have

23  substantially contributed to the financial woes now plaguing our economy.  Wells Fargo imposed

24  excessive fees and high interest rates, utilized deceptive marketing tactics, and steered customers to

25

26

27  _____

    [1] San Francisco Chronicle, Wells Fargo mortgage unit's bash in Vegas off (Feb. 4, 2009)
    http://www.sfgate.com/cgi-
28  bin/article.cgi?f=/c/a/2009/02/04/BUCG15MPJK.DTL&feed=rss.business.

010098-11 296864 V1

1  sub-prime loans to maximize Wells Fargo's profits.  It engaged in loan "flipping", selling

2  overpriced insurance, and offered sham "open-end" loans and credit cards.[2]

3      6.      In approximately 2004, instead of dealing with the appraisers directly, Wells Fargo

4  began routing appraisal requests through the appraisal management company Rels Valuation.[3]

5      7.      As part of its corporate objective to abandon underwriting standards in order to

6  maximize market share and profits, Wells Fargo and Rels Valuation have together engaged in a

7  practice of pressuring and intimidating appraisers into using appraisal techniques that produce

8  appraisals that meet Wells Fargo's business objectives even if the use of such appraisal techniques

9  is improper and in violation of industry and regulatory standards.  If appraisers fail to "play ball" as

10 Wells Fargo demands, Wells Fargo, through Rels Valuation, removes the appraiser from the list of

11 approved appraisers, which essentially "blacklists" the appraiser.  Once an appraiser is blacklisted

12 Wells Fargo and Rels Valuation will no longer request appraisals or accept appraisals from these

13 persons and companies.

14     8.      In addition to Rels Valuation's refusal to use appraisers removed from their

15 approved list, independent loan mortgage brokers, which also hire appraisers, may refuse to use

16 blacklisted appraisers if Wells Fargo is the lender, since they do not want to order and have a

17 borrower pay for an appraisal Wells Fargo will not accept.  Given Wells Fargo's enormous size

18 and clout in the mortgage market, blacklisted appraisers lose substantial revenue – all because they

19 refused to compromise their integrity and violate industry's standards at Wells Fargo's insistence.

20 In essence, being blacklisted by Wells Fargo list is a serious economic blow for an appraiser who

21 will not do business the Wells Fargo way, *i.e.*, illegally.

22     9.      Defendants' conduct violates, among other laws, the federal Racketeering

23 Influenced and Corrupt Practices Act.  Wells Fargo and Rels Valuation have caused substantial

24 damage to thousands of appraisers across the United States and have distorted real estate prices in

25 the marketplace.  Therefore, this suit is necessary to stop Wells Fargo and Rels Valuation's

26     [2] Center for Responsible Lending, A Review of Wells Fargo's Subprime Lending 6 (April
   2004), http://www.responsiblelending.org/pdfs/ip004-Wells_Fargo-0404.pdf.

27     [3] Based on a January 30, 2009, email from Don Pearsall confirming that in January 2004 Wells
28 began using ValueIT/Rels.

1    unlawful behavior and to compensate appraisers that were subject to Wells Fargo's unlawful

2    scheme.

### II.    JURISDICTION AND VENUE

4         10.    This Court has subject-matter jurisdiction over this class action pursuant to the Class

5    Action Fairness Act of 2005, which confers federal jurisdiction over class actions where, as here,

6    "any member of a class of plaintiffs is a citizen of a State different from any Defendants" and the

7    aggregated amount in controversy exceeds five million dollars ($5,000,000).  *See* 28 U.S.C.

8    §§ 1332(d)(2) and (6).

9         11.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c).  Many of

10   the acts and transactions giving rise to the violations of law complained of herein occurred in this

11   District.  Assignment to the San Francisco or Oakland division of this Court is appropriate under

12   Civil Local Rule 3-2 because Defendant Wells Fargo Bank, N.A. is headquartered in San Francisco

13   County, California and, therefore, a substantial part of the events or omissions which give rise to

14   the claims in this action occurred in San Francisco County.

### III.    THE PARTIES

16        12.    Plaintiff Sound Appraisal is a sole proprietorship with its principal place of business

17   in Puyallup, Washington.  Sound Appraisal is in the business of providing real estate appraisals to

18   mortgage brokers and mortgage lenders.

19        13.    Plaintiff Savage Appraisal Services, Inc. is an S corporation with its principal place

20   of business in Vail, Colorado.  Savage Appraisal Services, Inc. is in the business of providing real

21   estate appraisals to mortgage brokers and mortgage lenders.

22        14.    Defendant Wells Fargo Bank, N.A. is a national banking association chartered in

23   Sioux Falls, South Dakota.  It is headquartered in San Francisco, California.  Wells Fargo provides

24   residential mortgages through its division Wells Fargo Home Mortgage.

25        15.    Wells Fargo is a diversified financial services company that provides retail and

26   business banking, insurance, investments, mortgages, and consumer finance across the United

27   States.  The company is one of the top "cross-sellers" of financial services in the country, offering

28   credit cards, personal loans, wealth management services, and insurance.  Business-oriented

services include commercial banking services, lending, investment banking, venture capital, and equipment leasing.  Wells Fargo is one of the leaders in the realm of online banking, having become the first major financial services firm to offer Internet banking back in 1995.

16.    The company's community banking operations serve nearly 11 million customers through more than 3,000 bank branches (or what the company calls "stores") in 23 states, most of which are in the western United States – Ohio being the easternmost state of operation.  Wells Fargo Home Mortgage boasts it is the nation's number one originator and number two servicer of residential mortgages.  Wells Fargo has more than 1,200 home mortgage 'stores' and serves all 50 states.

17.    Collectively, these entities are referred to as "Wells Fargo."

18.    Defendant Valuation Information Technology, LLC, d/b/a Rels Valuation, ("Rels Valuation") is an Iowa limited liability company headquartered in Minnetonka, Minnesota. Valuation Information Technology, LLC is a joint venture between First American Real Estate Solutions, a subsidiary of First American Corporation, and Wells Fargo Foothill, a subsidiary of Wells Fargo & Co.  Valuation Information Technology, LLC is a provider of real estate settlement services including property appraisals.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    The Appraisal Business

19.    An appraiser is most commonly retained by a mortgage broker or mortgage lender in order to value the property that will be used as the collateral for the loan.  An appraiser's role is to provide an unbiased assessment of the property's value and to ensure this value actually reflects the estimated opinion of market value.  An accurate appraisal ensures that the loan is adequately collateralized in case the borrower defaults and necessary to determine whether the contemplated loan meets lender and/or governmental guidelines.[4]

---

[4] For example, with respect to lender guidelines, to avoid having to pay Private Mortgage Insurance (PMI) a loan usually must have a Loan to Value (LTV) no greater than 80%.  With respect to governmental guidelines, if a contemplated loan will be subject to Federal Housing Authority (FHA) guarantee, it must have a LTV not higher than 97%.

CLASS ACTION COMPLAINT                    - 4 -

010098-11 296864 V1

20.    A typical appraisal involves the appraiser's physical inspection of the property. The appraiser takes inventory of the number of rooms, the square footage, and assesses the overall condition and quality of the property. The appraiser also reviews recent property sales that the appraiser believes are comparable to the property being studied, and these "comps" serve as value benchmarks that aide the appraiser in determining the property's worth.

21.    After the appraiser has concluded his or her review, the appraiser typically provides the mortgage broker or lender with a report that estimates the value of the property and either confirms or challenges the sale price agreed to between the buyer and the seller.

22.    Appraisers either work "in house" as part of the broker's or lender's own operations or work as independent contractors. In the latter case, the appraiser builds a book of business by servicing as many mortgage brokers and lenders in a given geographic region as possible.

23.    These brokers and lenders are the "lifeblood" of the independent appraiser's revenue. Without their business, an appraiser cannot operate.

**B.    Federal Law Requires Appraisal Independence**

24.    Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent. The Uniform Standards of Professional Appraisal Practice ("USPAP"), incorporated into federal law, 12 C.F.R. § 34.44, require appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct). USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions." In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.

25.    Federal law sets independence standards for appraisers involved in federally-regulated transactions. *See* 12 U.S.C. §§ 3331, *et seq.* The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and

010098-11 296864 V1

1   collection functions and not involved, except as an appraiser, in the federally related transaction,

2   and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45.

3   For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the

4   appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or

5   indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

6       26.    In 2005, federal regulators, including the Office of Thrift Supervision ("OTS"),

7   published "Frequently Asked Questions on the Appraisal Regulations and the Interagency

8   Statement on Independent Appraisal and Evaluation Functions." With regard to appraisal

9   independence, the document highlighted the importance of independence and condemned attempts

10  to interfere therewith:

>   3.    *Who should be considered the loan production staff for*
>         *purposes of achieving appraiser independence? Could loan*
>         *production staff select an appraiser?*
>
>   *Answer:*    The loan production staff consists of those responsible
>               for generating loan volume or approving loans, as
>               well as their subordinates. This would include any
>               employee whose compensation is based on loan
>               volume. Employees responsible for the credit
>               administration function or credit risk management are
>               not considered loan production staff. Loan production
>               staff should not select appraisers.
>
>                       * * *
>
>   5.    *When selecting residential appraisers, may loan production*
>         *staff use a revolving pre-approved appraiser list, provided*
>         *the list is not under their control?*
>
>   *Answer:*    Yes, loan production staff may use a revolving, board-
>               approved list to select a residential appraiser, provided
>               the development and maintenance of the list is not
>               under their control. Staff responsible for the
>               development and maintenance of the list should be
>               independent of the loan production process. . . .
>               Further, there should be periodic internal review of
>               the appraiser selection process to ensure that
>               appropriate procedures are being followed and that
>               controls exist to ensure independence.

**C.    The Incentives for Mortgage Brokers and Lenders to Pressure Appraisers**

27.    Traditionally, mortgage lenders held a substantial amount of the mortgage loans that

they originated, which incentivized them to ensure that loans were adequately collateralized.

CLASS ACTION COMPLAINT                    - 6 -

010098-11 296864 V1

28.     Over time, the mortgage industry landscape changed.  Rather than holding the mortgage loans, lenders now regularly sell them in the financial markets.  The loans are then pooled together, securitized and sold to institutions and investors as mortgage-backed securities.  Today, the vast majority of mortgage loans are sold, leaving the original lender holding far fewer mortgages in its portfolio.  The money that the lender receives for selling its mortgage loans is then used to finance new mortgages, thereby increasing the lender's profits and aiding its stock price.

**D.     Wells Fargo**

29.     One of the biggest drivers in Wells Fargo Bank's steady growth is its mortgage business.  In 2000, Wells Fargo earned $76.5 billion in mortgage originations and reported its focus was increased efficiency, higher ancillary revenue, and new channels and partnerships.  Three years later Wells Fargo's earnings from mortgage originations were $470 billion.  Although Wells Fargo's mortgage lending segment includes, retail, wholesale, and correspondent lending, Wells Fargo has relied more heavily on retail originations compared with other major lenders.[5]

30.     Wells Fargo has sourced loans through a vast network of thousands of contracted mortgage brokers.

31.     With the real estate boom of 2000-2006, the number of refinance and purchase transactions in real estate increased significantly.  To service the drastic increase in transactions, the number of real estate related service providers also grew tremendously.  For example, the number of Realtors in the United States grew from 750,000 in 2000 to over 1.3 million in 2007.[6]  Likewise, Wells Fargo's fleet of corporate and affiliated mortgage brokers grew as did the number of property appraisers.

**E.     Wells Fargo and Rels Valuation Corrupt the Appraisal System**

32.     With the growing number of appraisers and increased competition in the appraisal marketplace, the environment was ripe for a market force such as Wells Fargo to exert its will on appraisers.  In 2004, Wells Fargo stopped dealing directly with appraisers and forced

---

[5] Center for Responsible Lending, A Review of Wells Fargo's Subprime Lending 2 (April 2004), http://www.responsiblelending.org/pdfs/ip004-Wells_Fargo-0404.pdf.

[6] Jack W. Plunkett, Plunkett's Real Estate & Construction Industry Almanac 2008 15 (Plunkett Research, Ltd. 2008).

010098-11  296864 V1

1    "independent" appraisers to receive appraisal work from Wells Fargo through their affiliate

2    Appraisal Management Company (AMC), ValueIT, an appraisal clearing-house that contracts with

3    independent appraisers to meet Wells Fargo's and other lenders' appraisal needs. ValueIT

4    eventually changed its name to Rels Valuation; and through Rels Valuation, Wells Fargo is able to

5    indirectly pressure the "independent" appraiser in order to get the value Wells Fargo needs to fund

6    the loan at issue.

7           33.    On information and belief, Wells Fargo routes all of its Distributed Retail appraisal

8    work, and nearly all of the appraisal work for Wells Fargo's centralized retail, banking, home

9    equity, and consumer credit group units to Rels Valuation.[7]

10   **F.     The Suspension of Honest Appraisers**

11          34.    Part of Wells Fargo's scheme to increase market share and to make as many loans

12   as possible has involved the corruption of the appraisal process. Wells Fargo needs appraisals that

13   support the loans it wishes to make, irrespective of the actual values of the properties being

14   appraised.

15          35.    To accomplish this objective, Wells Fargo, directly and in conjunction with Rels

16   Valuation, has engaged in a pattern and practice of pressuring appraisers to write an appraisal

17   designed to have the loan underwritten even if the appraisal violates USPAP. In other words,

18   Wells Fargo is more interested in having the property pass appraisal than it is in determining

19   whether an appraisal is fair and accurate and prepared in accordance with industry standards.

20          36.    Wells Fargo and Rels Valuation utilize a host of indirect and underhanded methods

21   to communicate to the appraiser the value needed to fund the loan, and the value the appraiser is

22   expected to "hit." For example, Rels Valuation's appraisal order form indicates the "Borrower

23   Estimated Value." Appraisers know that this value reflects the value the appraiser is expected to

24   meet or exceed in their appraisal in order to "make the deal." In some instances Wells Fargo and

25   Rels Valuation also select and provide appraisers with the comparables they want the appraiser to

26   use. As discussed previously, part of the appraisal process involves an appraiser's review of recent

27          [7] March 3, 2009 email from "John Smith" appraiser, forwarding Oct. 2008 email from Jeff
28   Peters, Rels Valuation, Divisional Appraisal Manager.

property sales that the appraiser believes are comparable to the property being studied, and these "comps" serve as value benchmarks that aide the appraiser in determining the property's worth. When Wells Fargo and Rels Valuation provide the appraiser with the comps they want the appraiser to use, the appraiser's integrity and independence is compromised. The appraiser is thereby pressured to ensure that the appraised value of the property in question matches the comps, even if the appraiser does not independently believe the comps are in fact comparable.

37.     If an appraiser does not "play ball" and produce a report affirming the property value or the parameters that Wells Fargo expects or wants, Wells Fargo, through Rels Valuation, suspends the appraiser or removes the appraiser from the list of preferred appraisers and, in essence, "blacklists" the appraiser.

38.     The suspension list or blacklist is a Wells Fargo and Rels Valuation database containing the names of appraisers who have been suspended or removed from the list of preferred appraisers because their appraisals were not accepted by Wells Fargo, and thus were not accepted by Rels Valuation.

39.     Rels Valuation is a "captive" puppet of Wells Fargo, either by virtue of partial ownership by a common parent or economic power as its largest client. Rels describes itself as "lucky to have our wagon hitched to the Wells Fargo stagecoach."[8] To this extent, Rels Valuation knows what Wells Fargo wants to accomplish, and with its suspension list Rels Valuation facilitates Wells Fargo's scheme by attacking the appraisals of persons on the list and undercutting valuations, whether warranted or not.

**G.      The Suspension or Blacklisting of Plaintiff Sound Appraisal**

40.     Plaintiff Sound Appraisal is owned and operated by Mr. Don Pearsall. Mr. Pearsall is an appraiser licensed to serve all counties in Washington State.

41.     In 1989, Mr. Pearsall began working as an apprentice appraiser. He received his appraisal license in 1992. Mr. Pearsall began operating Sound Appraisal in 2001.

---

[8] March 3, 2009 email from "John Smith" appraiser, forwarding Oct. 2008 email from Jeff Peters, Rels Valuation, Divisional Appraisal Manager.

42. Sound Appraisal has historically conducted appraisals for area mortgage brokers and major lenders such as Countrywide, Wells Fargo, Washington Mutual, and others. Due to its expertise and experience as an appraiser, Sound Appraisal often conducts "review appraisals" to ensure that appraisal reports by other appraisers are accurate and in compliance with regulations.

43. In June 2007, Sound Appraisal received a request from Wells Fargo through Rels Valuation to conduct an appraisal of a home in Enumclaw, Washington. Don Pearsall, Sound Appraisal's sole proprietor, visited the property and completed a Uniform Residential Appraisal Report.

44. After Sound Appraisal submitted the completed appraisal, Rels Valuation contacted Mr. Pearsall and asked that he alter the Uniform Residential Appraisal Report he submitted to Rels Valuation. Mr. Pearsall knew that under USPAP the appraisal report must reflect his independent opinion of the property's value, and that altering the appraisal report to reflect Rels Valuation's desired views would compromise his independence and would violate USPAP. Thus, Mr. Pearsall refused to alter the report.

45. Rels Valuation lambasted Mr. Pearsall for his adherence to USPAP and his refusal to alter the report. Randall Pierzina, Rels Valuation's area manager, criticized Mr. Pearsall and told him that he "took USPAP too seriously" and that he was going to "kill the deal". Despite the pressure to succumb to Wells Fargo's and Rels Valuation's wishes and "play ball" Mr. Pearsall refused.

46. Prior to this 2007 incident approximately 25-35% of Sound Appraisal's business came from Wells Fargo and Rels Valuation. After this incident Sound Appraisal no longer received appraisal requests from Rels Valuation. In 2006, Sound Appraisal's income from Rels Valuation was $33,395. In 2008, Sound Appraisal's income from Rels Valuation was $0.

47. Eventually Mr. Pearsall contacted Rels Valuation and inquired about the lack of work Sound Appraisal received from Rels Valuation. Randall Pierzina informed Mr. Pearsall that he had been suspended and was no longer an approved appraiser for Rels Valuation.

48.     On April 8, 2009, Don Pearsall of Sound Appraisal received a work order request via telephone from Rels Valuation that confirmed the existence of the blacklist. The conversation was as follows:

Pearsall:        "I would love to take the job, but aren't I on your blacklist?"

Rels employee:  Oh, let me check.  (Puts Pearsall on hold.)

Rels employee:  (after checking)  I'm sorry.  I wasn't supposed to contact you.

End of call.

49.     The employee thus confirmed the existence of the blacklist.

## H.     The Suspension of Savage Appraisal Services

50.     The owner and President of Savage Appraisal is Timothy W. Savage.  Mr. Savage has been a highly respected real estate appraiser in Vail, Colorado for 18 years.

51.     Savage Appraisal worked on Rels Valuation orders for over 12 years.

52.     In January of 2009 Savage Appraisals performed two appraisal assignments for Rels Valuation.  After the appraisals were delivered, Rels Valuation sent emails, pressuring Mr. Savage to increase the value of each appraisal as the homeowners were not happy with his opinion of value.

53.     On January 15, 2009, Donna Londrem, a "Collateral Compliance Reviewer" for Rels Valuation sent Mr. Savage an email purporting to provide information to "support an increased valuation" for property at 993 Lionsridge Loop 322, Vail, Colorado.  On January 14, 2009, Emlee Becker, a "Collateral Compliance Reviewer" for Rels Valuation sent an email to Mr. Savage purporting to provide information "to support an increased value" of property at 945 Sandstone Road, Vail, Colorado.  On both occasions Mr. Savage reviewed the materials provided to determine whether, under USPAP, an increased valuation was appropriate.  After a lengthy letter of explanation, Mr. Savage refused to increase his original opinion of value for the two homes at issue.

1    54.    The next time Mr. Savage heard from Rels Valuation, via a letter dated February 5,

2    2009, was to inform him that he had been removed from their approved panel of appraisers. No

3    further explanation was given.

4    55.    Mr. Savage tried several times, unsuccessfully, to get a detailed response from Rels

5    Valuation as to why he was placed on their blacklist. He has and will continue to lose income as a

6    direct result of being blacklisted.

7    **I.    Examples of Other Appraisers Being Subject to Pressure and Blacklisted**

8    56.    The Plaintiffs' experience is typical of how others have been treated who would not

9    succumb to Rels Valuation's pressure to violate USPAP.

10    57.    "CW"[9] 1 from Arizona reports:

11    I read about your investigation into Wells Fargo/RELS on
12    MarketWatch. Are you also interested in, or currently representing
     appraisers? Our company, & one appraiser in particular, has been
13    'blacklisted' from RELS because **we refused to 'reconsider' values**
     (hit their numbers) & requested fair fees. When I contacted Anthony
14    Vermuelen, head of RELS, he stated he didn't have to give a reason
     for removing us from the list, however a Wells Fargo loan officer
15    said he was told by Mr. Vermuelen there were 'ethical issues'.
     Please let me know if we can help at all – I suspect there are many
16    more ethical appraisers in the AZ market who have had the same
     experience.

17    58.    CW 2 from Nevada reports:

18    I was blacklisted by Rels by an individual by the name of Matt
     Nelsen. **He was trying to influence my value estimate.** We
19    discussed the property and appraisal practices and procedures and I
     told him that what he was trying to do is "risk management" and my
20    job was to do an appraisal according to USPAP and recognized
     appraisal practices. The discussion heated up and I mentioned to him
21    that it felt like he was trying to influence my value estimate. I told
     him of my qualifications – Associate of Applied Science in Real
22    Estate – Cum Laude, BBA-Magna Cum Laude, Masters in
     Management, Taught Appraisal and Real Estate Course for five years
23    at the College level, Appointed to the Advisory Committee for the
     Real Estate Curriculum at the College of Southern Nevada, part of
24    the University of Nevada system, and appointed to the Education
     Commission for the Appraisal Division for the State of Nevada.

25    59.    CW 3 from Washington reports:

26

27

28    [9] CW refers to "Confidential Witness."

I worked for RELS for approximately 11 years. *I quit a couple of years ago due to the growing pressure to inflate values.* I still have the letter I sent to the president, and divisional manager outlining the reason I was quitting was increased pressure to inflate values. Since I quit I have been blacklisted from completing any appraisals for Wells Fargo and RELS. For several years I worked for RELS I was in the top 10 producers nation wide.

60.   CW 4 from Pennsylvania reports:

I was assigned to the Wells Fargo Team. I lasted only 6 weeks before I'd had enough. I cannot ethically agree with the hiring of people with any form of mortgage industry background to review reports. Paying an appraiser ½ of the actual fee, and then not properly disclosing this via the settlement statement would appear to be a RESPA violation.

61.   CW 5 from Illinois reports:

About a year ago, I was pressured to evaluate my appraisal for a higher value that the customer of Wells Fargo thought should be higher. This happened several times. I checked the box that said that I had been pressured and I have not heard from them since. I discussed with them on the phone my position and they suggested my fees were too high. I have not worked for them for a long time. Am I blacklisted?

62.   CW 6 reports from Illinois:

I am sure we are on that black list in Illinois, when we refused to do drive bys with values placed on the orders for refinance not purchases. The orders stated that if property didn't make value as drive by appraiser had to go back and do full order minus the fee of the drive by. We refused to follow this procedure because we didn't allow our appraiser to see the number for the drive by following USPAP and Illinois law. After the first order they have not sent us another since this policy went in effect and we refuse to follow it.

63.   CW 7 from Virginia reports:

I have done a large number of appraisals for Wells Fargo / RELS in the past. I was blacklisted (or taken off the upper tier of appraisal vendors) for not succumbing to a Wells Fargo Branch Manager request for a higher value on a refinance loan.

64.   CW 8 from Indiana reports:

I had previous[ly] performed FHA and conventional appraisals for RELS approximately 2 years ago. However, I ended the relationship after being threaten by my account representative. This young lady told me I had to do what RELS and the loan officer said or I would not be paid. What they were asking be to do was an out and out violation of USPAP and guidelines set forth by HUD/FHA. I quickly ended my relationship after this incident.

CLASS ACTION COMPLAINT                          - 13 -

65.     CW 9 from Oregon reports:

> I am a real estate appraiser and have had a connection with
> RELS/ValueIT for 12 years having done a number of appraisal
> reports for them over the years for Norwest Mrg. and then Wells
> Fargo. During that time I was blacklisted twice, once in 1999 and
> again in 2007. . . . In good times of increasing values this was no
> particular problem but, in the times leading into recessions it became
> a problem to get an appraisal approved if it did not meet the needs of
> the lender which was usually a conflict over a valuation where I tried
> to reflect current market conditions as they existed at the time.

**J.      The Wells Fargo Brokerage Network**

66.     Wells Fargo has a network of contracted mortgage brokers that participate in their

Broker's First® program and complete home mortgage loans through Wells Fargo. Brokers

become authorized as Wells Fargo Approved Brokers by submitting a mortgage broker application

package and entering into a broker agreement with Wells Fargo. These contracted brokers are

provided access to Wells Fargo's Broker's First® and Direct Express℠ computer systems, which

are designed to allow the mortgage broker to submit loan information and receive qualified loan

decisions and instant feedback on first mortgages, piggyback submissions, or home equity

decisions.

67.     On information and belief, Wells Fargo's Real Estate Settlement Service, RES

Direct, manages, *inter alia*, the process of approving brokers. Under the Real Estate Settlement

Procedures Act (RESPA), settlement service providers are prohibited from requiring the use of

other settlement service providers in order to ensure that conflicts of interest and backroom deals

do not drive up settlement costs or corrupt the home purchase process. However, RESPA has an

exception that specifically allows lenders to require the use of a particular appraiser.[10]  Cognizant

of this loophole, RES Direct pressures the brokers to use Rels Valuation for their appraisal needs or

causes brokers to use Rels Valuation by default. Wells Fargo's pressure of independent mortgage

brokers to use Rels Valuation for their appraisal needs furthers Wells Fargo's scheme to

---

[10] Since, absent the mass-marketing of loans to the secondary market, a lender would have an
interest in making sure an appraisal accurately reflects home value, this exception conceptually
would make sense as the last thing a lender would want is an inflated appraisal. However, since
the lender no longer owns the loan, whether it is adequately collaterized has become "someone
else's problem" and the synergy no longer exists. Unfortunately, RESPA has not been changed to
reflect the current state of affairs.

1    manipulate the appraisal process to advance Wells Fargo's financial goals.  Once brokers use Rels

2    Valuation, Rels has confirmed that, "Rels Valuation, under direction from Wells Fargo, does NOT

3    allow the broker any choice, recommendation, etc. in selecting who will appraise their property."

4         68.     Wells Fargo needs its network of authorized brokers knowingly or unknowingly

5    complicit in their scheme with Rels Valuation to pressure appraisers to inflate property values and

6    maximize profits from the loan.   A broker, who never holds the loan after funding, has no

7    incentive to ensure that the appraisal is an accurate assessment of the property's true market value,

8    he or she just wants the deal to close.

9         69.     The process of securitizing loans and selling them to the secondary market changed

10   the mortgage industry and has diminished the broker's and the lender's incentive to ensure the

11   appraisal backing the loan is accurate.  Because lenders' profits are determined by the quantity of

12   loans that they successfully close, and not the quality of those loans, the lender has an incentive to

13   pressure appraisers to reach values that will allow the loan to close – without regard to whether the

14   appraisal accurately reflects the home's actual value.  Likewise, the independent broker is not tied

15   to a particular lender, but instead has relationships with multiple lenders and seeks to comply with

16   the lender's wishes and conditions in order to service clients and maximize their profits.

**K.     Investigations and Legal Action Relating to Wells Fargo's Practices**

17

18        70.     Wells Fargo has been the subject of numerous investigations for deceptive practices

19   that undermine the integrity of the mortgage origination process.

20        71.     In March 2008, the Illinois attorney general issued fair lending subpoenas to Wells

21   Fargo and Countrywide to determine whether these companies steered minority borrowers into

22   higher cost or otherwise inappropriate home loans in violation of fair lending and civil rights

23   laws.[11]

24

25

26

---

27      [11] Press Release, Office of the Illinois Attorney General Lisa Madigan, Illinois Attorney
General Sues 14th Company for Mortgage Rescue Fraud (Aug. 28, 2008),

28   http://www.ag.state.il.us/pressroom/2008_08/20080828.html.

72.     The city of Baltimore sued Wells Fargo in January 2008 alleging that Wells Fargo engaged in a pattern of predatory lending practices in Baltimore's poorest neighborhoods, leading to foreclosure rates that nearly doubled the city-wide average.[12]

73.     In June 2004, the Association of Community Organizations for Reform Now (ACORN) filed three lawsuits against Wells Fargo & Co. and Wells Fargo Financial, Inc. charging the company with a broad range of unfair and deceptive lending practices, including misleading borrowers about the real terms and conditions of their loans, "bait and switch" sales tactics, and routinely failing to inform borrowers with good credit that they can qualify for credit at significantly better rates and fees than those charged them by Wells Fargo.  Wells Fargo & Co. ultimately settled the class action.[13]

## V.     CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring all claims herein as class claims pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The requirements of subparts 23(a) and 23(b)(2), and (b)(3) are met with respect to the Class defined below.

**A.     Class Definition**

75.     Plaintiffs bring this action on behalf of themselves and on behalf of all state-licensed or state-approved appraisers nationwide who have been blacklisted or otherwise removed as an approved appraiser by Wells Fargo and/or Rels Valuation.  Excluded from the proposed Class are any individuals or corporations employed or controlled by Wells Fargo and/or Rels Valuation, and any person or entity related to it, and all governmental entities and any appraiser who has been delisted by any regulatory authority or who is not a state-licensed or state-approved appraiser.

**B.     Numerosity**

76.     The Class is so numerous that joinder of all members is impracticable.  Class members number in the hundreds or more.  The precise number of Class members and their addresses are unknown to the Plaintiffs, but can be obtained from Defendants' records.

---

[12] http://www.huffingtonpost.com/2008/01/10/suit-wells-fargo-lenders_n_80839.html.
[13] http://www.acorn.org/fileadmin/Reports/McCain_Report.pdf,
http://www.allbusiness.com/legal/banking-law-fair-lending/5664042-1.html.

010098-11 296864 V1

**C.      Commonality**

77.      There are questions of law or fact common to the Class, including at least the following:

(a)      Whether Defendants created and maintained a "Suspended List," "Blacklist" or any other list specifying appraisers that are no longer approved to perform appraisals in connection with Wells Fargo loans;

(b)      Whether Defendants pressured appraisers into producing appraisal reports that misstated the value of the subject properties or were not in conformance with USPAP and blacklisted those who refused to do so;

(c)      Whether Defendants used the wires and mails to further the scheme;

(d)      Whether Defendants violated RICO;

(e)      Whether Defendants' wrongful conduct resulted in economic damage to Plaintiffs and members of the Class, and the amount of said damages; and

(f)      What relief should be imposed in favor of the Plaintiffs and the Class.

**D.      Typicality**

78.      Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs have the same interests in this matter as all other members of the Class, and their claims are substantially identical to and typical of the claims of all other members of the Class. Plaintiffs do not have interests antagonistic to or in conflict with those of the members of the Class.

**E.      Adequacy**

79.      Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in class actions. Plaintiffs will fairly and adequately represent the interests of the Class members.

**F.      The Prerequisites to Maintaining a Class Action for Injunctive Relief are Readily Apparent**

80.      The prerequisites to maintaining a class action for injunctive relief exist:

a.      If injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and the members of the Class will continue; and

CLASS ACTION COMPLAINT                                      - 17 -

010098-11 296864 V1

b.     Plaintiffs and the members of the Class have no adequate remedy at law for the injuries which are threatened to recur, in that, absent action from this Court, Defendants will continue to violate RICO and cause damage.

81.     The prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for Defendants – for example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal.  Individual actions may, as a practical matter, be dispositive of the interests of the Class.

82.     Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

**G.     Common Questions Predominate, and the Class Action Device Is Superior**

83.     The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  To Plaintiffs' knowledge, no similar litigation is currently pending by other members of the Class.  Plaintiffs' counsel, highly experienced in class actions, foresee little difficulty in the management of this case as a class action.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of RICO (18 U.S.C. § 1962(C)(D))

84.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

85.     This cause of action, which alleges violations of Title 18, Section 1962(c) and (d) of RICO, is asserted against the Defendants on behalf of the Class.

86.     Plaintiffs, each Class member, and each Defendant is a "person," as that term is defined in 18 U.S.C. § 1961(3).

87.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 1962(d).

A.    **The Enterprises**

    1.    **The Wells Fargo Brokerage Enterprise**

88.    The RICO "enterprise" is an association-in-fact entitled the "Wells Fargo Brokerage Enterprise" consisting of: (1) Wells Fargo, including its Rels Valuation and other loan closing services affiliates, and (2) mortgage brokers not named as defendants herein who have contracts with Wells Fargo pursuant to which they sell, arrange, promote, or otherwise assist Wells Fargo in directing borrowers into loans issued by Wells Fargo. The Enterprise is ongoing and continuing business organizations consisting of both corporations and individuals that are and have been associated for the common or shared purposes of pressuring appraisers to submit appraisal reports at or above pre-determined values and preventing appraisers suspended or removed from the approved appraiser list from obtaining any business related to real estate transactions in which Wells Fargo is the mortgage lender.

89.    The Wells Fargo Brokerage Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

90.    While all Defendants participate in and are members and part of the Wells Fargo Brokerage Enterprise, they also have an existence separate and distinct from the enterprise.

91.    In order to successfully close as many loans as possible, Defendants need a system that allows them to effectively eliminate the hurdle of a truly independent appraisal. The Wells Fargo Brokerage Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme. Furthermore, the participation by the Rels Valuation affiliates in the Wells Fargo Brokerage Enterprise allows the enterprise to function more effectively, given that many of the functions provided by these entities, such as appraisals, would normally be conducted by independent entities. Rels Valuation's participation in the enterprise allows the normal checks and balances (such as appraiser

1    independence) within the mortgage process to be eliminated, permitting Defendants to advance

2    their scheme and conceal the fraudulent activity they have been engaging in.

3         92.    The Defendants control and operate the Wells Fargo Brokerage Enterprise as

4    follows:  (a) Wells Fargo determines the commission structure to be paid to all Wells Fargo brokers

5    and authorized brokers, rewarding and incentivizing them to offer borrowers loans with less

6    favorable terms than they would otherwise qualify for, and/or to complete as many loans as

7    possible, regardless of the quality; (b) Wells Fargo requires that Wells Fargo employees and

8    authorized brokers utilize Rels Valuation and other settlement affiliates of Wells Fargo for certain

9    settlement services associated with the loan; (c) Wells Fargo and Rels Valuation pressure and

10   manipulate appraisers to assess the subject property at the value Wells Fargo desires; and (d) Wells

11   Fargo and Rels Valuation suspend and/or exclude from the preferred appraiser list those appraisers

12   that refuse to comply with Wells Fargo's wishes.

13        93.    The Wells Fargo Brokerage Enterprise has an ascertainable structure separate and

14   apart from the pattern of racketeering activity in which the Defendants engage.

15        **2.    Alternative Enterprise Allegations:  The Wells Fargo Enterprise**

16        94.    Plaintiffs, the Class members, and Defendants are all "persons" within the meaning

17   of 18 U.S.C. § 1961(3).

18        95.    Based upon Plaintiffs' current knowledge, the following persons constitute a group

19   of individuals associated in fact that will be referred to herein as the "Wells Fargo Enterprise":

20   (1) Wells Fargo and (2) Wells Fargo's subsidiaries, including Rels Valuation, and loan closing

21   services subsidiaries.

22        96.    The Wells Fargo Enterprise is an ongoing organization that engages in, and whose

23   activities affect, interstate commerce.

24        97.    While all Defendants participate in and are members and part of the Wells Fargo

25   Enterprise, they also have an existence separate and distinct from the Wells Fargo Enterprise.

26        98.    In order to successfully close as many loans as possible, Defendants need a system

27   that allows them to effectively eliminate the hurdle of a truly independent appraisal.  The Wells

28   Fargo Enterprise provides Defendants with that system and ability, and Defendants control of and

010098-11 296864 V1

participation in the Wells Fargo Enterprise is necessary for the successful operation of their scheme. Furthermore, the participation by Rels Valuation and other settlement affiliates in the Wells Fargo Enterprise, allows the enterprise to function more effectively, given that many of the functions provided by these entities, such as appraisals, would normally be conducted by independent entities. Rels Valuation's participation in the enterprise allows the normal checks and balances within the mortgage process provided by the independent appraiser to be eliminated, permitting Defendants to advance their scheme and conceal the fraudulent activity they have been engaging in.

99. The Wells Fargo Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

100. The Enterprises have a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Wells Fargo and Rels Valuation. There is a common communication network by which Wells Fargo and Rels Valuation shared and continued to share information on a regular basis throughout the Class Period. Typically this communication occurred by use of the wires and mails through which Wells Fargo and Rels Valuation exchanged information. In addition, the Enterprises used the wires in telephone and email communications with Class members, including Plaintiffs, to pressure appraisers to change the values in their reports. Wells Fargo and Rels Valuation functioned as a continuing unit for the purposes of implementing their scheme of pressuring and manipulating appraisers and ultimately suspending and excluding from the preferred appraiser list, those who would not comply with Wells Fargo's wishes.

101. At all relevant times, Rels Valuation was aware of Wells Fargo's conduct; was a knowing and a willing participant in that conduct by refusing to hire Plaintiffs and the Class members to conduct appraisals for loans being provided by Wells Fargo; and reaped profits from that conduct.

102. The impacts of this conduct are still in place, *i.e.*, Plaintiffs and the Class members are still suspended/blacklisted and, consequently, brokers placing loans with Wells Fargo refuse to hire Plaintiffs and the Class members to prepare appraisals.

103.    The foregoing evidences that all Defendants are willing participants in the Enterprises; had a common purpose and interest in the establishment and operations of the foregoing scheme; and agreed to a structure wherein Rels Valuation, the brokers, and Wells Fargo would bypass Plaintiffs and the Class members in favor of other appraisers not blacklisted or on the suspended list. This structure was the basis on which the Enterprises operated.

**B.     The Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

104.    The Enterprises engaged in and affected interstate commerce because they engaged in the suspension and exclusion of appraisers from the approved appraiser list, thus precluding appraisers from conducting appraisals. That this behavior occurred across state boundaries is self evident from the fact that Plaintiffs are in two distinct states—Washington and Colorado—that are themselves distinct from Wells Fargo's home state of California.

105.    During the Class Period, the Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products and funds by the U.S. mails and interstate wire facilities.

106.    The nature and pervasiveness of the scheme, which was orchestrated out of Wells Fargo's offices, necessarily required those offices to communicate directly and frequently with brokers by the U.S. mails and by interstate wire facilities.

107.    Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme. In addition, Plaintiffs can describe in detail telephone conversations and emails that were sent to them, via the wires, in furtherance of the scheme alleged herein. Plaintiffs describe this below.

108.    The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the scheme involved thousands of communications throughout the Class Period including telephone, email, and U.S. Mail communications to brokers regarding the blacklisting of the appraisers who

CLASS ACTION COMPLAINT                          - 22 -

010098-11 296864 V1

were suspended or removed from the approved appraiser list, or who were to be excluded from appraisal work for Wells Fargo and/or Rels Valuation. It involved the transmission by email and/or U.S. mail of appraisals prepared by appraisers who did not appear on the "suspended list." It also involved the use of telephone and email communications from Wells Fargo and Rels Valuation to Class members, including Plaintiffs, which were attempts to pressure appraisers to change the values in their appraisal reports. In addition to these RICO predicate acts, it was foreseeable to each Defendant that it would communicate with the brokers and appraisers by the U.S. mail and by interstate wire facilities. Further, each Defendant has, in furtherance of the scheme, communicated through use of the U.S. mail and by interstate wire facilities with their various local offices or divisions.

109.    In Plaintiffs' case Rels Valuation used the wires to effectuate the scheme. Use of telephone wires is an integral part of Rels Valuation's scheme of manipulating and controlling appraised values and real estate transactions. Rels Valuation communicates work orders to appraisers over the telephone. And when an appraiser's report does not produce the value Wells Fargo and Rels Valuation desire, Rels Valuation pressures appraisers to change their reports and increase values via email and over the telephone.

110.    For example, in Sound Appraisal's June 2007 appraisal report of the property in Enumclaw, Washington (described above), Mr. Pearsall received at least five to six telephone calls from three or four different Rels Valuation's employees demanding that he change his appraisal report. Initially Mr. Pearsall was contacted via telephone by a low-level Rels Valuation employee who asked him to make changes to his report. Mr. Pearsall refused and subsequently was contacted via telephone by a higher-ranking Rels Valuation employee who insisted that he make changes to the report. Again, Mr. Pearsall refused. This process continued and with each subsequent telephone call the ranking of the Rels Valuation employee increased and each caller demanded that he alter the report. Eventually Rels Valuation's area manager, Randy Pierzina, called Mr. Pearsall on the telephone, told Mr. Pearsall that he "took USPAP to [sic] seriously" and gave Mr. Pearsall an ultimatum: either alter the appraisal report or be suspended from Rels

1  Valuation approved appraiser list. In addition, Rels Valuation recently used the wires to confirm

2  the existence of the scheme as described above. (¶ 48.)

3      111.  According to Mr. Pearsall, this level and frequency of communication from Rels

4  Valuation employees over telephone wires was typical in the work orders Sound Appraisal

5  received from Wells Fargo and Rels.

6      112.  With respect to Plaintiff Savage Appraisals, on January 14, 2009, and January 15,

7  2009, Rels Valuation employees sent emails to Mr. Savage in furtherance of the scheme attempting

8  to pressure him to change his appraisal reports. (¶ 53.) In addition, via the interstate mails, Mr.

9  Savage received a letter dated February 5, 2009, from Rels Valuation informing him that he had

10  been removed from their approved appraiser list. (¶ 54.)

11  **C.    Conduct of the RICO Enterprises' Affairs**

12      113.  During the Class Period, the Defendants have exerted control over the Enterprises

13  and, in violation of Section 1962(c) of RICO, the Defendants have conducted or participated in the

14  conduct of the affairs of those RICO Enterprises, directly or indirectly by controlling which

15  appraisals it would accept to qualify a loan. The brokers accepted the Defendants' control over

16  appraiser choice so that the brokers would get the loan approved and receive their commission on

17  the origination of the loan. Rels Valuation followed Wells Fargo's overt or implied directives as to

18  which appraisers to target.

19      114.  The Enterprises had a hierarchical decision-making structure headed by Wells

20  Fargo. Wells Fargo incentivizes brokers to generate as many loans as possible regardless of

21  quality. Wells Fargo uses Rels Valuation to ensure that the appraisals meet the requirements

22  needed to complete the loan. Wells Fargo overtly or indirectly instructs Rels Valuation regarding

23  which appraisals it will or will not accept.

24  **D.    The Defendants' Pattern of Racketeering Activity**

25      115.  Each of the Defendants conducted and participated in the affairs of the above-

26  referenced Enterprises through a pattern of racketeering activity, including acts that are indictable

27  under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The

28  Defendants' pattern of racketeering likely involved thousands of separate instances of use of the

010098-11 296864 V1

1    U.S. mail or interstate wire facilities in furtherance of their scheme including, in particular, the

2    wire and mail communications set forth above directed to Sound Appraisals and Savage

3    Appraisals.  Each of these fraudulent mailings and interstate wire transmissions constitutes a

4    "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these

5    violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C.

6    § 1961(5), in which the Defendants intended to defraud Plaintiffs, the members of the Class and

7    other intended victims.

8           116.    The Defendants' racketeering activities amounted to a common course of conduct,

9    with similar pattern and purpose, intended to exclude impartial and objective appraisers, that is,

10   Plaintiffs and members of the Class.  Each separate use of the U.S. mail and/or interstate wire

11   facilities employed by the Defendants was related, had similar intended purposes, involved similar

12   participants and methods of execution, and had the same results affecting the same victims,

13   including Plaintiffs and members of the Class.  Each Defendant has engaged in the pattern of

14   racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprises.

15   **E.      Damages Caused by the Defendants' Scheme**

16          117.    The Defendants' violations of federal law and their pattern of racketeering activity

17   have directly and proximately caused Plaintiffs and members of the Class to be injured in their

18   business or property because Plaintiffs and members of the Class have lost a substantial amount of

19   business by being excluded from preparing appraisals on real estate transactions where Wells

20   Fargo is the lender or potential buyer of the contemplated loan.

21          118.    Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and

22   severally liable to Plaintiffs and members of the Class for three times the damages that Plaintiffs

23   and the Class members have sustained, plus the costs of bringing this suit, including reasonable

24   attorneys' fees.

25

26

27

28

## SECOND CAUSE OF ACTION

## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

119.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

120.    This cause of action, which alleges violations of the California Unfair Competition Law ("UCL"), Cal. Bus. and Prof. Code §§ 17200, *et seq.*, is asserted against the Defendants on behalf of the Class.

121.    Defendant Wells Fargo is headquartered in the State of California.  On information and belief, the actions and underlying decisions of Defendants, alleged herein emanated from and occurred within the State of California.  California law applies to the claims of Plaintiffs and all Class members because the State of California has an overriding interest in regulating the conduct of Defendants.  Wells Fargo planned and implemented their wrongful scheme in California and many of the wrongful acts emanated from Wells Fargo's California offices.

122.    Defendants' conduct described herein constitutes an unlawful business practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*, in that the conduct violates RICO and California law.  Specifically, as alleged herein, Defendants have:

   a.    Violated 18 U.S.C. § 1962(c) by conducting the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 18 U.S.C. § 1962(d).

   b.    Violated 12 C.F.R. § 33.44-45 by having appraisals prepared in violation of USPAP.

123.    Defendants violated the "unfair" and "unlawful" prongs of the UCL by engaging in the conduct set forth above, because the State of California has explicitly adopted the USPAP standards.  *See* Cal. Code Reg., Title 10, section 3701 ("Every holder of a license under this part shall conform to and observe the Uniform Standards of Professional Appraisal Practice (USPAP) and any subsequent amendments thereto as promulgated by the Appraisal Standards Board of The

CLASS ACTION COMPLAINT                                - 26 -

010098-11 296864 V1

1  Appraisal Foundation which standards are herein incorporated into these regulations by reference

2  as if fully set forth herein.").

3       124.    Plaintiffs and the Class members were injured by Defendants' conduct because

4  Plaintiffs and members of the Class have lost a substantial amount of business by being excluded

5  for preparing appraisals on real estate transactions where Wells Fargo is the lender or potential

6  buyer of the contemplated loan.

7       125.    Plaintiffs do not seek restitution for violation of the UCL. Instead, Plaintiffs seek

8  injunctive relief under Section 17203 of the California Business and Professions Code, which

9  provides that "any person who engages, has engaged, or proposes to engage in unfair competition

10  may be enjoined in any court of competent jurisdiction." Specifically, Plaintiffs seek an injunction

11  requiring Defendants to cease their wrongful conduct, as alleged above.

12  **THIRD CAUSE OF ACTION**

13  **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

14       126.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and

15  incorporate herein by reference each of the allegations contained in the preceding paragraphs of

16  this Complaint.

17       127.    This cause of action, which alleges interference with prospective economic

18  advantage, is asserted against the Defendants on behalf of the Class.

19       128.    California law applies to the claims of Plaintiffs and all Class members, because

20  Defendant Wells Fargo is headquarters in California. Defendants planned and implemented their

21  wrongful scheme in California, which thus has an overriding interest in regulating the conduct of

22  Defendants.

23       129.    Plaintiffs and all Class members have economic relationships with mortgage brokers

24  and mortgage lenders. Defendants knew about those relationships and intentionally and

25  successfully engaged in the conduct alleged in this Complaint for the purpose of disrupting those

26  relationships.      .

27       130.    Defendants' unlawful conduct has directly and proximately caused Plaintiffs and

28  members of the Class to be injured in their business or property because Plaintiffs and members of

the Class have lost a substantial amount of business by being excluded from preparing appraisals on real estate transactions where Wells Fargo is the lender or potential buyer of the contemplated loan.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.       Determining that this action is a proper class action and designating Plaintiffs as representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.       Awarding compensatory damages in favor of Plaintiffs and the Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding treble damages;

D.       Entering an injunction barring Defendants from engaging in the unlawful conduct alleged herein;

E.       Awarding Plaintiffs and the Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.       Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED:  April 14, 2009.

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
       JEFF D. FRIEDMAN

715 Hearst Ave., Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Steve W. Berman, WSBA #12536
Thomas E. Loeser, CBN 202724, WSBA #38701
Genessa Stout, WSBA #38410
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com
genessa@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*