Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Steve W. Berman
Thomas E. Loeser
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUND APPRAISAL and SAVAGE APPRAISAL SERVICES, INC., on behalf of themselves and all others similarly situated, | Case No. 4:09-cv-01630-CW |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO VALUATION INFORMATION TECHNOLOGY, LLC'S MOTION TO DISMISS** |
| vs. | |
| WELLS FARGO BANK N.A. and VALUATION INFORMATION TECHNOLOGY, LLC, d/b/a RELS VALUATION, | Date: September 17, 2009<br>Time: 2:00 p.m.<br>Courtroom: Courtroom 2, 4th Floor<br>Judge: Honorable Claudia Wilken |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .......................................................................................................... 1

II.   PLAINTIFFS' ALLEGATIONS ................................................................................... 1

      A.    Nature of the Action ........................................................................................ 1

      B.    The Parties ....................................................................................................... 3

      C.    Substantive Allegations ................................................................................... 4

            1.    The Appraisal Business ......................................................................... 4

            2.    Federal Law Requires Appraisal Independence .................................... 4

            3.    The Incentives for Mortgage Brokers and Lenders to Pressure
                  Appraisers ............................................................................................. 5

            4.    Wells Fargo ............................................................................................ 6

            5.    Wells Fargo and Rels Corrupt the Appraisal System ........................... 6

            6.    The Suspension of Honest Appraisers ................................................... 7

            7.    The Suspension or Blacklisting of Plaintiff Sound Appraisal ............... 8

            8.    The Suspension or Blacklisting of Plaintiff Savage Appraisal Services ........... 9

            9.    Examples of Other Appraisers Being Subject to Pressure and
                  Blacklisted .......................................................................................... 10

            10.   The Wells Fargo Brokerage Network .................................................. 11

III.  ARGUMENT .............................................................................................................. 12

      A.    Plaintiffs Adequately Allege that Defendants Violated RICO .................... 12

            1.    The Complaint Alleges Mail and Wire Fraud .................................... 12

            2.    The Complaint Satisfies Rule 9(b) ..................................................... 17

                  a.    Plaintiffs allege a pattern of mail and wire fraud with
                        particularity ............................................................................. 17

                  b.    Plaintiffs sufficiently allege a RICO conspiracy ..................... 18

      B.    Plaintiffs Adequately Allege Interference With Prospective Economic
            Advantage ...................................................................................................... 19

            1.    Plaintiffs allege a sufficient nexus with California ........................... 19

2.      Plaintiffs adequately allege interference with prospective economic advantage ........................................................................20

IV.      CONCLUSION ........................................................................................21

# TABLE OF AUTHORITIES

## CASES

Page

*Acciard v. Whitney*,
    2008 U.S. Dist. LEXIS 98131 (M.D. Fla. Dec. 4, 2008) .................................................. 14, 17

*In re Actimmune Mktg. Litig.*,
    614 F. Supp. 2d 1037 (N.D. Cal. 2009) .......................................................................... 18

*Aetna Casualty Sur. Co. v. P&B Autobody*,
    43 F.3d 1546 (1st Cir. 1994) ......................................................................................... 14

*Baumer v. Pachl*,
    8 F.3d 1341 (9th Cir. 1993) ........................................................................................... 18

*Bridge v. Phoenix Bond & Indem. Co.*,
    128 S. Ct. 2131 (2008) .............................................................................................. 15, 16

*Camarillo v. City of Maywood*,
    2008 U.S. Dist. LEXIS 85386 (C.D. Cal. Aug. 27, 2008) ............................................. 18

*Certain Underwriters at Lloyd's v. Real Estate Professionals Ins. Co.*,
    2007 U.S. Dist. LEXIS 88241 (C.D. Cal. Nov. 26, 2007) ............................................. 21

*Cutler v. Bank of America Nat'l Trust & Savings Ass'n*,
    441 F. Supp. 863 (N.D. Cal. 1977) ................................................................................ 20

*Diaz v. Gates*,
    420 F.3d 897 (9th Cir. 2005) ......................................................................................... 16

*Dooley v. Crab Boat Owners Ass'n*,
    2004 U.S. Dist. LEXIS 7117 (N.D. Cal. Apr. 16, 2004) ................................................ 18

*Fifty Assocs. v. Prudential Ins. Co.*,
    450 F.2d 1007 (9th Cir. 1971) ....................................................................................... 17

*First Magnus Fin. Corp. v. Star Equity Funding, L.L.C.*,
    2007 U.S. Dist. LEXIS 8109 (D. Kan. Feb. 2, 2007) ..................................................... 14

*Gray v. Upchurch*,
    2006 U.S. Dist. LEXIS  90184 (S.D. Miss. Dec. 13, 2006) ........................................... 14

*In re Jamster Mktg. Litig.*,
    2008 U.S. Dist. LEXIS 91096 (S.D. Cal. Nov. 10, 2008) .............................................. 20

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ....................................................................................... 18

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ................................................................................................. 21

*Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*,
    940 F.2d 397 (9th Cir. 1991) ......................................................................................... 15

*Marks v. City of Seattle*,
    2003 U.S. Dist. LEXIS 22426 (W.D. Wash. Oct. 16, 2003)................................................. 15

*Mazza v. Am. Honda Motor Co.*,
    254 F.R.D. 610 (C.D. Cal. 2008)................................................. 20

*McGhee v. Arabian Am. Oil Co.*,
    871 F.2d 1412 (9th Cir. 1989)................................................. 20

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002)................................................. 16

*Miller v. Yokohama Tire Corp.*,
    358 F.3d 616 (9th Cir. 2004)................................................. 17

*Newcal Indus. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008)................................................. 17, 18

*Oki Semiconductor Co. v. Wells Fargo Bank*,
    298 F.3d 768 (9th Cir 2002)................................................. 16, 18

*Parker v. Learn the Skills Corp.*,
    530 F. Supp. 2d 661 (D. Del. 2008) ................................................. 15

*Parkinson v. Hyundai Motor Am.*,
    2008 U.S. Dist. LEXIS 101098 (C.D. Cal. Dec. 12, 2008)................................................. 20

*United States v. Fullwood*,
    342 F.3d 409 (5th Cir. 2003) ................................................. 14

*United States v. Kohli*,
    110 F.3d 1475 (9th Cir. 1997) ................................................. 13

*United States v. Nguyen*,
    504 F.3d 561 (5th Cir. 2007) ................................................. 13

*United States v. Owens*,
    301 F.3d 521 (7th Cir. 2002) ................................................. 14

*United States v. Panza*,
    750 F.2d 1141 (2d Cir. 1984) ................................................. 14

*United States v. Suarez*,
    215 Fed. Appx. 872 (11th Cir. 2007) ................................................. 13

*Vieux v. E. Bay Reg'l Park Dist.*,
    906 F.2d 1330 (9th Cir. 1990) ................................................. 18

*Wagner v. Magellan Health Servs., Inc.*,
    125 F. Supp. 2d 302 (N.D. Ill. 2000)................................................. 15

*Washington Mut. Bank v. Superior Court*,
    24 Cal. 4th 906 (2001)................................................. 20

*Wershba v. Apple Computer, Inc.*,
     91 Cal. 4th 224 (2001) ........................................................................................... 19

**STATUTES**

12 C.F.R. § 34.44 ................................................................................................................ 5

12 C.F.R. § 34.45 ................................................................................................................ 5

12 U.S.C. §§ 3331, *et seq.* ................................................................................................. 5

Cal. Bus. & Prof. Code § 17200 *et seq* ............................................................................. 1

## I.   INTRODUCTION

To Wells Fargo, in its unfettered drive to originate as many loans as possible, an honest and independent property appraisal was a hindrance, not an essential underwriting tool.  So Wells Fargo spawned Valuation Information Technology, LLC, d/b/a Rels Valuation ("Rels") and, pursuant to a common scheme and plan, they (1) extracted valuation control and price concessions from appraisers who needed their business, and (2) forced out of the process honest appraisers who resisted their corruption of the appraisal process.  As part of this scheme, Defendants pressured appraisers to falsify appraisals.  Appraisers, like Plaintiffs, who refused to go along with the scheme were censured, *i.e.*, they were unable to get work from Wells Fargo or any of the brokers who conducted business with Wells Fargo.  Because Wells Fargo is one of the largest lenders in the country, the consequence of this Scheme is devastating.

The arguments in Rels's motion to dismiss ("Motion") regarding Plaintiffs' claims under RICO and for interference with prospective economic advantage are unavailing.[1]  As shown in this Opposition, Plaintiffs adequately allege that the fraudulent appraisal scheme conducted by Wells Fargo and Rels constitutes mail and wire fraud and, thus, violates RICO.  Further, Plaintiffs were proximately harmed by the RICO scheme, because they were blacklisted as a direct result of Defendants' refusal to hire appraisers who refuse to provide fraudulent appraisals.  Plaintiffs also state a valid claim for interference with prospective economic advantage based on their lost income as a result of being blacklisted by Defendants.

## II.   PLAINTIFFS' ALLEGATIONS[2]

### A.   Nature of the Action

The independence and integrity of the real estate appraisers who determine the value of home loan collateral is vitally important.  ¶ 1.[3]  Appraisals are intended to provide borrowers and

---

[1] Plaintiffs do not oppose dismissal of their claim for injunctive relief under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

[2] In order to avoid repetition by the Court, Plaintiffs note that this section is identical to the section entitled "Plaintiffs' Allegations" in Plaintiffs' memorandum in opposition to defendant Wells Fargo's motion to dismiss.

[3] All references to "¶" are to the Class Action Complaint in this action.

1    lenders with an independent and accurate assessment of the true value of the property underlying a

2    loan.  *Id.*  Federal and state laws exist to protect the integrity of the appraisal process so that

3    appraisers can provide borrowers and lenders with an independent and accurate assessment of the

4    value of a home.  Lenders are prohibited from pressuring appraisers into compromising their

5    independence and producing a report that is not based on the appraiser's objective opinion.  ¶ 2.

6    Wells Fargo's mortgage originations increased exponentially during the lending boom during 2000

7    – 2006.  The company incentivized employees to fund as many loans as quickly as possible.  ¶ 3.

8    Wells Fargo's top-performing employees were rewarded with all-expense-paid trips including

9    helicopter rides, wine-tasting, horseback riding in Puerto Rico, and a private Jimmy Buffet concert

10   in the Bahamas.  *Id.*

11         Subprime loans in particular have increased Wells Fargo's profits through increased interest

12   rates, increased origination fees and other fees, and through fees, commissions and profits earned

13   on the packaging of mortgage-backed securities that are at the heart of the financial woes now

14   plaguing our economy.  ¶ 4.

15         Rels is a joint venture between Wells Fargo Foothill (a subsidiary of Wells Fargo & Co.)

16   and First American Real Estate Solutions (a subsidiary of First American Corporation).  ¶ 18.  Rels

17   receives real estate settlement service referrals from Defendant Wells Fargo.  Historically, Wells

18   Fargo mortgage salespeople would select and refer their clients to individual appraisers with whom

19   such salespeople had pre-existing relationships.  In approximately 2004, instead of dealing with the

20   appraisers directly, Wells Fargo began routing appraisal requests exclusively through Rels, which

21   acted as an appraisal management company or "AMC."  ¶ 6.  As part of its corporate objective to

22   maximize market share and profits, Wells Fargo abandoned underwriting standards together with

23   Rels by engaging in a practice of pressuring and intimidating appraisers into using appraisal

24   techniques that produce appraisals that meet Wells Fargo's business objectives even if the use of

25   such appraisal techniques is improper and in violation of industry and regulatory standards.  ¶ 7.  If

26   appraisers fail to "play ball" as Wells Fargo demands, Wells Fargo, through Rels, removes the

27   appraiser from the list of approved appraisers, which essentially "blacklists" the appraiser.  *Id.*

28

1  Once an appraiser is blacklisted Wells Fargo and Rels will no longer request appraisals or accept

2  appraisals from these persons and companies.  *Id.*

3         In addition to Rels's refusal to use appraisers removed from their approved list, independent

4  loan mortgage brokers, who also select appraisers, may decline to select blacklisted appraisers if

5  Wells Fargo is the lender, since they do not want to order and have a borrower pay for an appraisal

6  that Wells Fargo will not accept.  ¶ 8.  Given Wells Fargo's enormous size and clout in the

7  mortgage market, blacklisted appraisers lose substantial revenue – all because they refused to

8  compromise their integrity and violate industry standards at Wells Fargo's insistence.  *Id.*  In

9  essence, being blacklisted by Wells Fargo is a serious economic blow for an appraiser who will not

10 do business the Wells Fargo way, *i.e.*, illegally.  *Id.*

11 **B.     The Parties**

12        Plaintiff Sound Appraisal is a sole proprietorship with its principal place of business in

13 Puyallup, Washington.  Sound Appraisal is in the business of providing real estate appraisals to

14 mortgage brokers and mortgage lenders.  ¶ 12.  Plaintiff Savage Appraisal Services, Inc., is an S

15 corporation with its principal place of business in Vail, Colorado.  Savage Appraisal Services, Inc.

16 is in the business of providing real estate appraisals to mortgage brokers and mortgage lenders.  ¶

17 13.

18        Defendant Wells Fargo Bank, N.A. is a national banking association chartered in Sioux

19 Falls, South Dakota.  It is headquartered in San Francisco, California.  ¶ 14.  Wells Fargo provides

20 residential mortgages through its division Wells Fargo Home Mortgage.  *Id.*  Wells Fargo is a

21 diversified financial services company that provides retail and business banking, insurance,

22 investments, mortgages, and consumer finance across the United States.  *Id.*  The company is one

23 of the top "cross-sellers" of financial services in the country, offering credit cards, personal loans,

24 wealth management services, and insurance.  *Id.*  Business-oriented services include commercial

25 banking services, lending, investment banking, venture capital, and equipment leasing.  *Id.*  Wells

26 Fargo is one of the leaders in the realm of online banking, having become the first major financial

27 services firm to offer Internet banking back in 1995.  *Id.*

28

The company's community banking operations serve nearly 11 million customers through more than 3,000 bank branches (or what the company calls "stores") in 23 states, most of which are in the western United States – Ohio being the easternmost state of operation. ¶ 16.  Wells Fargo Home Mortgage boasts it is the nation's number one originator and number two servicer of residential mortgages.  *Id*.  Wells Fargo has more than 1,200 home mortgage 'stores' and provides mortgage banking services in all 50 states.  *Id*.

Defendant Valuation Information Technology, LLC, d/b/a Rels Valuation, ("Rels") is an Iowa limited liability company headquartered in Minnetonka, Minnesota.  ¶ 18.  Valuation Information Technology, LLC is a joint venture between First American Real Estate Solutions, a subsidiary of First American Corporation, and Wells Fargo Foothill, a subsidiary of Wells Fargo & Co.  *Id*.  Valuation Information Technology, LLC is a provider of real estate settlement services including property appraisals.  *Id*.

## C.      Substantive Allegations

### 1.      The Appraisal Business

An appraiser is most commonly retained by a mortgage broker or mortgage lender in order to value the property that will be used as the collateral for the loan.  ¶ 19.  An appraiser's role is to provide an unbiased assessment of the property's value and to ensure this value actually reflects the estimated opinion of market value.  *Id*.  In principle, an accurate appraisal ensures that the loan is adequately collateralized in case the borrower defaults; an accurate appraisal is also necessary to determine whether the contemplated loan meets lender and/or governmental guidelines.  *Id*.

Appraisers either work "in house" as part of the broker's, lender's or AMC's own operations or work as independent contractors.  ¶ 22.  In the latter case, the appraiser builds a book of business by servicing as many mortgage brokers and lenders in a given geographic region as possible.  *Id*.  These brokers and lenders are the "lifeblood" of the independent appraiser's revenue. ¶ 23.  Without their business, an appraiser cannot operate.  *Id*.

### 2.      Federal Law Requires Appraisal Independence

Because of the importance of appraisals in the home-lending market, state and federal statutes and regulations require that appraisals be accurate and independent.  The Uniform

Standards of Professional Appraisal Practice ("USPAP"), incorporated into federal law, 12 C.F.R. § 34.44, require appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct). USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions." In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.

Federal law sets independence standards for appraisers involved in federally-regulated transactions. *See* 12 U.S.C. §§ 3331, *et seq.* The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45; Complaint, ¶ 25.

In 2005, federal regulators, including the Office of Thrift Supervision ("OTS"), published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." ¶ 26. With regard to appraisal independence, the document highlighted the importance of independence and condemned attempts to interfere therewith. *Id.*

### 3. The Incentives for Mortgage Brokers and Lenders to Pressure Appraisers

Traditionally, mortgage lenders held a substantial amount of the mortgage loans that they originated, which incentivized them to ensure that loans were adequately collateralized. ¶ 27. Over time, the mortgage industry landscape changed. ¶ 28. Rather than holding the mortgage loans, lenders now regularly sell them in the financial markets. *Id.* The loans are then pooled

1   together, securitized and sold to institutions and investors as mortgage-backed securities.  *Id.*

2   Today, the vast majority of mortgage loans are sold, leaving the original lender holding far fewer

3   mortgages in its portfolio.  *Id.*  The money that the lender receives for selling its mortgage loans is

4   then used to finance new mortgages, thereby increasing the lender's profits and aiding its stock

5   price.  *Id.*

6   **4.   Wells Fargo**

7   One of the biggest drivers in Wells Fargo Bank's steady growth is its mortgage business.  ¶

8   29.  In 2000, Wells Fargo earned $76.5 billion in mortgage originations and reported its focus was

9   increased efficiency, higher ancillary revenue, and new channels and partnerships.  *Id.*  Three years

10  later, Wells Fargo's earnings from mortgage originations ballooned to $470 billion.  *Id.*  Although

11  Wells Fargo's mortgage lending segment includes retail, wholesale, and correspondent lending,

12  Wells Fargo has relied more heavily on retail originations compared with other major lenders.  *Id.*

13  Wells Fargo has sourced loans through a vast network of thousands of contracted mortgage

14  brokers.  ¶ 30.

15  With the real estate boom of 2000-2006, the number of refinance and purchase transactions

16  in real estate increased significantly.  ¶ 31.  To service the drastic increase in transactions, the

17  number of real estate related service providers also grew tremendously.  *Id.*  For example, the

18  number of realtors in the United States grew from 750,000 in 2000 to over 1.3 million in 2007.  *Id.*

19  Likewise, Wells Fargo's fleet of corporate and affiliated mortgage brokers grew as did the number

20  of property appraisers.  *Id.*

21  **5.   Wells Fargo and Rels Corrupt the Appraisal System**

22  With the growing number of appraisers and increased competition in the appraisal

23  marketplace, the environment was ripe for a market force such as Wells Fargo to exert its will on

24  appraisers.  ¶ 32.  In 2004, Wells Fargo stopped dealing directly with appraisers and forced

25  "independent" appraisers to receive appraisal work from Wells Fargo through Wells Fargo's

26  affiliate Appraisal Management Company (AMC), ValueIT, an appraisal clearing-house that

27  contracts with independent appraisers to meet Wells Fargo's and other lenders' appraisal needs.  *Id.*

28  ValueIT eventually changed its name to Rels Valuation; and through Rels Valuation, Wells Fargo

1  is able to indirectly pressure the "independent" appraiser in order to get the value Wells Fargo

2  needs to fund the loan at issue.  *Id.*

3        Wells Fargo routes all of its Distributed Retail appraisal work, and nearly all of the

4  appraisal work for Wells Fargo's centralized retail, banking, home equity, and consumer credit

5  group units to Rels.  ¶ 33.

6        **6.**        **The Suspension of Honest Appraisers**

7        Part of Wells Fargo's scheme to increase market share and to make as many loans as

8  possible has involved the corruption of the appraisal process.  ¶ 34.  Wells Fargo needs appraisals

9  that support the loans it wishes to make, irrespective of the actual values of the properties being

10  appraised.  *Id.*

11        To accomplish this objective, Wells Fargo, directly and in conjunction with Rels, has

12  engaged in a pattern and practice of pressuring appraisers to write an appraisal designed to have the

13  loan underwritten even if the appraisal violates USPAP.  ¶ 35.  In other words, Wells Fargo is more

14  interested in having the property pass appraisal than it is in determining whether an appraisal is fair

15  and accurate and prepared in accordance with industry standards.  *Id.*

16        Wells Fargo and Rels utilize a host of indirect and underhanded methods to communicate to

17  the appraiser the value needed to fund the loan, and the value the appraiser is expected to "hit."

18  ¶ 36.  For example, Rels's appraisal order form indicates the "Borrower Estimated Value."  *Id.*

19  Appraisers know that this value reflects the value the appraiser is expected to meet or exceed in

20  their appraisal in order to "make the deal."  *Id.*  In some instances Wells Fargo and Rels also select

21  and provide appraisers with the comparables they want the appraiser to use.  *Id.*  As discussed

22  previously, part of the appraisal process involves an appraiser's review of recent property sales that

23  the appraiser believes are comparable to the property being studied, and these "comps" serve as

24  value benchmarks that aide the appraiser in determining the property's worth.  *Id.*  When Wells

25  Fargo and Rels provide the appraiser with the comps they want the appraiser to use, the appraiser's

26  integrity and independence is compromised.  *Id.*  The appraiser is thereby pressured to ensure that

27  the appraised value of the property in question matches the comps, even if the appraiser does not

28  independently believe the comps are in fact comparable.  *Id.*

1    If an appraiser does not "play ball" and produce a report affirming the property value or the

2    parameters that Wells Fargo expects or wants, Wells Fargo, through Rels, suspends the appraiser or

3    removes the appraiser from the list of preferred appraisers and, in essence, "blacklists" the

4    appraiser. ¶ 37.  The suspension list or blacklist is a Wells Fargo and Rels database containing the

5    names of appraisers who have been suspended or removed from the list of preferred appraisers

6    because their appraisals were not accepted by Wells Fargo, and thus were not accepted by Rels. ¶

7    38.

8    Rels is a "captive" puppet of Wells Fargo, either by virtue of partial ownership by a

9    common parent or economic power as its largest client. ¶ 39.  Rels describes itself as "lucky to

10   have our wagon hitched to the Wells Fargo stagecoach."  *Id*.  To this extent, Rels knows what

11   Wells Fargo wants to accomplish and, with its suspension list, Rels facilitates Wells Fargo's

12   scheme by attacking the appraisals of persons on the list and undercutting valuations, whether

13   warranted or not.  *Id*.

14       **7.       The Suspension or Blacklisting of Plaintiff Sound Appraisal**

15   Plaintiff Sound Appraisal is owned and operated by Mr. Don Pearsall.  ¶ 40.  Mr. Pearsall is

16   an appraiser licensed to serve all counties in Washington State.  *Id*.  In 1989, Mr. Pearsall began

17   working as an apprentice appraiser.  He received his appraisal license in 1992. ¶ 41.  Mr. Pearsall

18   began operating Sound Appraisal in 2001.  *Id*.

19   Sound Appraisal has historically conducted appraisals for area mortgage brokers and major

20   lenders such as Countrywide, Wells Fargo, Washington Mutual, and others.  ¶ 42.  Due to its

21   expertise and experience as an appraiser, Sound Appraisal often conducts "review appraisals" to

22   ensure that appraisal reports by other appraisers are accurate and in compliance with regulations.

23   *Id*.

24   In June 2007, Sound Appraisal received a request from Wells Fargo through Rels to

25   conduct an appraisal of a home in Enumclaw, Washington.  ¶ 43.  Mr. Pearsall, Sound Appraisal's

26   sole proprietor, visited the property and completed a Uniform Residential Appraisal Report.  *Id*.

27   After Sound Appraisal submitted the completed appraisal, Rels contacted Mr. Pearsall and

28   asked that he alter the Uniform Residential Appraisal Report he submitted to Rels.  ¶ 44.

1   Mr. Pearsall knew that under USPAP the appraisal report must reflect his independent opinion of

2   the property's value, and that altering the appraisal report to reflect Rels's desired views would

3   compromise his independence and would violate USPAP.  *Id*.  Thus, Mr. Pearsall refused to alter

4   the report.  *Id*.

5          Rels lambasted Mr. Pearsall for his adherence to USPAP and his refusal to alter the report.

6   ¶ 45.  Randall Pierzina, Rels's area manager, criticized Mr. Pearsall and told him that he "took

7   USPAP too seriously" and that he was going to "kill the deal."  *Id*.  Despite the pressure to

8   succumb to Wells Fargo's and Rels's wishes and "play ball," Mr. Pearsall refused.  *Id*.

9          Prior to this 2007 incident, approximately 25-35% of Sound Appraisal's business came

10  from Wells Fargo and Rels.  ¶ 46.  After this incident, Sound Appraisal no longer received

11  appraisal requests from Rels.  *Id*.  In 2006, Sound Appraisal's income from Rels was $33,395.  In

12  2008, Sound Appraisal's income from Rels was $0.  *Id*.

13         Eventually Mr. Pearsall contacted Rels and inquired about the lack of work Sound

14  Appraisal received from Rels.  ¶ 47.  Randall Pierzina informed Mr. Pearsall that he had been

15  suspended and was no longer an approved appraiser for Rels.  *Id*.

16         On April 8, 2009, Mr. Pearsall received a work order request via telephone from Rels that

17  confirmed the existence of the blacklist.  ¶ 48.  The conversation was as follows:

18                 Pearsall:        "I would love to take the job, but aren't I on your
                                   blacklist?"
19
                   Rels employee:  Oh, let me check.  (Puts Pearsall on hold.)
20
                   Rels employee:  (after checking)  I'm sorry.  I wasn't supposed to
21                                 contact you.

22                 End of call.

23  *Id*.  The employee thus confirmed the existence of the blacklist.  ¶ 49.

24         **8.     The Suspension or Blacklisting of Plaintiff Savage Appraisal Services**

25         The owner and President of Savage Appraisal is Timothy W. Savage.  ¶ 50.  He has been a

26  highly respected real estate appraiser in Vail, Colorado for 18 years.  *Id*.  Savage Appraisal worked

27  on Rels orders for over 12 years.  ¶ 51.

28

In January of 2009, Savage Appraisals performed two appraisal assignments for Rels.  ¶ 52. After the appraisals were delivered, Rels sent emails, pressuring Mr. Savage to increase the value of each appraisal as the homeowners were not happy with his opinion of value.  *Id.*

On January 15, 2009, Donna Londrem, a "Collateral Compliance Reviewer" for Rels sent Mr. Savage an email purporting to provide information to "support an increased valuation" for property at 993 Lionsridge Loop 322, Vail, Colorado.  ¶ 53.  On January 14, 2009, Emlee Becker, a "Collateral Compliance Reviewer" for Rels sent an email to Mr. Savage purporting to provide information "to support an increased value" of property at 945 Sandstone Road, Vail, Colorado. *Id.*  On both occasions Mr. Savage reviewed the materials provided to determine whether, under USPAP, an increased valuation was appropriate.  *Id.*  After a lengthy letter of explanation, Mr. Savage refused to increase his original opinion of value for the two homes at issue.  *Id.*

The next time Mr. Savage heard from Rels, via a letter dated February 5, 2009, was to inform him that he had been removed from their approved panel of appraisers.  ¶ 54.  No further explanation was given.  *Id.*  Mr. Savage tried several times, unsuccessfully, to get a detailed response from Rels as to why he was placed on their blacklist.  ¶ 55.  He has lost and will continue to lose income as a direct result of being blacklisted.  *Id.*

**9.     Examples of Other Appraisers Being Subject to Pressure and Blacklisted**

The Complaint sets forth nine statements by confidential witnesses from various States, showing how Rels has treated appraisers who would not succumb to Rels's pressure to violate USPAP.  ¶¶ 56-65.  For example, one appraiser stated that "[o]ur company, & one appraiser in particular, has been 'blacklisted' from RELS because we refused to 'reconsider' values (hit their numbers) & requested fair fees."  ¶ 57.  *See also* ¶ 58 ("I was blacklisted by Rels by an individual by the name of Matt Nelsen.  He was trying to influence my value estimate."); ¶ 59 ("I worked for RELS for approximately 11 years.  I quit a couple of years ago due to the growing pressure to inflate values."); ¶ 61 ("About a year ago, I was pressured to evaluate my appraisal for a higher value that the customer of Wells Fargo thought should be higher.  This happened several times.  I checked the box that said that I had been pressured and I have not heard from them since."); ¶ 62 ("I am sure we are on that black list in Illinois, when we refused to do drive bys with values placed

on the orders for refinance not purchases."); ¶ 63 ("I have done a large number of appraisals for Wells Fargo/RELS in the past. I was blacklisted (or taken off the upper tier of appraisal vendors) for not succumbing to a Wells Fargo Branch Manager request for a higher value on a refinance loan."); ¶ 64 ("I had previous[ly] performed FHA and conventional appraisals for RELS approximately 2 years ago.  However, I ended the relationship after being threaten[ed] by my account representative.  This young lady told me I had to do what RELS and the loan officer said or I would not be paid.").

### 10.    The Wells Fargo Brokerage Network

Wells Fargo has a network of contracted mortgage brokers that participate in their Broker's First® program and complete home mortgage loans through Wells Fargo.  ¶ 66.  Brokers become authorized as Wells Fargo Approved Brokers by submitting a mortgage broker application package and entering into a broker agreement with Wells Fargo.  *Id*.  These contracted brokers are provided access to Wells Fargo's Broker's First® and Direct Express$^{SM}$ computer systems, which are designed to allow the mortgage broker to submit loan information and receive qualified loan decisions and instant feedback on first mortgages, piggyback submissions, or home equity decisions.  *Id*.

Wells Fargo's Real Estate Settlement Service, RES Direct, manages, *inter alia*, the process of approving brokers.  ¶ 67.  Under the Real Estate Settlement Procedures Act (RESPA), settlement service providers are prohibited from requiring the use of other settlement service providers in order to ensure that conflicts of interest and backroom deals do not drive up settlement costs or corrupt the home purchase process.  *Id*.  However, RESPA has an exception that specifically allows lenders to require the use of a particular appraiser.  *Id*.  Cognizant of this loophole, RES Direct pressures the brokers to use Rels for their appraisal needs or causes brokers to use Rels by default. *Id*.  Wells Fargo's pressure of independent mortgage brokers to use Rels for their appraisal needs furthers Wells Fargo's scheme to manipulate the appraisal process to advance Wells Fargo's financial goals.  *Id*.  Rels has confirmed that "Rels Valuation, under direction from Wells Fargo, does NOT allow the broker any choice, recommendation, etc. in selecting who will appraise their property."  *Id*.

1   Wells Fargo needs its network of authorized brokers knowingly or unknowingly complicit

2   in their scheme with Rels to pressure appraisers to inflate property values and maximize profits

3   from the loan.  ¶ 68.  A broker, who never holds the loan after funding, has no incentive to ensure

4   that the appraisal is an accurate assessment of the property's true market value, he or she just wants

5   the deal to close.  *Id.*

6   The process of securitizing loans and selling them to the secondary market changed the

7   mortgage industry and has diminished the broker's and the lender's incentive to ensure the

8   appraisal backing the loan is accurate.  ¶ 69.  Because lenders' profits are determined by the

9   quantity of loans that they successfully close, and not the quality of those loans, the lender has an

10  incentive to pressure appraisers to reach values that will allow the loan to close – without regard to

11  whether the appraisal accurately reflects the home's actual value.  *Id.*  Likewise, the independent

12  broker is not tied to a particular lender, but instead has relationships with multiple lenders and

13  seeks to comply with the lender's wishes and conditions in order to service clients and maximize

14  their profits.  *Id.*

### III.   ARGUMENT

**A.   Plaintiffs Adequately Allege that Defendants Violated RICO**

**1.   The Complaint Alleges Mail and Wire Fraud**

18  Rels misapprehends Plaintiffs' RICO claim when it erroneously argues that "[n]othing

19  alleged in Plaintiffs' Complaint constitutes 'fraud,' even under the most liberal definition."  *See*

20  Motion at 12.  That argument ignores the numerous allegations throughout the Complaint that Rels

21  and Wells Fargo utilized fraudulent appraisals to carry out their scheme.  For example, Plaintiffs

22  allege:

23   • Part of Wells Fargo's scheme to increase market share and to make as many loans

24   as possible has involved the corruption of the appraisal process.  Wells Fargo needs

25   appraisals that support the loans it wishes to make, irrespective of the actual values

26   of the properties being appraised.  ¶ 34.

27   • To accomplish this objective, Wells Fargo, directly and in conjunction with Rels,

28   has engaged in a pattern and practice of pressuring appraisers to write an appraisal

designed to have the loan underwritten even if the appraisal violates USPAP.  In other words, Wells Fargo is more interested in having the property pass appraisal than it is in determining whether an appraisal is fair and accurate and prepared in accordance with industry standards.  ¶ 35.

- Wells Fargo and Rels utilize a host of indirect and underhanded methods to communicate to the appraiser the value needed to fund the loan, and the value the appraiser is expected to "hit."   For example, Rels's appraisal order form indicates the "Borrower Estimated Value."   Appraisers know that this value reflects the value the appraiser is expected to meet or exceed in their appraisal in order to "make the deal." ¶ 36.

- The process of securitizing loans and selling them to the secondary market changed the mortgage industry and has diminished the broker's and the lender's incentive to ensure the appraisal backing the loan is accurate.  Because lenders' profits are determined by the quantity of loans that they successfully close, and not the quality of those loans, the lender has an incentive to pressure appraisers to reach values that will allow the loan to close – without regard to whether the appraisal accurately reflects the home's actual value.  ¶ 69.

Moreover, fraudulent appraisals constitute mail and wire fraud, which are predicate acts for RICO claims.  *See United States v. Kohli*, 110 F.3d 1475, 1476 (9th Cir. 1997) (defendants pled guilty to fraudulently inducing home sales by, among other things, "fraudulently inducing lenders to make loans on the properties after inflated appraisals").  *See also United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007) (affirming conviction for mail fraud based on false representations, because "a rational jury could find beyond a reasonable doubt that Myna knew that the sales prices and loan amounts for the Fox Hunt and Silvercrest properties stemmed from false appraisals"); *United States v. Suarez*, 215 Fed. Appx. 872, 874 (11th Cir. 2007) (affirming mail fraud conviction where the "jury found that Suarez prepared fraudulent appraisals as part of an illegal land-flip

1   scheme");[4] *United States v. Fullwood*, 342 F.3d 409 (5th Cir. 2003); *United States v. Owens*, 301

2   F.3d 521, 528 (7th Cir. 2002) (affirming conviction for scheme that relied on fraudulent appraisals,

3   where the "jury's conclusion that Owens had an intent to defraud is also supported by the abundant

4   evidence that Owens received 'kickbacks' for his artificially-inflated appraisals").

5        Indeed, courts have sustained RICO claims based on fraudulent appraisals, which violate

6   the mail fraud statute.  For example, in *Acciard v. Whitney*, 2008 U.S. Dist. Lexis 98131, *10

7   (M.D. Fla. Dec. 4, 2008), the plaintiffs sued the defendants under RICO for fraudulent sale of real

8   estate, basing their claims in part on defendants' use of a "fraudulent appraisal value for the

9   property."  The defendants argued that the plaintiffs failed to allege fraud with particularity, but the

10  court disagreed:

11               Plaintiffs have identified the false statements that were made--the
             fraudulent appraisal values. Plaintiffs allege that United Mortgage,
12           which is alleged to be an agent of First Community Bank, provided
             loan documents to Plaintiffs containing the fraudulent appraisals.
13           Plaintiffs also allege that the Lenders, which include First
             Community Bank, knowingly utilized the fraudulent appraisal and
14           that the fraudulent appraisals and financing were key to the
             fraudulent scheme.  Accordingly, the Court finds that Plaintiffs meet
15           the particularity requirements for pleading fraud in this case.

16  *Id.* at *15-16.  In denying the motion to dismiss the RICO claim, the court further explained that

17  "Plaintiffs allege that Huron coerced or attempted to coerce Plaintiffs to close on permanent finan-

18  cing based on fraudulent appraisal values in order to further the fraudulent scheme."  *Id.* at *34.

19  Thus, the fraudulent appraisals constituted the fraud necessary to support the RICO claim.  *See also*

20  *Aetna Casualty Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994) (scheme to defraud

21  insurance company by submission of "fraudulent appraisals" constituted mail fraud and supported

22  jury verdict that defendants violated RICO); *United States v. Panza*, 750 F.2d 1141, 1147 (2d Cir.

23  1984) (affirming RICO convictions for scheme that used "fraudulent appraisals"); *First Magnus*

24  *Fin. Corp. v. Star Equity Funding, L.L.C.*, 2007 U.S. Dist. Lexis 8109, *14 (D. Kan. Feb. 2, 2007)

25  (denying motion to dismiss RICO claim where defendant "directed the loan officers to obtain

26  appraisals at pre-determined, inflated values"); *Gray v. Upchurch*, 2006 U.S. Dist. Lexis 90184,

27

28       [4] This unpublished case was decided in 2007 and, thus, may be cited.  *See* Fed. R. App. P. 32.1.

1    *15 (S.D. Miss. Dec. 13, 2006) (denying motion to dismiss RICO claim where complaint set forth

2    "the appraisal fraud and the HUD-1 fraud allegedly perpetrated" by the defendants).[5]

3           Further, there is no merit to Rels's argument that Plaintiffs have failed to "allege any facts

4    which would support their conclusory claim that they were defrauded by Rels…." *See* Motion at

5    12.  Plaintiffs need not show that they relied on fraudulent statements.  In *Bridge v. Phoenix Bond

6    & Indem. Co.*, 128 S. Ct. 2131, 2138-39 (2008), the Supreme Court stated:

7              Using the mail to execute or attempt to execute a scheme to defraud
               is indictable as mail fraud, and hence a predicate act of racketeering
8              under RICO, even if no one relied on any misrepresentation.  *See*
               *Neder v. United States*, 527 U.S. 1, 24-25, 119 S. Ct. 1827, 144 L.
9              Ed. 2d 35 (1999) ("The common-law requirement[t] of 'justifiable
               reliance' … plainly ha[s] no place in the [mail, wire, or bank] fraud
10             statutes").  And one can conduct the affairs of a qualifying enterprise
               through a pattern of such acts without anyone relying on a fraudulent
11             misrepresentation.

12   The Court also stated that "it is difficult to derive a first-party reliance requirement from § 1964(c),

13   which states simply that '[a]ny person injured in his business or property by reason of a violation

14   of section 1962' may sue for treble damages.  The statute provides a right of action to '[a]ny

15   person' injured by the violation, suggesting a breadth of coverage not easily reconciled with an

16   implicit requirement that the plaintiff show reliance in addition to injury in his business or

17   property." *Id.* at 2139.  Moreover, the Court stated, "Having rejected petitioners' argument that

18   reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that

19   argument in through the back door by holding that the proximate-cause analysis under RICO must

20   precisely track the proximate-cause analysis of a common-law fraud claim." *Id.* at 2142.  Thus,

21   Plaintiffs are not required to allege their reliance on fraudulent statements.

---

[5] The cases cited by Rels are inapposite, because none involved a scheme involving fraudulent
appraisals (or another scheme to defraud) that caused the plaintiff to lose business.  *See Lancaster
Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991) (no RICO fraud
claim where plaintiffs only alleged misappropriation of funds and kickbacks); *Wagner v. Magellan
Health Servs., Inc.*, 125 F. Supp. 2d 302, 307 (N.D. Ill. 2000) ("There was no scheme to defraud
alleged because the statements in question either could not be construed to be attempts to get
something of monetary value, or to be made in furtherance of such a scheme, or were not in fact
false."); *Parker v. Learn the Skills Corp.*, 530 F. Supp. 2d 661, 679 (D. Del. 2008) ("[P]laintiff has
not alleged he has suffered an injury to his business or property sufficient to confer RICO standing.
Indeed, plaintiff merely parrots the RICO statute in an effort to state a claim."); *Marks v. City of
Seattle*, 2003 U.S. Dist. Lexis 22426 (W.D. Wash. Oct. 16, 2003) (invasion of privacy and
defamation are not criminal wrongs of the sort contained in § 1961).

Moreover, there is no merit to Rels's cursory argument that Plaintiffs have failed to allege proximate causation under RICO.  *See* Motion at 12-13.  In *Diaz v. Gates*, 420 F.3d 897, 901 (9th Cir. 2005) (en banc), the Court explained the standards for proximate causation under RICO:

> The only requirement for RICO standing is that one be a 'person injured in his business or property by reason of a violation of section 1962.'  18 U.S.C. § 1964(c).  And the Supreme Court has already told us that 'by reason of' incorporates a proximate cause standard, *see Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992), which is generous enough to include the unintended, though foreseeable, consequences of RICO predicate acts ….

Moreover, the Court stated that there is "no room in the statutory language for an additional, amorphous requirement that, for an injury to be to business or property, the business or property interest have been the 'direct target' of the predicate act."  *Id*.  Thus, if a plaintiff "properly alleges that his injuries were 'by reason of a violation of section 1962,' there is nothing to prevent him from 'suing therefor.'  *See* 18 U.S.C. § 1964(c)."  *Id*. at 902.  *See also Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 773 (9th Cir 2002) (the injurious RICO conduct need only be "a substantial factor in the sequence of responsible causation") (internal quotation omitted).

Under those standards, Plaintiffs adequately allege proximate causation, because the harm they suffered was an integral part of the Defendants' wrongdoing.  In *Bridge*, if the defendants had not engaged in mail fraud, the plaintiffs would have obtained the opportunity to acquire valuable liens.  *See* 128 S. Ct. at 2138 ("[R]espondents lost the opportunity to acquire valuable liens. Accordingly, respondents were injured in their business or property by reason of petitioners' violation of § 1962(c)) ….").  Similarly, blacklisting appraisers who would not agree to participate in their fraudulent appraisal scheme caused the blacklisted appraisers to lose the opportunity to conduct honest appraisals for Defendants and others.  Thus, the proximate cause is straightforward – Defendants refused to deal with Plaintiffs solely because Plaintiffs would not falsify their appraisal reports in support of Defendants' scheme.  If Defendants had not hatched and carried out their scheme, Plaintiffs would have continued to receive business from them.  *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 n.4 (9th Cir. 2002) (a class of agricultural laborers who alleged that their employers had depressed their wages by illegally hiring undocumented workers at

below-market wages adequately alleged proximate cause by claiming an injury to their "legal

entitlement to business relations unhampered by schemes prohibited by the RICO predicate

statutes").

**2.      The Complaint Satisfies Rule 9(b)**

**a.      Plaintiffs allege a pattern of mail and wire fraud with particularity**

Contrary to Rels's argument, *see* Motion at 8-10, the Complaint alleges a pattern of mail

and wire fraud.  Rels's argument overlooks Plaintiffs' allegations that Defendants' scheme rested

on fraudulent appraisals.  As a result, Rels makes no argument whatsoever that Plaintiffs have not

met the standards of Rule 9(b) in explaining the nature of and Defendants' use of the fraudulent

appraisals that lie at the heart of this case.  *See Acciard*, 2008 U.S. Dist. Lexis 98131, at *15

(denying motion to dismiss RICO claim where "[p]laintiffs have identified the false statements that

were made–the fraudulent appraisal values").  *See also Newcal Indus. v. Ikon Office Solution*, 513

F.3d 1038, 1056 (9th Cir. 2008) ("IKON asserts that Newcal failed to identify the false statements

of fact that give rise to the fraud allegation. We disagree. [¶] Newcal alleged several forms of

misrepresentation and deception in which IKON purportedly engaged…. These allegations are

sufficient to satisfy Rule 9(b).").

Further, Rels erroneously asserts that "communications concerning matters of opinion as to

value cannot be actionable as fraud."  Motion at 10.  The cases cited by Rels do not support that

argument.  In *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004), the Ninth Circuit

explained that "where a misrepresentation of law is only one of opinion, rather than one that

includes a misrepresentation of fact, the recipient can only justifiably rely on it to the extent that he

can justifiably rely on other opinions."  That holding does not remotely support Rels's argument

that fraudulent appraisals are not actionable as fraud.  Similarly, Rels's argument is not supported

by its citation to *Fifty Assocs. v. Prudential Ins. Co.*, 450 F.2d 1007, 1011 (9th Cir. 1971), in which

the Court explained that "an expression of opinion can be treated as a representation of fact when it

is propounded by an expert."  Rels cannot seriously contend that it is *not* an expert in appraising

value.  Thus, that Ninth Circuit decision undermines its argument.

1

### b.   Plaintiffs sufficiently allege a RICO conspiracy

2      Rels erroneously contends that "Plaintiffs merely state the legal conclusion that Defendants

3   'engaged in a conspiracy in violation of 1962(d).' (Compl., ¶ 87.)" *See* Motion at 10. "Proof of

4   an agreement which is a substantive violation of RICO (such as conducting the affairs of an enter-

5   prise through a pattern of racketeering) is sufficient to establish a violation of section 1962(d). It is

6   only when proof of such an objective is lacking that the evidence must establish the defendant's

7   participation or agreement to participate in two predicate offenses." *Baumer v. Pachl*, 8 F.3d 1341,

8   1346 (9th Cir. 1993). *See also Dooley v. Crab Boat Owners Ass'n*, 2004 U.S. Dist. Lexis 7117,

9   *31 (N.D. Cal. Apr. 16, 2004) ("For purposes of conspiracy liability, a plaintiff is not required to

10  show that each defendant agreed to commit two predicate acts. [Citations omitted.] Rather, the

11  defendant 'must have been aware of the essential nature and scope of the criminal enterprise and

12  intended to participate in it.' *Howard v. America Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000)

13  (citing *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)) (internal quotation marks omitted).").

14      The Complaint alleges a conspiracy under either of those standards. First, as explained

15  above, Plaintiffs allege a substantive violation of RICO in that Rels and Wells Fargo conducted an

16  enterprise through a pattern of racketeering. Second and alternatively, Plaintiffs adequately allege

17  both defendants' participation in or agreement to participate in two or more predicate offenses,

18  based on their blacklisting of both Plaintiffs in support of their fraudulent scheme. *See Newcal*,

19  513 F.3d at 1056 ("[T]he complaint specifically alleges that GE, which bought and enforced some

20  flexed IKON contracts, knew about the fraud and actively profited from the fraud. Because GE

21  allegedly knew about the fraud, participated in gathering profits from the fraud, and did, in fact,

22  profit from the fraud, its specific intent can be inferred. These allegations are sufficient to satisfy

23  Rule 9(b)."); *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774-75 (9th Cir. 2002)

24  ("The illegal agreement [under § 1962(d)] need not be express as long as its existence can be

25  inferred from the words, actions, or interdependence of activities and persons involved.").[6]

26  _____

27      [6] The cases cited by Rels are inapposite. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048
    (9th Cir. 2008) ("Appellants failed to plead any evidentiary facts beyond parallel conduct to prove
    their allegation of a conspiracy [under section 1 of the Sherman Act]."); *Vieux v. E. Bay Reg'l Park
28  Dist.*, 906 F.2d 1330 (9th Cir. 1990) (summary judgment entered on section 1983 claim where

**B.      Plaintiffs Adequately Allege Interference With Prospective Economic Advantage**

There is no merit to Rels's argument that Plaintiffs have failed to allege a claim for interference with prospective economic advantage. *See* Motion at 18-20.

**1.      Plaintiffs allege a sufficient nexus with California**

Rels incorrectly asserts that Plaintiffs fail to allege a sufficient nexus with California in order for California law to apply. *See id.* at 18-19. To the contrary, Plaintiffs allege:

> Defendant Wells Fargo is headquartered in the State of California. On information and belief, the actions and underlying decisions of Defendants, alleged herein emanated from and occurred within the State of California. California law applies to the claims of Plaintiffs and all Class members because the State of California has an over-riding interest in regulating the conduct of Defendants. Wells Fargo planned and implemented their wrongful scheme in California and many of the wrongful acts emanated from Wells Fargo's California offices.

Complaint, ¶ 121. Thus, Plaintiffs allege not only that Wells Fargo has its headquarters in California but also that the scheme originated there.

These allegations suffice at the pleading stage. In *Wershba v. Apple Computer, Inc.*, 91 Cal. 4th 224 (2001), the trial court certified a nationwide class that challenged the defendant's withdrawal of free technical support. The Court of Appeal affirmed certification of the nationwide class. The Court explained that "a California court may properly apply the same California statutes at issue here to non-California members of a nationwide class where the defendant is a California corporation and some or all of the challenged conduct emanates from California." *Id.* at 243. The Court held that the trial court did not err in certifying a nationwide class, because the defendant's principal place of business was in California, brochures promising free telephone support were prepared in California, substantial numbers of class members resided in California and the change

---

plaintiffs failed to present sufficient evidence of conspiracy); *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009) (dismissing complaint for failure to please RICO causation, not for failure to plead conspiracy); *Camarillo v. City of Maywood*, 2008 U.S. Dist. Lexis 85386, at *8 (C.D. Cal. Aug. 27, 2008) ("All of Plaintiff's factual allegations capable of supporting a racketeering activity arise from a single incident occurring on May 28, 2005.").

Further, there is no merit to Rels's assertion that the § 1962(d) claim fails because Plaintiffs "do not even identify Defendants' alleged co-conspirators, referring instead to unidentified brokers." *See* Motion at 11. Plaintiffs need not identify the brokers, because they sufficiently allege a conspiracy between Wells Fargo and Rels.

of policy was made at the defendant's headquarters in California. *See also Parkinson v. Hyundai Motor Am.*, 2008 U.S. Dist. Lexis 101098, *48 (C.D. Cal. Dec. 12, 2008) (applying California law to class claims, where "Plaintiffs allege that the wrongful acts underlying those claims emanated from defendant's California headquarters"); *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 620 (C.D. Cal. 2008) (applying California law to nationwide class where "Defendant's allegedly deceptive practices originate in, and emanate from, California").

The cases cited by Rels are inapposite. In *In re Jamster Mktg. Litig.*, 2008 U.S. Dist. Lexis 91096 (S.D. Cal. Nov. 10, 2008), there was no evidence that the wrongful conduct originated in California. The other two cases cited by Rels are similarly off point. *See McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1424 (9th Cir. 1989) ("The plaintiffs point out that one of Aramco's four shareholders, Chevron, has its headquarters in California and that Aramco has regularly recruited Californians for its foreign work force. Plaintiffs have not alleged, however, that Chevron or Aramco's recruitment subsidiary played any direct role in defaming or traumatizing them."); *Cutler v. Bank of America Nat'l Trust & Savings Ass'n*, 441 F. Supp. 863 (N.D. Cal. 1977) (plaintiff claimed only that defendant's headquarters were in California, not that the wrongful conduct originated in California).

Rels's argument must be rejected for an additional reason – Rels fails to establish any conflict between California law and any other State's law. As the California Supreme Court has explained, "Under the first step of the governmental interest approach, the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California. The fact that two or more states are involved does not in itself indicate there is a conflict of laws problem." *Washington Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 919-20 (2001). Thus, Rels's argument lacks merit because of its failure to identify any conflict.

### 2.    Plaintiffs adequately allege interference with prospective economic advantage

Rels erroneously asserts that Plaintiffs fail to identify "any specific business relationship with a third party that Rels Valuation disrupted." *See* Motion at 20. To the contrary, Plaintiffs specify that Defendants' fraudulent scheme made it impossible for blacklisted appraisers such as

themselves to obtain appraisal work from any mortgage lender where Wells Fargo is the lender. *See* Complaint, ¶¶ 8, 126-130.  Indeed, the very purpose of blacklisting Plaintiffs is to prevent them from obtaining such business so as to serve Defendants' fraudulent scheme.  Moreover, Defendants knew about their relationships with such brokers based on their history with Plaintiffs, and specifically schemed to prevent Plaintiffs from obtaining such business.  These allegations accord with *Certain Underwriters at Lloyd's v. Real Estate Professionals Ins. Co.*, 2007 U.S. Dist. Lexis 88241, at *20-23 (C.D. Cal. Nov. 26, 2007) (cited by Rels), where the court held that the plaintiff had established the defendants' awareness of his relationships with insureds, on whose behalf the defendants had sought plaintiff's legal services but not with respect to his other relationships in the real estate, mortgage and home industry.  *See also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (plaintiffs must allege the "*probability* of future economic benefit to the plaintiff" from third-party relationships) (emphasis added).

Moreover, there is no merit to Rels's argument that Plaintiffs have failed to allege conduct that is independently wrongful.  *See* Motion at 21-22.  In *Korea Supply*, the Supreme Court explained that an "act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  29 Cal. 4th at 1159.  Here, the wrongful conduct is not only the RICO violations but also the violations of USPAP, which have been adopted by California through regulations.  *See* Cal. Code Reg., Title 10, section 3701 ("Every holder of a license under this part shall conform to and observe the Uniform Standards of Professional Appraisal Practice (USPAP) and any subsequent amendments thereto as promulgated by the Appraisal Standards Board of The Appraisal Foundation which standards are herein incorporated into these regulations by reference as if fully set forth herein.").  As a result, Plaintiffs have adequately alleged conduct that is independently wrongful.

## IV.   CONCLUSION

The motion to dismiss should be denied.[7]

---

[7] If the Court dismisses any claim other than the claim under California's Unfair Competiton Law, Plaintiffs request leave to amend the Complaint.

1       DATED: August 10, 2009

2                                   Jeff D. Friedman (SBN 173886)

3                                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                     715 Hearst Ave., Suite 202

4                                   Berkeley, CA  94710
                                   Telephone:  (510) 725-3000

5                                   Facsimile:  (510) 725-3001
                                   jefff@hbsslaw.com

6                                   HAGENS BERMAN SOBOL SHAPIRO LLP

7

8                                   By:  _s/ Steve W. Berman_____
                                     Steve W. Berman (*pro hac vice*)

9                                     Thomas E. Loeser (SBN 202724)
                                     Genessa Stout

10                                 1301 Fifth Avenue, Suite 2900
                                 Seattle, Washington  98101

11                                 Telephone:  (206) 623-7292
                                 Facsimile:  (206) 623-0594

12                                 steve@hbsslaw.com
                                 toml@hbsslaw.com

13                                 genessa@hbsslaw.com

14                                 *Attorneys for Plaintiffs and the Proposed Class*

1

2

## CERTIFICATE OF SERVICE

3        I hereby certify that on August 10, 2009, I electronically filed the foregoing with the Clerk

4   of the Court using the CM/ECF system which will send notification of such filing to the e-mail

5   addresses registered, as denoted on the Electronic Mail Notice List.

6                                    HAGENS BERMAN SOBOL SHAPIRO LLP

7                                    By:  _s/ Steve W. Berman_____

8                                          Steve W. Berman (*pro hac vice*)

9   **Electronic Mail Notice List**

10  • **Gayle M. Athanacio**
       gathanacio@sonnenschein.com

11  • **Steve W. Berman**
       steve@hbsslaw.com

12  • **Brooks Russell Brown**
       bbrown@goodwinprocter.com

13  • **Elizabeth Ferrick**
       eferrick@sonnenschein.com

14  • **Jeff D Friedman**
       jefff@hbsslaw.com

15  • **Charles A. Newman**
       cnewman@sonnenschein.com

16

17

18

19

20

21

22

23

24

25

26

27

28