Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

Steve W. Berman
Thomas E. Loeser
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUND APPRAISAL and SAVAGE APPRAISAL SERVICES, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK N.A. and VALUATION INFORMATION TECHNOLOGY, LLC, d/b/a RELS VALUATION,<br><br>Defendants. | Case No. 4:09-cv-01630-CW<br><br>**PLAINTIFFS' OPPOSITION TO WELLS FARGO'S MOTION TO DISMISS**<br><br>Date:  September 17, 2009<br>Time:  2:00 p.m.<br>Courtroom:  Courtroom 2, 4th Floor<br>Judge:  Honorable Claudia Wilken |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................. 1

II.  PLAINTIFFS' ALLEGATIONS ..................................................................... 1

   A.   Nature of the Action .............................................................................. 1

   B.   The Parties .............................................................................................. 3

   C.   Substantive Allegations ......................................................................... 4

      1.   The Appraisal Business ............................................................... 4

      2.   Federal Law Requires Appraisal Independence .......................... 4

      3.   The Incentives for Mortgage Brokers and Lenders to Pressure Appraisers ...... 5

      4.   Wells Fargo .................................................................................. 6

      5.   Wells Fargo and Rels Corrupt the Appraisal System ................. 6

      6.   The Suspension of Honest Appraisers ........................................ 7

      7.   The Suspension or Blacklisting of Plaintiff Sound Appraisal ........ 8

      8.   The Suspension or Blacklisting of Plaintiff Savage Appraisal Services ......... 9

      9.   Examples of Other Appraisers Being Subject to Pressure and Blacklisted ..... 10

      10.  The Wells Fargo Brokerage Network .......................................... 11

III. ARGUMENT .................................................................................................... 12

   A.   Plaintiffs Adequately Allege that Defendants Violated RICO .................. 12

      1.   The Complaint Alleges a Pattern of Racketeering Activity ............ 12

         a.   Plaintiffs allege predicate acts of mail and wire fraud ........ 12

         b.   The Court can and should consider Plaintiff's witness statements. .... 15

      2.   The Complaint Alleges a RICO Enterprise .................................. 17

      3.   The Complaint Alleges Proximate Causation .............................. 20

   B.   Plaintiffs State a Valid Claim for Interference With Prospective Economic Advantage ........................................... 21

IV.  CONCLUSION ................................................................................................. 22

1

# TABLE OF AUTHORITIES

2

## CASES

Page

3

*Acciard v. Whitney*,
4          2008 U.S. Dist. LEXIS 98131 (M.D. Fla. Dec. 4, 2008) ........................................ 14

5      *Aetna Casualty Sur. Co. v. P&B Autobody*,
           43 F.3d 1546 (1st Cir. 1994) ........................................................................... 14
6

7      *Berson v. Applied Signal Tech., Inc.*,
           527 F.3d 982 (9th Cir. 2008) .......................................................................... 16

8      *Bridge v. Phoenix Bond & Indem. Co.*,
           128 S. Ct. 2131 (2008) .................................................................................. 20
9

10     *Certain Underwriters at Lloyd's v. Real Estate Professionals Ins. Co.*,
           2007 U.S. Dist. LEXIS 88241 (C.D. Cal. Nov. 26, 2007) ................................ 21

11     *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Prac. Litig.*,
           601 F. Supp. 2d 1201 (S.D. Cal. 2009) ...................................................... 17, 19
12

13     *In re Daou Sys.*,
           411 F.3d 1006 (9th Cir. 2005) ......................................................................... 16

14     *Diaz v. Gates*,
           420 F.3d 897 (9th Cir. 2005) .......................................................................... 20
15

16     *Dickson v. Microsoft Corp.*,
           309 F.3d 193 (4th Cir. 2002) .......................................................................... 18

17     *Fifty Assocs. v. Prudential Ins. Co.*,
           450 F.2d 1007 (9th Cir. 1971) ......................................................................... 15
18

19     *First Magnus Fin. Corp. v. Star Equity Funding, L.L.C.*,
           2007 U.S. Dist. LEXIS 8109 (D. Kan. Feb. 2, 2007)........................................ 14

20     *In re Firstenergy S'holder Derivative Litig.*,
           219 F.R.D. 584 (N.D. Ohio 2004)..................................................................... 16
21

22     *Gray v. Upchurch*,
           2006 U.S. Dist. LEXIS 90184 (S.D. Miss. Dec. 13, 2006) ............................... 15

23     *In re Ins. Brokerage Antitrust Litig.*,
           2007 U.S. Dist. LEXIS 73220 (D.N.J. Sept. 28, 2007)..................................... 19
24

25     *Korea Supply Co. v. Lockheed Martin Corp.*,
           29 Cal. 4th 1134 (2003)............................................................................ 21, 22

26     *Lamb v. Phillip Morris, Inc.*,
           915 F.2d 1024 (6th Cir. 1990) ......................................................................... 22
27

28     *Lozano v. AT&T Wireless Servs.*,
           504 F.3d 718 (9th Cir. 2007) ...................................................................... 15, 16

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002) ........................................................................... 21

*Miller v. Yokohama Tire Corp.*,
    358 F.3d 616 (9th Cir. 2003) ............................................................................. 15

*In re MIPS Techs, Inc.*,
    2008 WL 3823726 (N.D. Cal. Aug. 13, 2008) .................................................... 16

*In re Nat'l Western Life Ins. Deferred Annuities Litig.*,
    2009 U.S. Dist. LEXIS 62949 (S.D. Cal. June 16,  2009) ............................... 17, 19

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ................................................................................. 16

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ............................................................................. 19

*Oki Semiconductor Co. v. Wells Fargo Bank*,
    298 F.3d 768 (9th Cir 2002) .............................................................................. 20

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    263 F. Supp. 2d 172 (D. Mass. 2003) ................................................................ 19

*Shoaga v. Maersk, Inc.*,
    2008 U.S. Dist. LEXIS 82711 (N.D. Cal. Oct. 16, 2008) ................................... 22

*United States v. Chandler*,
    388 F.3d 796 (11th Cir. 2004) ........................................................................... 18

*United States v. Fullwood*,
    342 F.3d 409 (5th Cir. 2003) ............................................................................. 14

*United States v. Kohli*,
    110 F.3d 1475 (9th Cir. 1997) ........................................................................... 13

*United States v. Nguyen*,
    504 F.3d 561 (5th Cir. 2007) ............................................................................. 13

*United States v. Owens*,
    301 F.3d 521 (7th Cir. 2002) ............................................................................. 14

*United States v. Panza*,
    750 F.2d 1141 (2d Cir. 1984) ............................................................................ 14

*United States v. Suarez*,
    215 Fed. Appx. 872 (11th Cir. 2007) ................................................................ 14

*VanDenBroeck v. CommonPoint Mortg. Co.*,
    210 F.3d 696 (6th Cir. 2000) ......................................................................... 18, 19

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................. 16

1

**STATUTES**

2    12 C.F.R. § 34.44 ................................................................................................................... 5

3    12 C.F.R. § 34.45 ................................................................................................................... 5

4    12 U.S.C. §§ 3331, *et seq.* ..................................................................................................... 5

5    Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................................................. 1

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

To Wells Fargo, in its unfettered drive to originate as many loans as possible, an honest and independent property appraisal was a hindrance, not an essential underwriting tool. So Wells Fargo spawned Valuation Information Technology, LLC, d/b/a Rels Valuation ("Rels") and, pursuant to a common scheme and plan, they (1) extracted valuation control and price concessions from appraisers who needed their business, and (2) forced out of the process honest appraisers who resisted their corruption of the appraisal process. As part of this scheme, Defendants pressured appraisers to falsify appraisals. Appraisers, like Plaintiffs, who refused to go along with the scheme were censured, *i.e.*, they were unable to get work from Wells Fargo or any of the brokers who conducted business with Wells Fargo. Because Wells Fargo is one of the largest lenders in the country, the consequence of this Scheme is devastating.

The arguments in Wells Fargo's motion to dismiss ("Motion") regarding Plaintiffs' claims under RICO and for interference with prospective economic advantage are unavailing.[1] As shown in this Opposition, Plaintiffs adequately allege that the fraudulent appraisal scheme conducted by Wells Fargo and Rels constitutes mail and wire fraud and, thus, violates RICO. Further, Plaintiffs were proximately harmed by the RICO scheme, because they were blacklisted as a direct result of Defendants' refusal to hire appraisers who refuse to provide fraudulent appraisals. In addition, Plaintiffs adequately allege two enterprises, only one of which is challenged in the Motion. Finally, Plaintiffs state a valid claim for interference with prospective economic advantage based on their lost income as a result of being blacklisted by Defendants.

## II.    PLAINTIFFS' ALLEGATIONS[2]

### A.    Nature of the Action

The independence and integrity of the real estate appraisers who determine the value of home loan collateral is vitally important. ¶ 1.[3] Appraisals are intended to provide borrowers and

---

[1] Plaintiffs do not oppose dismissal of their claim for injunctive relief under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

[2] In order to avoid repetition by the Court, Plaintiffs note that this section is identical to the section entitled "Plaintiffs' Allegations" in Plaintiffs' memorandum in opposition to defendant Rels Valuation's motion to dismiss.

lenders with an independent and accurate assessment of the true value of the property underlying a loan.  *Id.*  Federal and state laws exist to protect the integrity of the appraisal process so that appraisers can provide borrowers and lenders with an independent and accurate assessment of the value of a home.  Lenders are prohibited from pressuring appraisers into compromising their independence and producing a report that is not based on the appraiser's objective opinion.  ¶ 2.  Wells Fargo's mortgage originations increased exponentially during the lending boom during 2000 – 2006.  The company incentivized employees to fund as many loans as quickly as possible.  ¶ 3.  Wells Fargo's top-performing employees were rewarded with all-expense-paid trips including helicopter rides, wine-tasting, horseback riding in Puerto Rico, and a private Jimmy Buffet concert in the Bahamas.  *Id.*

Subprime loans in particular have increased Wells Fargo's profits through increased interest rates, increased origination fees and other fees, and through fees, commissions and profits earned on the packaging of mortgage-backed securities that are at the heart of the financial woes now plaguing our economy.  ¶ 4.

Rels is a joint venture between Wells Fargo Foothill (a subsidiary of Wells Fargo & Co.) and First American Real Estate Solutions (a subsidiary of First American Corporation).  ¶ 18.  Rels receives real estate settlement service referrals from Defendant Wells Fargo.  Historically, Wells Fargo mortgage salespeople would select and refer their clients to individual appraisers with whom such salespeople had pre-existing relationships.  In approximately 2004, instead of dealing with the appraisers directly, Wells Fargo began routing appraisal requests exclusively through Rels, which acted as an appraisal management company or "AMC."  ¶ 6.  As part of its corporate objective to maximize market share and profits, Wells Fargo abandoned underwriting standards together with Rels by engaging in a practice of pressuring and intimidating appraisers into using appraisal techniques that produce appraisals that meet Wells Fargo's business objectives even if the use of such appraisal techniques is improper and in violation of industry and regulatory standards.  ¶ 7.  If appraisers fail to "play ball" as Wells Fargo demands, Wells Fargo, through Rels, removes the

---

[3] All references to "¶" are to the Class Action Complaint in this action.

1  appraiser from the list of approved appraisers, which essentially "blacklists" the appraiser. *Id.*

2  Once an appraiser is blacklisted Wells Fargo and Rels will no longer request appraisals or accept

3  appraisals from these persons and companies. *Id.*

4        In addition to Rels's refusal to use appraisers removed from their approved list, independent

5  loan mortgage brokers, who also select appraisers, may decline to select blacklisted appraisers if

6  Wells Fargo is the lender, since they do not want to order and have a borrower pay for an appraisal

7  that Wells Fargo will not accept. ¶ 8. Given Wells Fargo's enormous size and clout in the

8  mortgage market, blacklisted appraisers lose substantial revenue – all because they refused to

9  compromise their integrity and violate industry standards at Wells Fargo's insistence. *Id.* In

10  essence, being blacklisted by Wells Fargo is a serious economic blow for an appraiser who will not

11  do business the Wells Fargo way, *i.e.*, illegally. *Id.*

12  **B.      The Parties**

13        Plaintiff Sound Appraisal is a sole proprietorship with its principal place of business in

14  Puyallup, Washington. Sound Appraisal is in the business of providing real estate appraisals to

15  mortgage brokers and mortgage lenders. ¶ 12. Plaintiff Savage Appraisal Services, Inc., is an S

16  corporation with its principal place of business in Vail, Colorado. Savage Appraisal Services, Inc.

17  is in the business of providing real estate appraisals to mortgage brokers and mortgage lenders. ¶

18  13.

19        Defendant Wells Fargo Bank, N.A. is a national banking association chartered in Sioux

20  Falls, South Dakota. It is headquartered in San Francisco, California. ¶ 14. Wells Fargo provides

21  residential mortgages through its division Wells Fargo Home Mortgage. *Id.* Wells Fargo is a

22  diversified financial services company that provides retail and business banking, insurance,

23  investments, mortgages, and consumer finance across the United States. *Id.* The company is one

24  of the top "cross-sellers" of financial services in the country, offering credit cards, personal loans,

25  wealth management services, and insurance. *Id.* Business-oriented services include commercial

26  banking services, lending, investment banking, venture capital, and equipment leasing. *Id.* Wells

27  Fargo is one of the leaders in the realm of online banking, having become the first major financial

28  services firm to offer Internet banking back in 1995. *Id.*

The company's community banking operations serve nearly 11 million customers through more than 3,000 bank branches (or what the company calls "stores") in 23 states, most of which are in the western United States – Ohio being the easternmost state of operation. ¶ 16.  Wells Fargo Home Mortgage boasts it is the nation's number one originator and number two servicer of residential mortgages.  *Id*.  Wells Fargo has more than 1,200 home mortgage 'stores' and provides mortgage banking services in all 50 states.  *Id*.

Defendant Valuation Information Technology, LLC, d/b/a Rels Valuation, ("Rels") is an Iowa limited liability company headquartered in Minnetonka, Minnesota.  ¶ 18.  Valuation Information Technology, LLC is a joint venture between First American Real Estate Solutions, a subsidiary of First American Corporation, and Wells Fargo Foothill, a subsidiary of Wells Fargo & Co.  *Id*.  Valuation Information Technology, LLC is a provider of real estate settlement services including property appraisals.  *Id*.

## C.     Substantive Allegations

### 1.     The Appraisal Business

An appraiser is most commonly retained by a mortgage broker or mortgage lender in order to value the property that will be used as the collateral for the loan.  ¶ 19.  An appraiser's role is to provide an unbiased assessment of the property's value and to ensure this value actually reflects the estimated opinion of market value.  *Id*.  In principle, an accurate appraisal ensures that the loan is adequately collateralized in case the borrower defaults; an accurate appraisal is also necessary to determine whether the contemplated loan meets lender and/or governmental guidelines.  *Id*.

Appraisers either work "in house" as part of the broker's, lender's or AMC's own operations or work as independent contractors.  ¶ 22.  In the latter case, the appraiser builds a book of business by servicing as many mortgage brokers and lenders in a given geographic region as possible.  *Id*.  These brokers and lenders are the "lifeblood" of the independent appraiser's revenue. ¶ 23.  Without their business, an appraiser cannot operate.  *Id*.

### 2.     Federal Law Requires Appraisal Independence

Because of the importance of appraisals in the home-lending market, state and federal statutes and regulations require that appraisals be accurate and independent.  The Uniform

Standards of Professional Appraisal Practice ("USPAP"), incorporated into federal law, 12 C.F.R. § 34.44, require appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct). USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions." In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.

Federal law sets independence standards for appraisers involved in federally-regulated transactions. *See* 12 U.S.C. §§ 3331, *et seq.* The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45; Complaint, ¶ 25.

In 2005, federal regulators, including the Office of Thrift Supervision ("OTS"), published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." ¶ 26. With regard to appraisal independence, the document highlighted the importance of independence and condemned attempts to interfere therewith. *Id.*

### 3. The Incentives for Mortgage Brokers and Lenders to Pressure Appraisers

Traditionally, mortgage lenders held a substantial amount of the mortgage loans that they originated, which incentivized them to ensure that loans were adequately collateralized. ¶ 27. Over time, the mortgage industry landscape changed. ¶ 28. Rather than holding the mortgage loans, lenders now regularly sell them in the financial markets. *Id.* The loans are then pooled

1   together, securitized and sold to institutions and investors as mortgage-backed securities.  *Id*.

2   Today, the vast majority of mortgage loans are sold, leaving the original lender holding far fewer

3   mortgages in its portfolio.  *Id*.  The money that the lender receives for selling its mortgage loans is

4   then used to finance new mortgages, thereby increasing the lender's profits and aiding its stock

5   price.  *Id*.

6       **4.    Wells Fargo**

7       One of the biggest drivers in Wells Fargo Bank's steady growth is its mortgage business.  ¶

8   29.  In 2000, Wells Fargo earned $76.5 billion in mortgage originations and reported its focus was

9   increased efficiency, higher ancillary revenue, and new channels and partnerships.  *Id*.  Three years

10  later, Wells Fargo's earnings from mortgage originations ballooned to $470 billion.  *Id*.  Although

11  Wells Fargo's mortgage lending segment includes retail, wholesale, and correspondent lending,

12  Wells Fargo has relied more heavily on retail originations compared with other major lenders.  *Id*.

13  Wells Fargo has sourced loans through a vast network of thousands of contracted mortgage

14  brokers.  ¶ 30.

15      With the real estate boom of 2000-2006, the number of refinance and purchase transactions

16  in real estate increased significantly.  ¶ 31.  To service the drastic increase in transactions, the

17  number of real estate related service providers also grew tremendously.  *Id*.  For example, the

18  number of realtors in the United States grew from 750,000 in 2000 to over 1.3 million in 2007.  *Id*.

19  Likewise, Wells Fargo's fleet of corporate and affiliated mortgage brokers grew as did the number

20  of property appraisers.  *Id*.

21      **5.    Wells Fargo and Rels Corrupt the Appraisal System**

22      With the growing number of appraisers and increased competition in the appraisal

23  marketplace, the environment was ripe for a market force such as Wells Fargo to exert its will on

24  appraisers.  ¶ 32.  In 2004, Wells Fargo stopped dealing directly with appraisers and forced

25  "independent" appraisers to receive appraisal work from Wells Fargo through Wells Fargo's

26  affiliate Appraisal Management Company (AMC), ValueIT, an appraisal clearing-house that

27  contracts with independent appraisers to meet Wells Fargo's and other lenders' appraisal needs.  *Id*.

28  ValueIT eventually changed its name to Rels Valuation; and through Rels Valuation, Wells Fargo

1  is able to indirectly pressure the "independent" appraiser in order to get the value Wells Fargo

2  needs to fund the loan at issue.  *Id.*

3       Wells Fargo routes all of its Distributed Retail appraisal work, and nearly all of the

4  appraisal work for Wells Fargo's centralized retail, banking, home equity, and consumer credit

5  group units to Rels.  ¶ 33.

6       **6.    The Suspension of Honest Appraisers**

7       Part of Wells Fargo's scheme to increase market share and to make as many loans as

8  possible has involved the corruption of the appraisal process.  ¶ 34.  Wells Fargo needs appraisals

9  that support the loans it wishes to make, irrespective of the actual values of the properties being

10  appraised.  *Id.*

11       To accomplish this objective, Wells Fargo, directly and in conjunction with Rels, has

12  engaged in a pattern and practice of pressuring appraisers to write an appraisal designed to have the

13  loan underwritten even if the appraisal violates USPAP.  ¶ 35.  In other words, Wells Fargo is more

14  interested in having the property pass appraisal than it is in determining whether an appraisal is fair

15  and accurate and prepared in accordance with industry standards.  *Id.*

16       Wells Fargo and Rels utilize a host of indirect and underhanded methods to communicate to

17  the appraiser the value needed to fund the loan, and the value the appraiser is expected to "hit."

18  ¶ 36.  For example, Rels's appraisal order form indicates the "Borrower Estimated Value."  *Id.*

19  Appraisers know that this value reflects the value the appraiser is expected to meet or exceed in

20  their appraisal in order to "make the deal."  *Id.*  In some instances Wells Fargo and Rels also select

21  and provide appraisers with the comparables they want the appraiser to use.  *Id.*  As discussed

22  previously, part of the appraisal process involves an appraiser's review of recent property sales that

23  the appraiser believes are comparable to the property being studied, and these "comps" serve as

24  value benchmarks that aide the appraiser in determining the property's worth.  *Id.*  When Wells

25  Fargo and Rels provide the appraiser with the comps they want the appraiser to use, the appraiser's

26  integrity and independence is compromised.  *Id.*  The appraiser is thereby pressured to ensure that

27  the appraised value of the property in question matches the comps, even if the appraiser does not

28  independently believe the comps are in fact comparable.  *Id.*

1   If an appraiser does not "play ball" and produce a report affirming the property value or the

2   parameters that Wells Fargo expects or wants, Wells Fargo, through Rels, suspends the appraiser or

3   removes the appraiser from the list of preferred appraisers and, in essence, "blacklists" the

4   appraiser. ¶ 37. The suspension list or blacklist is a Wells Fargo and Rels database containing the

5   names of appraisers who have been suspended or removed from the list of preferred appraisers

6   because their appraisals were not accepted by Wells Fargo, and thus were not accepted by Rels. ¶

7   38.

8   Rels is a "captive" puppet of Wells Fargo, either by virtue of partial ownership by a

9   common parent or economic power as its largest client. ¶ 39. Rels describes itself as "lucky to

10  have our wagon hitched to the Wells Fargo stagecoach." *Id*. To this extent, Rels knows what

11  Wells Fargo wants to accomplish and, with its suspension list, Rels facilitates Wells Fargo's

12  scheme by attacking the appraisals of persons on the list and undercutting valuations, whether

13  warranted or not. *Id*.

14  **7.    The Suspension or Blacklisting of Plaintiff Sound Appraisal**

15  Plaintiff Sound Appraisal is owned and operated by Mr. Don Pearsall. ¶ 40. Mr. Pearsall is

16  an appraiser licensed to serve all counties in Washington State. *Id*. In 1989, Mr. Pearsall began

17  working as an apprentice appraiser. He received his appraisal license in 1992. ¶ 41. Mr. Pearsall

18  began operating Sound Appraisal in 2001. *Id*.

19  Sound Appraisal has historically conducted appraisals for area mortgage brokers and major

20  lenders such as Countrywide, Wells Fargo, Washington Mutual, and others. ¶ 42. Due to its

21  expertise and experience as an appraiser, Sound Appraisal often conducts "review appraisals" to

22  ensure that appraisal reports by other appraisers are accurate and in compliance with regulations.

23  *Id*.

24  In June 2007, Sound Appraisal received a request from Wells Fargo through Rels to

25  conduct an appraisal of a home in Enumclaw, Washington. ¶ 43. Mr. Pearsall, Sound Appraisal's

26  sole proprietor, visited the property and completed a Uniform Residential Appraisal Report. *Id*.

27  After Sound Appraisal submitted the completed appraisal, Rels contacted Mr. Pearsall and

28  asked that he alter the Uniform Residential Appraisal Report he submitted to Rels. ¶ 44.

Mr. Pearsall knew that under USPAP the appraisal report must reflect his independent opinion of the property's value, and that altering the appraisal report to reflect Rels's desired views would compromise his independence and would violate USPAP. *Id.* Thus, Mr. Pearsall refused to alter the report. *Id.*

Rels lambasted Mr. Pearsall for his adherence to USPAP and his refusal to alter the report. ¶ 45. Randall Pierzina, Rels's area manager, criticized Mr. Pearsall and told him that he "took USPAP too seriously" and that he was going to "kill the deal." *Id.* Despite the pressure to succumb to Wells Fargo's and Rels's wishes and "play ball," Mr. Pearsall refused. *Id.*

Prior to this 2007 incident, approximately 25-35% of Sound Appraisal's business came from Wells Fargo and Rels. ¶ 46. After this incident, Sound Appraisal no longer received appraisal requests from Rels. *Id.* In 2006, Sound Appraisal's income from Rels was $33,395. In 2008, Sound Appraisal's income from Rels was $0. *Id.*

Eventually Mr. Pearsall contacted Rels and inquired about the lack of work Sound Appraisal received from Rels. ¶ 47. Randall Pierzina informed Mr. Pearsall that he had been suspended and was no longer an approved appraiser for Rels. *Id.*

On April 8, 2009, Mr. Pearsall received a work order request via telephone from Rels that confirmed the existence of the blacklist. ¶ 48. The conversation was as follows:

> Pearsall:          "I would love to take the job, but aren't I on your blacklist?"
>
> Rels employee:  Oh, let me check. (Puts Pearsall on hold.)
>
> Rels employee:  (after checking) I'm sorry. I wasn't supposed to contact you.
>
> End of call.

*Id.* The employee thus confirmed the existence of the blacklist. ¶ 49.

### 8.   The Suspension or Blacklisting of Plaintiff Savage Appraisal Services

The owner and President of Savage Appraisal is Timothy W. Savage. ¶ 50. He has been a highly respected real estate appraiser in Vail, Colorado for 18 years. *Id.* Savage Appraisal worked on Rels orders for over 12 years. ¶ 51.

1       In January of 2009, Savage Appraisals performed two appraisal assignments for Rels.  ¶ 52.

2      After the appraisals were delivered, Rels sent emails, pressuring Mr. Savage to increase the value

3      of each appraisal as the homeowners were not happy with his opinion of value.  *Id.*

4       On January 15, 2009, Donna Londrem, a "Collateral Compliance Reviewer" for Rels sent

5      Mr. Savage an email purporting to provide information to "support an increased valuation" for

6      property at 993 Lionsridge Loop 322, Vail, Colorado.  ¶ 53.  On January 14, 2009, Emlee Becker, a

7      "Collateral Compliance Reviewer" for Rels sent an email to Mr. Savage purporting to provide

8      information "to support an increased value" of property at 945 Sandstone Road, Vail, Colorado.

9      *Id.*  On both occasions Mr. Savage reviewed the materials provided to determine whether, under

10     USPAP, an increased valuation was appropriate.  *Id.*  After a lengthy letter of explanation,

11     Mr. Savage refused to increase his original opinion of value for the two homes at issue.  *Id.*

12       The next time Mr. Savage heard from Rels, via a letter dated February 5, 2009, was to

13     inform him that he had been removed from their approved panel of appraisers.  ¶ 54.  No further

14     explanation was given.  *Id.*  Mr. Savage tried several times, unsuccessfully, to get a detailed

15     response from Rels as to why he was placed on their blacklist.  ¶ 55.  He has lost and will continue

16     to lose income as a direct result of being blacklisted.  *Id.*

17       **9.**     **Examples of Other Appraisers Being Subject to Pressure and Blacklisted**

18       The Complaint sets forth nine statements by confidential witnesses from various States,

19     showing how Rels has treated appraisers who would not succumb to Rels's pressure to violate

20     USPAP.  ¶¶ 56-65.  For example, one appraiser stated that "[o]ur company, & one appraiser in

21     particular, has been 'blacklisted' from RELS because we refused to 'reconsider' values (hit their

22     numbers) & requested fair fees."  ¶ 57.  *See also* ¶ 58 ("I was blacklisted by Rels by an individual

23     by the name of Matt Nelsen.  He was trying to influence my value estimate."); ¶ 59 ("I worked for

24     RELS for approximately 11 years.  I quit a couple of years ago due to the growing pressure to

25     inflate values."); ¶ 61 ("About a year ago, I was pressured to evaluate my appraisal for a higher

26     value that the customer of Wells Fargo thought should be higher.  This happened several times.  I

27     checked the box that said that I had been pressured and I have not heard from them since."); ¶ 62

28     ("I am sure we are on that black list in Illinois, when we refused to do drive bys with values placed

1  on the orders for refinance not purchases."); ¶ 63 ("I have done a large number of appraisals for

2  Wells Fargo/RELS in the past. I was blacklisted (or taken off the upper tier of appraisal vendors)

3  for not succumbing to a Wells Fargo Branch Manager request for a higher value on a refinance

4  loan."); ¶ 64 ("I had previous[ly] performed FHA and conventional appraisals for RELS

5  approximately 2 years ago. However, I ended the relationship after being threaten[ed] by my

6  account representative. This young lady told me I had to do what RELS and the loan officer said

7  or I would not be paid.").

8        **10.    The Wells Fargo Brokerage Network**

9        Wells Fargo has a network of contracted mortgage brokers that participate in their Broker's

10  First® program and complete home mortgage loans through Wells Fargo.  ¶ 66.  Brokers become

11  authorized as Wells Fargo Approved Brokers by submitting a mortgage broker application package

12  and entering into a broker agreement with Wells Fargo.  *Id.*  These contracted brokers are provided

13  access to Wells Fargo's Broker's First® and Direct Express$^{SM}$ computer systems, which are

14  designed to allow the mortgage broker to submit loan information and receive qualified loan

15  decisions and instant feedback on first mortgages, piggyback submissions, or home equity

16  decisions.  *Id.*

17        Wells Fargo's Real Estate Settlement Service, RES Direct, manages, *inter alia*, the process

18  of approving brokers.  ¶ 67.  Under the Real Estate Settlement Procedures Act (RESPA), settlement

19  service providers are prohibited from requiring the use of other settlement service providers in

20  order to ensure that conflicts of interest and backroom deals do not drive up settlement costs or

21  corrupt the home purchase process.  *Id.*  However, RESPA has an exception that specifically allows

22  lenders to require the use of a particular appraiser.  *Id.*  Cognizant of this loophole, RES Direct

23  pressures the brokers to use Rels for their appraisal needs or causes brokers to use Rels by default.

24  *Id.*  Wells Fargo's pressure of independent mortgage brokers to use Rels for their appraisal needs

25  furthers Wells Fargo's scheme to manipulate the appraisal process to advance Wells Fargo's

26  financial goals.  *Id.*  Rels has confirmed that "Rels Valuation, under direction from Wells Fargo,

27  does NOT allow the broker any choice, recommendation, etc. in selecting who will appraise their

28  property."  *Id.*

Wells Fargo needs its network of authorized brokers knowingly or unknowingly complicit in their scheme with Rels to pressure appraisers to inflate property values and maximize profits from the loan.  ¶ 68.  A broker, who never holds the loan after funding, has no incentive to ensure that the appraisal is an accurate assessment of the property's true market value, he or she just wants the deal to close.  *Id*.

The process of securitizing loans and selling them to the secondary market changed the mortgage industry and has diminished the broker's and the lender's incentive to ensure the appraisal backing the loan is accurate.  ¶ 69.  Because lenders' profits are determined by the quantity of loans that they successfully close, and not the quality of those loans, the lender has an incentive to pressure appraisers to reach values that will allow the loan to close – without regard to whether the appraisal accurately reflects the home's actual value.  *Id*.  Likewise, the independent broker is not tied to a particular lender, but instead has relationships with multiple lenders and seeks to comply with the lender's wishes and conditions in order to service clients and maximize their profits.  *Id*.

### III.     ARGUMENT

**A.     Plaintiffs Adequately Allege that Defendants Violated RICO**

> **1.     The Complaint Alleges a Pattern of Racketeering Activity**

>> **a.     Plaintiffs allege predicate acts of mail and wire fraud**

Wells Fargo misapprehends Plaintiffs' RICO claim when it argues that Plaintiffs fail to allege any misrepresentations or fraudulent conduct by Wells Fargo or Rels.  *See* Motion at 8-13. There are numerous allegations throughout the Complaint that Rels and Wells Fargo utilized fraudulent appraisals to carry out their scheme.  For example, Plaintiffs allege:

- Part of Wells Fargo's scheme to increase market share and to make as many loans as possible has involved the corruption of the appraisal process.  Wells Fargo needs appraisals that support the loans it wishes to make, irrespective of the actual values of the properties being appraised.  ¶ 34.

- To accomplish this objective, Wells Fargo, directly and in conjunction with Rels, has engaged in a pattern and practice of pressuring appraisers to write an appraisal

designed to have the loan underwritten even if the appraisal violates USPAP.  In other words, Wells Fargo is more interested in having the property pass appraisal than it is in determining whether an appraisal is fair and accurate and prepared in accordance with industry standards.  ¶ 35.

- Wells Fargo and Rels utilize a host of indirect and underhanded methods to communicate to the appraiser the value needed to fund the loan, and the value the appraiser is expected to "hit."  For example, Rels's appraisal order form indicates the "Borrower Estimated Value."  Appraisers know that this value reflects the value the appraiser is expected to meet or exceed in their appraisal in order to "make the deal."  ¶ 36.

- The process of securitizing loans and selling them to the secondary market changed the mortgage industry and has diminished the broker's and the lender's incentive to ensure the appraisal backing the loan is accurate.  Because lenders' profits are determined by the quantity of loans that they successfully close, and not the quality of those loans, the lender has an incentive to pressure appraisers to reach values that will allow the loan to close – without regard to whether the appraisal accurately reflects the home's actual value.  ¶ 69.

Thus, there is no merit to Wells Fargo's assertion that "Plaintiffs here do not identify what, if any, specific role Wells Fargo purportedly played in the alleged fraudulent scheme, let alone identify the time, place, and specific content of any communications made by Wells Fargo to or about them."  *See* Motion at 9.

Moreover, fraudulent appraisals constitute mail and wire fraud, which are predicate acts for RICO claims.  *See United States v. Kohli*, 110 F.3d 1475, 1476 (9th Cir. 1997) (defendants pled guilty to fraudulently inducing home sales by, among other things, "fraudulently inducing lenders to make loans on the properties after inflated appraisals").  *See also United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007) (affirming conviction for mail fraud based on false representations, because "a rational jury could find beyond a reasonable doubt that Myna knew that the sales prices and loan amounts for the Fox Hunt and Silvercrest properties stemmed from false appraisals");

1   *United States v. Suarez*, 215 Fed. Appx. 872, 874 (11th Cir. 2007) (affirming mail fraud conviction

2   where the "jury found that Suarez prepared fraudulent appraisals as part of an illegal land-flip

3   scheme");[4] *United States v. Fullwood*, 342 F.3d 409 (5th Cir. 2003); *United States v. Owens*, 301

4   F.3d 521, 528 (7th Cir. 2002) (affirming conviction for scheme that relied on fraudulent appraisals,

5   where the "jury's conclusion that Owens had an intent to defraud is also supported by the abundant

6   evidence that Owens received 'kickbacks' for his artificially-inflated appraisals").

7           Indeed, courts have sustained RICO claims based on fraudulent appraisals, which violate

8   the mail fraud statute.  For example, in *Acciard v. Whitney*, 2008 U.S. Dist. Lexis 98131, *10

9   (M.D. Fla. Dec. 4, 2008), the plaintiffs sued the defendants under RICO for fraudulent sale of real

10  estate, basing their claims in part on defendants' use of a "fraudulent appraisal value for the

11  property."  The defendants argued that the plaintiffs failed to allege fraud with particularity, but the

12  court disagreed:

13          > Plaintiffs have identified the false statements that were made--the
            > fraudulent appraisal values. Plaintiffs allege that United Mortgage,
14          > which is alleged to be an agent of First Community Bank, provided
            > loan documents to Plaintiffs containing the fraudulent appraisals.
15          > Plaintiffs also allege that the Lenders, which include First
            > Community Bank, knowingly utilized the fraudulent appraisal and
16          > that the fraudulent appraisals and financing were key to the
            > fraudulent scheme.  Accordingly, the Court finds that Plaintiffs meet
17          > the particularity requirements for pleading fraud in this case.

18  *Id.* at *15-16.  In denying the motion to dismiss the RICO claim, the court further explained that

19  "Plaintiffs allege that Huron coerced or attempted to coerce Plaintiffs to close on permanent finan-

20  cing based on fraudulent appraisal values in order to further the fraudulent scheme." *Id.* at *34.

21  Thus, the fraudulent appraisals constituted the fraud necessary to support the RICO claim.  *See*

22  *also Aetna Casualty Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994) (scheme to

23  defraud insurance company by submission of "fraudulent appraisals" constituted mail fraud and

24  supported jury verdict that defendants violated RICO); *United States v. Panza*, 750 F.2d 1141,

25  1147 (2d Cir. 1984) (affirming RICO convictions for scheme that used "fraudulent appraisals");

26  *First Magnus Fin. Corp. v. Star Equity Funding, L.L.C.*, 2007 U.S. Dist. Lexis 8109, *14 (D. Kan.

27

28          [4] This unpublished case was decided in 2007 and, thus, may be cited.  *See* Fed. R. App. P. 32.1.

PLAINTIFFS' OPPOSITION TO WELLS FARGO'S MOTION          - 14 -
TO DISMISS - 4:09:cv-01630-CW
010098-11 308737 V1

1   Feb. 2, 2007) (denying motion to dismiss RICO claim where defendant "directed the loan officers

2   to obtain appraisals at pre-determined, inflated values"); *Gray v. Upchurch*, 2006 U.S. Dist. Lexis

3   90184, *15 (S.D. Miss. Dec. 13, 2006) (denying motion to dismiss RICO claim where complaint

4   set forth "the appraisal fraud and the HUD-1 fraud allegedly perpetrated" by the defendants).

5           Finally, Wells Fargo erroneously contends that "Rels' alleged statements are not actionable

6   in fraud because, as Savage Appraisal concedes in its own pleading, the alleged communications

7   concern matters of opinion as to value – which are not instance of actionable fraud.  Compl. ¶¶ 52-

8   53." *See* Motion at 11.  The cases cited by Wells Fargo do not support that argument.  In *Miller v.*

9   *Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2003), the Ninth Circuit held nothing of the sort

10  but instead explained that "where a misrepresentation of law is only one of opinion, rather than one

11  that includes a misrepresentation of fact, the recipient can only justifiably rely on it to the extent

12  that he can justifiably rely on other opinions."  Similarly, Rels's argument is not supported by its

13  citation to *Fifty Assocs. v. Prudential Ins. Co.*, 450 F.2d 1007, 1011 (9th Cir. 1971), in which the

14  Ninth Circuit explained that "an expression of opinion can be treated as a representation of fact

15  when it is propounded by an expert."  Wells Fargo cannot seriously contend that Rels is not an

16  expert in appraising value.[5]

17          **b.       The Court can and should consider Plaintiff's witness statements.**

18          In order to explain the operation of the Scheme and provide the detail Wells Fargo claims is

19  lacking, the Complaint cites to other examples of blacklisting throughout the country.  ¶¶ 56-65.

20  Relying on *Lozano v. AT&T Wireless Servs.*, 504 F.3d 718 (9th Cir. 2007), Wells Fargo argues that

21  a plaintiff may not rely on confidential witness reports to survive a motion to dismiss.  *See* Motion

22  at 12-13.  But *Lozano* is concerned with the irrelevant issue of standing and has no bearing on the

23

24

25  _____
    [5] Wells Fargo makes a cursory and incorrect argument that Plaintiffs fail to allege a conspiracy
    under section 1962(d). *See* Motion at 14 n.7.  In particular, Wells Fargo ignores numerous allega-
26  tions that support a conspiracy claim when it erroneously asserts that Plaintiffs' only allegation
    about conspiracy is contained in paragraph 87 of the Complaint.  *See id.*  In fact, as explained in
27  detail in Plaintiffs' opposition to the motion to dismiss filed by Rels, the Complaint sets forth
    substantial allegations in support of the section 1962(d) claim.  Plaintiffs will not burden the Court
28  by repeating that argument in this brief.

use of confidential witness statements in a class action complaint.[6]  Next, Defendants rely on

securities cases to argue that the Court may not consider confidential witness statements unless

they have been described with sufficient particularity to establish reliability and personal

knowledge.  *See* Motion at 13.  Securities cases are inapposite, because they are governed by the

strict pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").  *See, e.g.,*

*In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (describing burden of pleading necessary to

comply with "PSLRA's mandate that the complaint 'state with particularity all facts on which [a]

belief is formed'").[7]  PSLRA pleading requirements have no place outside of private securities

litigation.  *See In re Firstenergy S'holder Derivative Litig.*, 219 F.R.D. 584, 586 (N.D. Ohio 2004)

("The PSLRA, by its terms, is limited to actions filed under the federal securities laws and does not

apply outside this context.").

Plaintiffs' use of confidential witness statements in their class action complaint is appro-

priate.  A "plaintiff who makes allegations [of fraud] on information and belief must state the

factual basis for the belief."  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).  The witness

statements form part of the basis for Plaintiffs' belief.  Moreover, for the purposes of a motion to

dismiss, the Court must presume the truth of the allegations.  Outside of the PSLRA context, this

includes the veracity of its confidential witness statements.[8]

---

[6] The issue in *Lozano* was whether a plaintiff had standing to bring a class action for injuries caused by a telephone company's out-of-cycle billing practices, when the plaintiff had been reimbursed for his damages prior to bringing the lawsuit.  504 F.3d at 732.  The court held that the plaintiff had standing because there was a realistic threat that the defendant would continue to charge him for out-of-cycle calls.  *Id.* at 733.  Because the court held that the plaintiff had standing despite being reimbursed for his injuries, it is hard to see how *Lozano* supports Defendants' motion.  In any event, it is indisputable that unlike the *Lozano* defendant, Defendants here have not reimbursed Plaintiffs for injuries arising from their fraudulent conduct.

[7] Defendants also rely on *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) and *In re MIPS Techs, Inc.*, 2008 WL 3823726 (N.D. Cal. Aug. 13, 2008), which are both securities fraud cases and are governed by the PLSRA.

[8] Indeed, the Complaint adequately describes the testimony of the confidential witnesses even if the PSLRA applied.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("[T]he complaint identifies four confidential witnesses who worked for Applied Signal and who allegedly will testify to the existence and effect of the stop-work orders.  Defendants quibble that these witnesses weren't in a position to see the stop-work orders first-hand because they were 'engineers or technical editors' rather than managers.... It's entirely plausible that 'engineers or technical editors' would know, or could reasonably deduce, that the company had suffered such setbacks.  *See In re Daou Sys., Inc.*, 411 F.3d at 1015-16 (complaint described confidential

2.      **The Complaint Alleges a RICO Enterprise**

Wells Fargo erroneously contends that the Wells Fargo Brokerage Enterprise is not a valid RICO enterprise.  *See* Motion at 15-17.  Plaintiffs allege two alternative enterprises – the Wells Fargo Brokerage Enterprise (Complaint, ¶ 88-93) and the Wells Fargo Enterprise (*id*. at ¶¶ 94-103).  Wells Fargo does not challenge the allegations regarding the Wells Fargo Enterprise but rather challenges only the Wells Fargo Brokerage Enterprise.  Thus, even if Wells Fargo's argument had any force, which it does not, it would not result in dismissal of the complaint, because Wells Fargo does not challenge the Wells Fargo Enterprise.

In any event, Wells Fargo's argument is not persuasive as other courts have already squarely held that a wholesale lender and its approved brokers can constitute a RICO enterprise.  In *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Prac. Litig.*, 601 F. Supp. 2d 1201, 1212 (S.D. Cal. 2009), the plaintiffs alleged an enterprise comprising "(1) Countrywide, including its LandSafe loan closing services subsidiaries, and (2) Mid Atlantic Capital, One Source Mortgage, and other mortgage brokers not named as defendants herein who have contracts with Countrywide pursuant to which they sell, arrange, promote, or otherwise assist Countrywide in directing borrowers into loans issued by Countrywide."  The court disagreed with the defendant's argument that this definition of the enterprise was inadequate:

> Defendants argue that Plaintiffs have failed to allege any connections between the independent mortgage brokers, thereby defeating the "common purpose" requirement.  Defendants contend the allegations in the CAC describe a "hub and spoke" structure, which does not fall within the definition of a RICO enterprise.  However, Defendants fail to cite any binding authority to support this argument.  (See Mem. of P. & A. in Supp. of Mot. at 24-25) (citing primarily cases from Southern District of New York and other district courts outside the Ninth Circuit).  Indeed, Ninth Circuit law is to the contrary.  *See Odom*, 486 F.3d at 551 ("an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise.")  Accordingly, the Court rejects this argument.

*Id*. at 1212-13.  For the same reasons, Wells Fargo's argument is unavailing.  *See also In re Nat'l Western Life Ins. Deferred Annuities Litig.*, 2009 U.S. Dist. Lexis 62949, *18 (S.D. Cal. June 16,

witnesses 'with sufficient particularity to support the probability' that they knew about the fraud).").

1   2009) (denying defendants' summary judgment motion challenging "hub and spoke" enterprise

2   that consisted of life insurance company, various marketing organizations and sales agents) (citing

3   *Countrywide*).  Indeed, Wells Fargo does not cite a single RICO case from the Ninth Circuit that

4   adopts its hub-and-spoke argument.

5       Even assuming Wells Fargo's hub-and-spoke argument applied in the Ninth Circuit, it lacks

6   merit.  In particular, Wells Fargo misses the mark when it erroneously asserts that Plaintiffs allege

7   "a classic 'hub-and-spoke' conspiracy, with Wells Fargo as the hub and each broker as a separate

8   spoke."  *See* Motion at 15.  That assertion overlooks Plaintiffs' contention that both Wells Fargo

9   and Rels form the hub of the enterprise.  That distinction is key, because a hub-and-spoke

10  conspiracy fails if there is only one conspirator at the hub.  *See, e.g., United States v. Chandler*,

11  388 F.3d 796, 807 (11th Cir. 2004) ("Unlike the classic hub-and-spoke conspiracy, however,

12  Jacobson was the *only* conspirator in the hub, and when he moved from spoke to spoke, he moved

13  alone.  There was no time at which he and another conspirator moved from spoke to spoke.");

14  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one

15  in which various defendants enter into separate agreements with a common defendant, but where

16  the defendants have no connection with one another, other than the common defendant's

17  involvement in each transaction.").

18      Thus, the cases cited by Wells Fargo are inapposite.  For example, Wells Fargo incorrectly

19  contends that the Sixth Circuit rejected a "striking similar claim" in *VanDenBroeck v. Common-*

20  *Point Mortg. Co.*, 210 F.3d 696 (6th Cir. 2000).  *See* Motion at 17.  In that case, the plaintiffs

21  claimed that the defendant CommonPoint was a subprime lender whose "undisclosed fees were

22  unreasonable."  210 F.3d at 698.  The plaintiffs claimed that a scheme between "CommonPoint and

23  the secondary lenders with which it dealt" constituted a RICO association-in-fact enterprise.  *Id*. at

24  699.  The Sixth Circuit held that there was no RICO enterprise, because there was no allegation "of

25  a hierarchy, even a highly limited one."  *Id*. at 700.  Instead, the complaint "seems to indicate

26  nothing more than that CommonPoint had a business relationship with the secondary lenders."  *Id*.

27  In contrast, Plaintiffs allege a hierarchy comprising Wells Fargo and Rels, not just a single entity

28

1   that has a business relationship with secondary actors.  Similarly, in other cases cited by Wells

2   Fargo, there was only one defendant at the hub.[9]

3        *VanDenBroeck* is distinguishable for an additional reason.  The Sixth Circuit explained that

4   "simply conspiring to commit a fraud is not enough to trigger the Act if the parties are not

5   organized in a fashion that would enable them to function as a racketeering organization for other

6   purposes."  *Id*. at 699.  That is not the law in the Ninth Circuit, *see Odom v. Microsoft Corp.*, 486

7   F.3d 541, 551 (9th Cir. 2007) ("an associated-in-fact enterprise under RICO does not require any

8   particular organizational structure, separate or otherwise").  Therefore, *VanDenBroeck* is not good

9   law in the Ninth Circuit.

10       Further, there is no merit to Wells Fargo's argument that the Wells Fargo Brokerage

11  Enterprise "is too amorphous to constitute a valid RICO enterprise."  *See* Motion at 17.  Recent

12  cases undermine that contention.  *See In re Countrywide*, 601 F. Supp. 2d at 1212 (plaintiff alleged

13  valid enterprise comprising "(1) Countrywide, including its LandSafe loan closing services

14  subsidiaries, and (2) Mid Atlantic Capital, One Source Mortgage, and other mortgage brokers not

15  named as defendants herein who have contracts with Countrywide pursuant to which they sell,

16  arrange, promote, or otherwise assist Countrywide in directing borrowers into loans issued by

17  Countrywide"); *In re Nat'l Western*, 2009 U.S. Dist. Lexis 62949 at *3 (denying defendants'

18  summary judgment challenge to enterprise that comprised a life insurance company, various

19  marketing organizations its and the marketing organizations' sales agents "located around the

20  country").

21

22

_____

23       [9] The other cases cited by Wells Fargo are readily distinguishable.  *See In re Ins. Brokerage Antitrust Litig.*, 2007 U.S. Dist. Lexis 73220, *118 (D.N.J. Sept. 28, 2007) ("Plaintiffs err in their

24  [argument] that a finding of consistent decision-making by a certain entity involved in each alleged act qualifies that entity as a 'hub' or draws any structural links other than independent connectors

25  between this 'quasi-hub' and other entities involved in that particular act."); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 183, 184 (D. Mass. 2003) ("Plaintiffs

26  essentially allege that each enterprise takes a hub-and-spoke design, with an individual drug manufacturer at the center dealing independently with each individual provider as the spoke....

27  [P]laintiffs have not alleged an association in fact between a specific pharmaceutical company and a specific medical care provider (or a specific network of providers), that forms a continuing unit

28  with a common purpose.").

PLAINTIFFS' OPPOSITION TO WELLS FARGO'S MOTION        - 19 -
TO DISMISS - 4:09:cv-01630-CW
010098-11  308737 V1

### 3.     The Complaint Alleges Proximate Causation

Wells Fargo incorrectly contends that the Complaint fails to allege that the two enterprises

proximately caused harm to Plaintiffs.  *See* Motion at 18-19.  In *Diaz v. Gates*, 420 F.3d 897, 901

(9th Cir. 2005) (en banc), the Court explained the standards for proximate causation under RICO:

> The only requirement for RICO standing is that one be a 'person
> injured in his business or property by reason of a violation of section
> 1962.' 18 U.S.C. § 1964(c).  And the Supreme Court has already
> told us that 'by reason of' incorporates a proximate cause standard,
> *see Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68, 117
> L. Ed. 2d 532, 112 S. Ct. 1311 (1992), which is generous enough to
> include the unintended, though foreseeable, consequences of RICO
> predicate acts ….

Moreover, the Court stated that there is "no room in the statutory language for an additional, amor-

phous requirement that, for an injury to be to business or property, the business or property interest

have been the 'direct target' of the predicate act."  *Id*.  Thus, if a plaintiff "properly alleges that his

injuries were 'by reason of a violation of section 1962,' there is nothing to prevent him from 'suing

therefor.'  *See* 18 U.S.C. § 1964(c)."  *Id*. at 902.  *See also Oki Semiconductor Co. v. Wells Fargo

Bank*, 298 F.3d 768, 773 (9th Cir 2002) (the injurious RICO conduct need only be "a substantial

factor in the sequence of responsible causation") (internal quotation omitted).  Under those

standards, Plaintiffs adequately allege proximate causation, because the harm they suffered was an

integral part of the Defendants' wrongdoing.

Moreover, this case is similar to *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131

(2008), in which the Supreme Court held that the plaintiffs adequately alleged proximate causation

in a RICO case.  The Court explained that if the defendants had not engaged in mail fraud, the

plaintiffs would have had the opportunity to acquire valuable liens.  *See id*. at 2138 ("[R]espond-

ents lost the opportunity to acquire valuable liens.  Accordingly, respondents were injured in their

business or property by reason of petitioners' violation of § 1962(c)) ….").  Similarly, blacklisting

appraisers who would not agree to participate in their fraudulent appraisal scheme caused the

blacklisted appraisers to lose the opportunity to conduct honest appraisals for Defendants and

others.  Thus, the proximate cause is straightforward – Defendants refused to deal with Plaintiffs

solely because Plaintiffs would not falsify their appraisal reports in support of Defendants' scheme.

If Defendants had not hatched and carried out their scheme, Plaintiffs would have continued to receive business from them. *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 n.4 (9th Cir. 2002) (a class of agricultural laborers who alleged that their employers had depressed their wages by illegally hiring undocumented workers at below-market wages adequately alleged proximate cause by claiming an injury to their "legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes").

**B.      Plaintiffs State a Valid Claim for Interference With Prospective Economic Advantage**

Wells Fargo erroneously argues that the Complaint fails to allege a claim for interference with prospective economic advantage. *See* Motion at 22-25. Plaintiffs specify that Defendants' fraudulent scheme made it impossible for blacklisted appraisers such as themselves to obtain appraisal work from any mortgage lender where Wells Fargo is the lender. *See* Complaint, ¶¶ 8, 126-130. Indeed, the very purpose of blacklisting Plaintiffs is to prevent them from obtaining such business so as to serve Defendants' fraudulent scheme. Moreover, Defendants knew about their relationships with such brokers based on their history with Plaintiffs, and specifically schemed to prevent Plaintiffs from obtaining such business. These allegations accord with *Certain Underwriters at Lloyd's v. Real Estate Professionals Ins. Co.*, 2007 U.S. Dist. Lexis 88241, at *20-23 (C.D. Cal. Nov. 26, 2007) (cited by Wells Fargo), where the court held that the plaintiff had established the defendants' awareness of his relationships with insureds, on whose behalf the defendants had sought plaintiff's legal services but not with respect to his other relationships in the real estate, mortgage and home industry. *See also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (plaintiffs must allege the "*probability* of future economic benefit to the plaintiff" from third-party relationships) (emphasis added).

Moreover, there is no merit to Wells Fargo's argument that Plaintiffs have failed to allege conduct that is independently wrongful. *See* Motion at 24. In *Korea Supply*, the Supreme Court explained that an "act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." 29 Cal. 4th at 1159. Here, the wrongful conduct is not only the RICO violations but also the violations of USPAP, which have been adopted by California through regulations. *See* Cal. Code Reg., Title 10,

section 3701 ("Every holder of a license under this part shall conform to and observe the Uniform Standards of Professional Appraisal Practice (USPAP) and any subsequent amendments thereto as promulgated by the Appraisal Standards Board of The Appraisal Foundation which standards are herein incorporated into these regulations by reference as if fully set forth herein.").  As a result, Plaintiffs have adequately alleged conduct that is independently wrongful.

Wells Fargo misses the mark when it asserts that "the California statute that Plaintiffs point to as incorporating the USPAP does not provide a private right of action for violation of those standards, and so cannot support an alleged 'independent wrong.'"  *See* Motion at 24.  No court has ever required that the independent wrong must provide for a private right of action.  To the contrary, the Supreme Court in *Korea Supply* held that violations of the Foreign Corrupt Practices Act ("FCPA") constitute an independent wrong.  *See* 29 Cal. 4th at 1159 ("[T]he complaint alleges that the commissions paid by Loral to Kim exceeded the maximum allowable amounts established by the Foreign Corrupt Practices Act. (15 U.S.C. § 78dd-2(a)(1)(A), (B).)  The complaint thus clearly alleges that defendants engaged in unlawful behavior in order to secure the SAR contract.  KSC has, therefore, sufficiently alleged that defendants' acts, in addition to interfering with KSC's business expectancy, were wrongful in and of themselves.").  The Court reached that conclusion even though there is no private right of action under the FCPA.  *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1030 (6th Cir. 1990) ("since none of the *Cort* factors supports the plaintiffs' private right of action theory, we AFFIRM the district court's dismissal of the FCPA claim"); *Shoaga v. Maersk, Inc.*, 2008 U.S. Dist. Lexis 82711, *9 (N.D. Cal. Oct. 16, 2008) ("There are no private rights of action for violation of the FCPA or 18 U.S.C. § 1951.").  Therefore, there is no merit to Wells Fargo's argument that the independent wrong must be enforceable through a private right of action.

## IV.   CONCLUSION

The motion to dismiss should be denied.[10]

---

[10] If the Court dismisses any claim other than the claim under California's Unfair Competiton Law, Plaintiffs request leave to amend the Complaint.

1     DATED:  August 10, 2009

2

3                                          Jeff D. Friedman (SBN 173886)
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           715 Hearst Ave., Suite 202
4                                          Berkeley, CA  94710
                                           Telephone:  (510) 725-3000
5                                          Facsimile:  (510) 725-3001
                                           jefff@hbsslaw.com
6
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
7

8                                          By:   s/ Steve W. Berman
                                              Steve W. Berman (*pro hac vice*)
9                                             Thomas E. Loeser (SBN 202724)
                                              Genessa Stout
10                                         1301 Fifth Avenue, Suite 2900
                                           Seattle, Washington  98101
11                                         Telephone:  (206) 623-7292
                                           Facsimile:  (206) 623-0594
12                                         steve@hbsslaw.com
                                           toml@hbsslaw.com
13                                         genessa@hbsslaw.com

14                                         *Attorneys for Plaintiffs and the Proposed Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify that on August 10, 2009, I electronically filed the foregoing with the Clerk

4  of the Court using the CM/ECF system which will send notification of such filing to the e-mail

5  addresses registered, as denoted on the Electronic Mail Notice List.

6                                                  HAGENS BERMAN SOBOL SHAPIRO LLP

7                                          By:  _s/ Steve W. Berman_____
                                                 Steve W. Berman (*pro hac vice*)
8

9      **Electronic Mail Notice List**

10     • **Gayle M. Athanacio**
          gathanacio@sonnenschein.com
11     • **Steve W. Berman**
          steve@hbsslaw.com
12     • **Brooks Russell Brown**
          bbrown@goodwinprocter.com
13     • **Elizabeth Ferrick**
          eferrick@sonnenschein.com
14     • **Jeff D Friedman**
          jefff@hbsslaw.com
15     • **Charles A. Newman**
          cnewman@sonnenschein.com
16

17

18

19

20

21

22

23

24

25

26

27

28