Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUND APPRAISAL and SAVAGE APPRAISAL SERVICES, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK N.A. and VALUATION INFORMATION TECHNOLOGY, LLC, d/b/a RELS VALUATION,<br><br>Defendants. | Case No. 4:09-cv-01630-CW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** (Violation of Common Law Duty to Provide Fair Procedures)<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

<u>PAGE</u>

I.     NATURE OF THE ACTION ................................................................................... 1

II.    JURISDICTION AND VENUE .............................................................................. 3

III.   THE PARTIES ........................................................................................................ 3

IV.    SUBSTANTIVE ALLEGATIONS ........................................................................ 5

     A.    The Appraisal Business ............................................................................... 5

     B.    State and Federal Law Require Appraisal Independence .............................. 5

     C.    The Incentives for Mortgage Brokers and Lenders to Pressure Appraisers ................. 8

     D.    Wells Fargo .................................................................................................. 8

     E.    Wells Fargo and Rels Valuation Corrupt the Appraisal System ................. 9

     F.    The Suspension of Honest Appraisers .......................................................... 9

     G.    The Suspension or Blacklisting of Plaintiff Sound Appraisal ..................... 11

     H.    The Suspension of Savage Appraisal Services ............................................ 14

     I.     Examples of Other Appraisers Being Subject to Pressure and Blacklisted ................. 15

     J.     The Wells Fargo Brokerage Network .......................................................... 17

     K.    Investigations and Legal Action Relating to Wells Fargo's Practices ........ 19

V.     CLASS ACTION ALLEGATIONS ....................................................................... 19

     A.    Class Definition ............................................................................................ 20

     B.    Numerosity .................................................................................................... 20

     C.    Commonality ................................................................................................. 20

     D.    Typicality ...................................................................................................... 21

     E.    Adequacy ....................................................................................................... 21

     F.    The Prerequisites to Maintaining a Class Action for Injunctive Relief
        are Apparent ................................................................................................. 21

     G.    Common Questions Predominate, and the Class Action Device Is Superior ............. 21

VI.    FIRST CAUSE OF ACTION:  VIOLATION OF AND CONSPIRACY TO
      VIOLATE COMMON LAW DUTY TO PROVIDE FAIR PROCEDURES ........ 22

1

VII.    PRAYER FOR RELIEF ................................................................................................ 25

2

VIII.   JURY DEMAND ........................................................................................................... 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1       Plaintiffs Sound Appraisal and Savage Appraisal Services, Inc. ("Plaintiffs"), by and

2   through their attorneys, on behalf of themselves and all others similarly situated, bring this Class

3   Action Complaint against Defendants and allege, based upon personal knowledge as to their own

4   acts, and as to all other matters upon information and belief, as follows:

5                               I.       NATURE OF THE ACTION

6       1.      The independence and integrity of the real estate appraisers who determine the value

7   of home loan collateral is vitally important.  Appraisals are intended to provide borrowers and

8   lenders with an independent and accurate assessment of the true value of the property underlying a

9   loan.

10      2.      Federal and state laws exist to protect the integrity of the appraisal process so that

11  appraisers can provide borrowers and lenders with an independent and accurate assessment of the

12  value of a home.  Lenders are prohibited from pressuring appraisers into compromising their

13  independence and producing a report that is not based on the appraiser's objective opinion.

14      3.      Wells Fargo's mortgage originations increased exponentially during the lending

15  boom during 2000 – 2006.  The company incentivized employees to fund as many loans as quickly

16  as possible.  Wells Fargo's top-performing employees were rewarded with all-expense-paid trips

17  including helicopter rides, wine-tasting, horseback riding in Puerto Rico, and a private Jimmy

18  Buffet concert in the Bahamas.[1]

19      4.      Subprime loans in particular have increased Wells Fargo's profits through increased

20  interest rates, increased origination fees and other fees, and through the packaging of mortgage-

21  backed securities that are at the heart of the financial woes now plaguing our economy.

22      5.      Wells Fargo has embraced a host of practices that victimize consumers and have

23  substantially contributed to the financial woes now plaguing our economy.  Wells Fargo imposed

24  excessive fees and high interest rates, utilized deceptive marketing tactics, and steered customers to

25

26

27  _____

        [1] San Francisco Chronicle, Wells Fargo mortgage unit's bash in Vegas off (Feb. 4, 2009)
28  http://www.sfgate.com/cgi-
    bin/article.cgi?f=/c/a/2009/02/04/BUCG15MPJK.DTL&feed=rss.business.

1    sub-prime loans to maximize Wells Fargo's profits.  It engaged in loan "flipping," selling

2    overpriced insurance, and offered sham "open-end" loans and credit cards.[2]

3           6.     In approximately 2004, instead of dealing with the appraisers directly, Wells Fargo

4    began routing appraisal requests through the appraisal management company Rels Valuation.[3]

5           7.     As part of its corporate objective to abandon underwriting standards in order to

6    maximize market share and profits, Wells Fargo and Rels Valuation have together engaged in a

7    practice of pressuring and intimidating appraisers into using appraisal techniques that produce

8    appraisals that meet Wells Fargo's business objectives even if the use of such appraisal techniques

9    is improper and in violation of industry and regulatory standards.  If appraisers fail to "play ball" as

10   Wells Fargo demands, Wells Fargo, through Rels Valuation, removes the appraiser from the list of

11   approved appraisers, which essentially "blacklists" the appraiser.  Once an appraiser is blacklisted,

12   Wells Fargo and Rels Valuation will no longer request appraisals or accept appraisals from these

13   persons and companies.

14          8.     When Wells Fargo and Rels Valuation remove appraisers from the list of approved

15   appraisers, they routinely do not provide any notice to the appraisers that they have been removed

16   from that list.  As a result, appraisers frequently do not even know that they have been removed

17   from the list.  If Wells Fargo and Rels Valuation give notice that an appraiser has been removed

18   from the list of approved appraisers, the notice is always cursory and fails to provide sufficient

19   detail for the appraiser to know the basis for the removal.  If an appraiser realizes that he or she has

20   been removed from the list of approved appraisals – either directly through a cursory notice or after

21   realizing that he or she is no longer receiving business from Wells Fargo and Rels Valuation – and

22   then inquires about no longer receiving work, Wells Fargo and Rels Valuation do not give the

23   appraiser meaningful information and do not give the appraiser an opportunity to seek relief from

24   being removed from the list.

25

26          [2] Center for Responsible Lending, A Review of Wells Fargo's Subprime Lending 6 (April
     2004), http://www.responsiblelending.org/pdfs/ip004-Wells_Fargo-0404.pdf.

27          [3] Based on a January 30, 2009, email from Don Pearsall confirming that in January 2004 Wells
     began using ValueIT/Rels.

28

     FIRST AMENDED CLASS ACTION COMPLAINT          - 2 -

     010098-11  331412 V1

9.      In addition to Rels Valuation's refusal to use appraisers removed from the approved list, independent loan mortgage brokers, which also hire appraisers, may refuse to use blacklisted appraisers if Wells Fargo is the lender, since they do not want to order and have a borrower pay for an appraisal Wells Fargo will not accept.  Given Wells Fargo's enormous size and clout in the mortgage market, blacklisted appraisers lose substantial revenue – all because they refused to compromise their integrity and violate industry's standards at Wells Fargo's insistence.  In essence, being blacklisted by Wells Fargo is a serious economic blow for an appraiser who will not do business the Wells Fargo way, *i.e.*, illegally.

10.     Wells Fargo and Rels Valuation have caused substantial damage to thousands of appraisers across the United States and have distorted real estate prices in the marketplace. Therefore, this suit is necessary to stop Wells Fargo and Rels Valuation's unlawful behavior and to compensate appraisers that were subject to Wells Fargo's unlawful scheme.

## II.      JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which confers federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any Defendants" and the aggregated amount in controversy exceeds five million dollars ($5,000,000).  *See* 28 U.S.C. §§ 1332(d)(2) and (6).

12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  Assignment to the San Francisco or Oakland division of this Court is appropriate under Civil Local Rule 3-2 because Defendant Wells Fargo Bank, N.A. is headquartered in San Francisco County, California and, therefore, a substantial part of the events or omissions which give rise to the claims in this action occurred in San Francisco County.

## III.      THE PARTIES

13.     Plaintiff Sound Appraisal is a sole proprietorship with its principal place of business in Puyallup, Washington.  Sound Appraisal is in the business of providing real estate appraisals to mortgage brokers and mortgage lenders.

FIRST AMENDED CLASS ACTION COMPLAINT        - 3 -

010098-11 331412 V1

14.     Plaintiff Savage Appraisal Services, Inc. ("Savage Appraisal Services") is an S corporation with its principal place of business in Vail, Colorado.  Savage Appraisal Services is in the business of providing real estate appraisals to mortgage brokers and mortgage lenders.

15.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls, South Dakota.  It is headquartered in San Francisco, California.  Wells Fargo Bank, Ltd., is licensed by the California Department of Financial Institutions and offers loans through Wells Fargo Bank, N.A.  In turn, Wells Fargo Bank, N.A., provides residential mortgages through its division Wells Fargo Home Mortgage.

16.     Wells Fargo Bank is a diversified financial services company that provides retail and business banking, insurance, investments, mortgages, and consumer finance across the United States.  The company is one of the top "cross-sellers" of financial services in the country, offering credit cards, personal loans, wealth management services, and insurance.  Business-oriented services include commercial banking services, lending, investment banking, venture capital, and equipment leasing.  Wells Fargo is one of the leaders in the realm of online banking, having become the first major financial services firm to offer Internet banking back in 1995.

17.     The company's community banking operations serve nearly 11 million customers through more than 3,000 bank branches (or what the company calls "stores") in 23 states, most of which are in the western United States – Ohio being the easternmost state of operation.  Wells Fargo Home Mortgage boasts it is the nation's number one originator and number two servicer of residential mortgages.  Wells Fargo has more than 1,200 home mortgage 'stores' and serves all 50 states.

18.     Collectively, these entities are referred to as "Wells Fargo."

19.     Defendant Valuation Information Technology, LLC, d/b/a Rels Valuation, ("Rels Valuation") is an Iowa limited liability company headquartered in Minnetonka, Minnesota.  Rels Valuation is a joint venture between First American Real Estate Solutions, a subsidiary of First American Corporation, and Wells Fargo Foothill, a subsidiary of Wells Fargo & Co.  Rels Valuation is a provider of real estate settlement services including property appraisals.

FIRST AMENDED CLASS ACTION COMPLAINT          - 4 -

1

### IV.   SUBSTANTIVE ALLEGATIONS

2

**A.   The Appraisal Business**

3      20.    An appraiser is most commonly retained by a mortgage broker or mortgage lender

4   in order to value the property that will be used as the collateral for the loan.  An appraiser's role is

5   to provide an unbiased assessment of the property's value and to ensure this value actually reflects

6   the estimated opinion of market value.  An accurate appraisal ensures that the loan is adequately

7   collateralized in case the borrower defaults and necessary to determine whether the contemplated

8   loan meets lender and/or governmental guidelines.[4]

9      21.    A typical appraisal involves the appraiser's physical inspection of the property.  The

10   appraiser takes inventory of the number of rooms, the square footage, and assesses the overall

11   condition and quality of the property.  The appraiser also reviews recent property sales that the

12   appraiser believes are comparable to the property being studied, and these "comps" serve as value

13   benchmarks that aide the appraiser in determining the property's worth.

14      22.    After the appraiser has concluded his or her review, the appraiser typically provides

15   the mortgage broker or lender with a report that estimates the value of the property and either

16   confirms or challenges the sale price agreed to between the buyer and the seller.

17      23.    Appraisers either work "in house" as part of the broker's or lender's own operations

18   or work as independent contractors.  In the latter case, the appraiser builds a book of business by

19   servicing as many mortgage brokers and lenders in a given geographic region as possible.

20      24.    These brokers and lenders are the "lifeblood" of the independent appraiser's

21   revenue.  Without their business, an appraiser cannot operate.

22

**B.   State and Federal Law Require Appraisal Independence**

23      25.    Because of the importance of appraisals in the home lending market, state and

24   federal statutes and regulations require that appraisals be accurate and independent.  The Uniform

25   Standards of Professional Appraisal Practice ("USPAP"), which are incorporated into California

26

---

27      [4] For example, with respect to lender guidelines, to avoid having to pay Private Mortgage
Insurance (PMI) a loan usually must have a Loan to Value (LTV) no greater than 80%.  With
respect to governmental guidelines, if a contemplated loan will be subject to Federal Housing
Authority (FHA) guarantee, it must have a LTV not higher than 97%.

28

law, Cal. Code Reg., Title 10, § 3701, require appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue."  USPAP Ethics Rule (Conduct).  USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."  In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.  The Director of California's Office of Real Estate Appraisers may "issue a citation, order of abatement, assess a fine or private or public reproval, suspend or revoke any license, and/or may deny the issuance or renewal of a license of any person who has … [v]iolated any provision of USPAP."  Cal. Code Reg., Title 10, § 3721(6).

26.     California Civil Code section 1090.5(a) states, "No person with an interest in a real estate transaction involving an appraisal shall improperly influence or attempt to improperly influence, through coercion, extortion, or bribery, the development, reporting, result, or review of a real estate appraisal sought in connection with a mortgage loan."  And section 1090.5(c) states, "If a person who violates this section is licensed under any state licensing law and the violation occurs within the course and scope of the person's duties as a licensee, the violation shall be deemed a violation of that state licensing law."  Further, California Business and Professions Code section 11323 states, "No licensee shall engage in any appraisal activity in connection with the purchase, sale, transfer, financing, or development of real property if his or her compensation is dependent on or affected by the value conclusion generated by the appraisal."

27.     California's Department of Financial Institutions sends out a notice on February 4, 2009, saying that it "is the jointly held intention of the Commissioners of the Department of Real Estate (DRE), the Department of Corporations (DOC), the Department of Financial Institutions (DFI), as well as the Director of the Office of Real Estate Appraisers (OREA), to provide outreach to their respective licensees for the purpose of informing those licensees that the following acts may constitute evidence of a violation of California law, and Civil Code section 1090.5 in

1  particular, and should be avoided when engaging the services of a licensed real estate appraiser."

2  The notice further states that the unlawful acts include "allowing the removal of an appraiser from

3  a list of qualified appraisers, or the addition of an appraiser to an exclusionary list of disapproved

4  appraisers, used by any entity, without prior written notice to such appraiser, which notice shall

5  include written evidence of the appraiser's illegal conduct, a violation of the Uniform Standards of

6  Professional Appraisal Practice (USPAP) or state licensing standards, substandard performance,

7  improper or unprofessional behavior or other substantive reason for removal."

8        28.    Federal law sets independence standards for appraisers involved in federally-

9  regulated transactions.  *See* 12 U.S.C. §§ 3331, *et seq.*  The Code of Federal Regulations provides

10  that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and

11  collection functions and not involved, except as an appraiser, in the federally related transaction,

12  and have no direct or indirect interest, financial or otherwise, in the property."  12 C.F.R. § 34.45.

13  For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the

14  appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or

15  indirect interest, financial or otherwise, in the property transaction."  12 C.F.R. § 34.45.

16        29.    In 2005, federal regulators, including the Office of Thrift Supervision ("OTS"),

17  published "Frequently Asked Questions on the Appraisal Regulations and the Interagency

18  Statement on Independent Appraisal and Evaluation Functions."  With regard to appraisal

19  independence, the document highlighted the importance of independence and condemned attempts

20  to interfere therewith:

21             3.    *Who should be considered the loan production staff for purposes of achieving appraiser independence?  Could loan*

22                 *production staff select an appraiser?*

23           *Answer:*     The loan production staff consists of those responsible
for generating loan volume or approving loans, as

24                      well as their subordinates.  This would include any
employee whose compensation is based on loan

25                      volume.  Employees responsible for the credit
administration function or credit risk management are

26                      not considered loan production staff.  Loan production
staff should not select appraisers.

27                                        * * *

28

FIRST AMENDED CLASS ACTION COMPLAINT     - 7 -

5.   *When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided the list is not under their control?*

*Answer:*   Yes, loan production staff may use a revolving, board-approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control.  Staff responsible for the development and maintenance of the list should be independent of the loan production process. . . .  Further, there should be periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that controls exist to ensure independence.

## C.   The Incentives for Mortgage Brokers and Lenders to Pressure Appraisers

30.   Traditionally, mortgage lenders held a substantial amount of the mortgage loans that they originated, which incentivized them to ensure that loans were adequately collateralized.

31.   Over time, the mortgage industry landscape changed.  Rather than holding the mortgage loans, lenders now regularly sell them in the financial markets.  The loans are then pooled together, securitized and sold to institutions and investors as mortgage-backed securities.  Today, the vast majority of mortgage loans are sold, leaving the original lender holding far fewer mortgages in its portfolio.  The money that the lender receives for selling its mortgage loans is then used to finance new mortgages, thereby increasing the lender's profits and aiding its stock price.

## D.   Wells Fargo

32.   One of the biggest drivers in Wells Fargo's steady growth is its mortgage business.  In 2000, Wells Fargo earned $76.5 billion in mortgage originations and reported its focus was increased efficiency, higher ancillary revenue, and new channels and partnerships.  Three years later, Wells Fargo's earnings from mortgage originations were $470 billion.  Although Wells Fargo's mortgage lending segment includes, retail, wholesale, and correspondent lending, Wells Fargo has relied more heavily on retail originations compared with other major lenders.[5]

33.   Wells Fargo has sourced loans through a vast network of thousands of contracted mortgage brokers.

---

[5] Center for Responsible Lending, A Review of Wells Fargo's Subprime Lending 2 (April 2004), http://www.responsiblelending.org/pdfs/ip004-Wells_Fargo-0404.pdf.

34.     With the real estate boom of 2000-2006, the number of refinance and purchase transactions in real estate increased significantly.  To service the drastic increase in transactions, the number of real estate related service providers also grew tremendously.  For example, the number of realtors in the United States grew from 750,000 in 2000 to over 1.3 million in 2007.[6] Likewise, Wells Fargo's fleet of corporate and affiliated mortgage brokers grew as did the number of property appraisers.

**E.     Wells Fargo and Rels Valuation Corrupt the Appraisal System**

35.     With the growing number of appraisers and increased competition in the appraisal marketplace, the environment was ripe for a market force such as Wells Fargo to exert its will on appraisers.  In 2004, Wells Fargo stopped dealing directly with appraisers and forced "independent" appraisers to receive appraisal work from Wells Fargo through their affiliate Appraisal Management Company (AMC), ValueIT, an appraisal clearing-house that contracts with independent appraisers to meet Wells Fargo's and other lenders' appraisal needs.  ValueIT eventually changed its name to Rels Valuation; and through Rels Valuation, Wells Fargo is able to indirectly pressure the "independent" appraiser in order to get the value Wells Fargo needs to fund the loan at issue.

36.     On information and belief, Wells Fargo routes all of its Distributed Retail appraisal work, and nearly all of the appraisal work for Wells Fargo's centralized retail, banking, home equity, and consumer credit group units to Rels Valuation.[7]

**F.     The Suspension of Honest Appraisers**

37.     Part of Wells Fargo's scheme to increase market share and to make as many loans as possible has involved the corruption of the appraisal process.  Wells Fargo needs appraisals that support the loans it wishes to make, irrespective of the actual values of the properties being appraised.

---

[6] Jack W. Plunkett, Plunkett's Real Estate & Construction Industry Almanac 2008 15 (Plunkett Research, Ltd. 2008).

[7] March 3, 2009 email from "John Smith" appraiser, forwarding Oct. 2008 email from Jeff Peters, Rels Valuation, Divisional Appraisal Manager.

38.     To accomplish this objective, Wells Fargo, directly and in conjunction with Rels Valuation, has engaged in a pattern and practice of pressuring appraisers to write an appraisal designed to have the loan underwritten even if the appraisal violates USPAP.  In other words, Wells Fargo is more interested in having the property pass appraisal than it is in determining whether an appraisal is fair and accurate and prepared in accordance with industry standards.

39.     Wells Fargo and Rels Valuation utilize a host of indirect and underhanded methods to communicate to the appraiser the value needed to fund the loan, and the value the appraiser is expected to "hit."  For example, Rels Valuation's appraisal order form indicates the "Borrower Estimated Value."  Appraisers know that this value reflects the value the appraiser is expected to meet or exceed in their appraisal in order to "make the deal."  In some instances, Wells Fargo and Rels Valuation also select and provide appraisers with the comparables they want the appraiser to use.  As discussed previously, part of the appraisal process involves an appraiser's review of recent property sales that the appraiser believes are comparable to the property being studied, and these "comps" serve as value benchmarks that aide the appraiser in determining the property's worth. When Wells Fargo and Rels Valuation provide the appraiser with the comps they want the appraiser to use, the appraiser's integrity and independence is compromised.  The appraiser is thereby pressured to ensure that the appraised value of the property in question matches the comps, even if the appraiser does not independently believe the comps are in fact comparable.

40.     If an appraiser does not "play ball" and produce a report affirming the property value or the parameters that Wells Fargo expects or wants, Wells Fargo, through Rels Valuation, suspends the appraiser or removes the appraiser from the list of preferred appraisers and, in essence, "blacklists" the appraiser.

41.     The suspension list or blacklist is a Wells Fargo and Rels Valuation database containing the names of appraisers who have been suspended or removed from the list of preferred appraisers because their appraisals were not accepted by Wells Fargo, and thus were not accepted by Rels Valuation.

42.     Rels Valuation is a "captive" puppet of Wells Fargo, either by virtue of partial ownership by a common parent or economic power as its largest client.  Rels describes itself as

"lucky to have our wagon hitched to the Wells Fargo stagecoach."[8]  To this extent, Rels Valuation knows what Wells Fargo wants to accomplish and, with its suspension list, Rels Valuation facilitates Wells Fargo's scheme by attacking the appraisals of persons on the list and undercutting valuations, whether warranted or not.

**G.      The Suspension or Blacklisting of Plaintiff Sound Appraisal**

43.      Plaintiff Sound Appraisal is owned and operated by Mr. Don Pearsall.  Mr. Pearsall is an appraiser licensed to serve all counties in Washington State.

44.      In 1989, Mr. Pearsall began working as an apprentice appraiser.  He received his appraisal license in 1992.  Mr. Pearsall began operating Sound Appraisal in 2001.

45.      Sound Appraisal has historically conducted appraisals for area mortgage brokers and major lenders such as Countrywide, Wells Fargo, Washington Mutual, and others.  Due to its expertise and experience as an appraiser, Sound Appraisal often conducts "review appraisals" to ensure that appraisal reports by other appraisers are accurate and in compliance with regulations.

46.      In June 2007, Sound Appraisal received an order from Wells Fargo through Rels Valuation to conduct an appraisal of a single family residence at 39027 264th Ave. SE, Enumclaw, Washington (the "Enumclaw Residence").  The order stated that the sales price of the Enumclaw Residence was $235,000.00, and that the lender was Wells Fargo Bank, N.A.

47.      Don Pearsall, Sound Appraisal's sole proprietor, visited the Enumclaw Residence, and found that it was under construction for a complete interior remodel.  It could not be lived in, because there was no working kitchen or bath and because there were construction materials throughout the residence.  The seller was present, and told Mr. Pearsall that he and the buyer, who was his friend, were cooperating on the remodel.

48.      Mr. Pearsall knew that Wells Fargo would not make a loan on a residence that is not inhabitable, so he called Rels and asked if he should make the report "AS IS" or "Subject to Completion."  The processor to whom he spoke said she would consult with Wells Fargo and get

---

[8] March 3, 2009, email from "John Smith" appraiser, forwarding Oct. 2008 email from Jeff Peters, Rels Valuation, Divisional Appraisal Manager.

FIRST AMENDED CLASS ACTION COMPLAINT          - 11 -

1    back to him.  After a few hours, she called back and said that he should make the valuation "AS

2    IS."

3            49.    Mr. Pearsall prepared a report entitled "Appraisal of Real Property," which valued

4    the Enumclaw Residence at $350,000.00 as of June 7, 2007.  Throughout that report, Mr. Pearsall

5    explained that the Enumclaw Residence was being remodeled, and that $350,000 was the "as is"

6    value, which he had been told that Wells Fargo had requested.  The report includes photographs of

7    the Enumclaw Residence, showing that the remodel was in process, and provided information

8    about five comparable properties.

9            50.    After a few days had passed, processors from Rels Valuation started contacting

10    Mr. Pearsall by telephone, telling him that he had to change his report on the Enumclaw Residence

11    and take out all references to a remodel being in progress.  He received approximately five phone

12    calls to that effect from Rels Valuation processors and more senior members of Rels Valuation.  In

13    each call, he told the caller that he could only change the report to indicate that the appraised value

14    was "subject to completion" of the remodeling.  In every phone call, he asked for a new order

15    document for the request for a new or changed appraisal.  On several occasions, the caller said that

16    Rels Valuation would send him a new order, but he never received such a new order.

17            51.    Mr. Pearsall knew that under USPAP, his report had to reflect his independent

18    opinion of the property's value, and that altering the appraisal report to reflect Rels Valuation's

19    desired views would compromise his independence and would violate USPAP.  Thus, Mr. Pearsall

20    refused to alter the report.

21            52.    On approximately June 26 or 27, 2007, Mr. Pearsall received a phone call from

22    Randall Pierzina, with whom Mr. Pearsall had never before spoken.  In that call, Mr. Pierzina was

23    overbearing, telling Mr. Pearsall that he was Rels Valuation's area manager and that he was

24    Mr. Pearsall's boss.  Mr. Pierzina kept asking, "Do you know who I am?", with his tone making it

25    clear that Mr. Pearsall should be afraid of him.  Mr. Pierzina demanded to know why Mr. Pearsall

26    would not do what Rels Valuation people wanted.  Mr. Pearsall told Mr. Pierzina that it would be a

27    violation of ethics to do what they wanted.  Mr. Pearsall asked Mr. Pierzina if he was an appraiser,

28    and Mr. Pierzina said he was.  Mr. Pearsall said that if Mr. Pierzina was an appraiser, he should

know that to alter the report as requested by Rels Valuation would be a violation of ethics and several USPAP standards.  Mr. Pierzina became more and more angry, and yelled into the phone, "YOU APPRAISERS TAKE USPAP TOO SERIOUSLY."  Mr. Pearsall was shocked at that statement.  Then, Mr. Pierzina demanded to know when Mr. Pearsall would send the altered report.  Mr. Pearsall again stated that the requested report would violate USPAP.  Mr. Pierzina then said that he would "remove" Mr. Pearsall from the "eligible list" if Mr. Pierzina did not receive the requested, altered report immediately.  Mr. Pearsall tried to mediate the conflict by telling Mr. Pierzina that he would change the report once he got a written request.  Mr. Pierzina demanded to know why Mr. Pearsall wanted another request, and told Mr. Pearsall that he should make the changes that Rels Valuation wanted.  Mr. Pearsall told Mr. Pierzina that such a request for an altered report is required for record keeping by USPAP.   Mr. Pierzina then hung up the phone.  The call lasted approximately ten minutes.

53.     On August 27, 2007, Mr. Pearsall received a written order from Rels Valuation for an "Appraisal Update" for the Enumclaw Residence.  Mr. Pearsall called Rels Valuation, because it was not clear what he was supposed to update.  The Rels processor told him that he was supposed to change the report to show that the remodel had been completed.  Mr. Pearsall refused to change the report to stated that the remodel had been completed, because the remodeling project had *not* been completed.  Instead, he revised the report to show that the Enumclaw Residence was still under construction, that the appraised value was $475,000, and that the "appraised value is subject to the remodel project being completed and the home ready to occupy."  Mr. Pearsall knew that Rels wanted him to state that the remodel had already been completed and that failing to do so might cause him problems, but he would not provide a fraudulent report to that effect.

54.     In an email to Mr. Pierzina dated January 2, 2009, Mr. Pearsall stated:

> Hello Randy, Leigha Warner is an associate of mine in the Olympia area.  She reports that is getting lots of RELS orders.  However I am not getting any, although I have been on the RELS panel far far longer than she has.  Can you tell me why I am not getting any orders?  I cover all of Thurston, Pierce, King, Kitsap, and Snohomish counties.  [¶]  Thank you very much.

In a responsive email dated January 5, 2009, Mr. Pierzina stated, "Don, Yes I can explain.  You are on suspension because you REFUSED to comply with an OPUS issue.  [¶]  Thank you."  He did not explain what an "OPUS issue" is and never provided any further explanation for the suspension of Mr. Pearsall and Sound Appraisal or any procedure by which Mr. Pearsall could challenge, or seek relief from, his suspension.

55.     On April 8, 2009, Mr. Pearsall received a telephone call from Rels Valuation for a work order request that confirmed the existence of the blacklist.  The conversation was as follows:

> Pearsall:          I would love to take the job, but aren't I on your
>                    blacklist?
>
> Rels employee:  Oh, let me check.  (Puts Pearsall on hold.)
>
> Rels employee:  (after checking)  I'm sorry.  I wasn't supposed to
>                    contact you.
>
> End of call.

56.     The employee thus confirmed the existence of the blacklist.

57.     Before Sound Appraisal was blacklisted, approximately 25-35% of its business came from Wells Fargo and Rels Valuation.  Since being blacklisted, Sound Appraisal has not received any appraisal orders from Rels Valuation.  In 2006, Sound Appraisal's income from Rels Valuation was $33,395, which represented 36.95% of its total income for the year.  Since that time, Sound Appraisal's income from Rels Valuation has been $0.

**H.     The Suspension of Savage Appraisal Services**

58.     The owner and President of Savage Appraisal Services is Timothy W. Savage.  Mr. Savage has been a highly respected real estate appraiser in Vail, Colorado for 18 years.

59.     Savage Appraisal Services worked on Rels Valuation orders for over 12 years.

60.     In January of 2009, Savage Appraisals Services performed two appraisal assignments for Rels Valuation.  After the appraisals were delivered, Rels Valuation sent emails, pressuring Mr. Savage to increase the value of each appraisal as the homeowners were not happy with his opinion of value.

61.     On January 14, 2009, Emlee Becker, a "Collateral Compliance Reviewer" for Rels Valuation, sent an email to Mr. Savage purporting to provide information "to support an increased

value" of property at 945 Sandstone Road, Vail, Colorado.  On January 15, 2009, Donna Londrem, a "Collateral Compliance Reviewer" for Rels Valuation, sent Mr. Savage an email purporting to provide information to "support an increased valuation" for property at 993 Lionsridge Loop 322, Vail, Colorado.  On both occasions, Mr. Savage reviewed the materials provided to determine whether, under USPAP, an increased valuation was appropriate.  After a lengthy letter of explanation, Mr. Savage refused to increase his original opinion of value for the two homes at issue.

62.     The next time Mr. Savage heard from Rels Valuation, via a letter dated February 5, 2009, was to inform him that "you have been removed from the Valuation Support Services approval panel at this time."  No explanation was given, and Defendants have never provided any procedure by which Mr. Savage could challenge, or seek relief from, his removal from the approval panel.

63.     Mr. Savage tried several times, unsuccessfully, to get a detailed response from Rels Valuation as to why he was placed on their blacklist.

64.     Savage Appraisal Services has lost and will continue to lose substantial income as a direct result of being blacklisted.  Savage Appraisal Services' total income was $179,142 in 2006, $209,394 in 2007, and $133,582 in 2008.  In each of those years, Savage Appraisal Services was paid approximately $23,000 by Rels for appraisal work.  Since it was blacklisted, Savage Appraisal Services' income from Rels Valuation has been $0.

**I.     Examples of Other Appraisers Being Subject to Pressure and Blacklisted**

65.     The Plaintiffs' experience is typical of how others have been treated who would not succumb to Rels Valuation's pressure to violate USPAP.

66.     "CW"[9] 1 from Arizona reports:

> I read about your investigation into Wells Fargo/RELS on MarketWatch.  Are you also interested in, or currently representing appraisers?  Our company, & one appraiser in particular, has been 'blacklisted' from RELS because **we refused to 'reconsider' values** (hit their numbers) & requested fair fees.  When I contacted Anthony Vermuelen, head of RELS, he stated he didn't have to give a reason for removing us from the list, however a Wells Fargo loan officer said he was told by Mr. Vermuelen there were 'ethical issues'.

_____
[9] CW refers to "Confidential Witness."

1    Please let me know if we can help at all – I suspect there are many
2    more ethical appraisers in the AZ market who have had the same
     experience.

3    67.    CW 2 from Nevada reports:

4    I was blacklisted by Rels by an individual by the name of Matt
     Nelsen.  **He was trying to influence my value estimate.**  We
5    discussed the property and appraisal practices and procedures and I
     told him that what he was trying to do is "risk management" and my
6    job was to do an appraisal according to USPAP and recognized
     appraisal practices.  The discussion heated up and I mentioned to him
7    that it felt like he was trying to influence my value estimate.  I told
     him of my qualifications – Associate of Applied Science in Real
8    Estate – Cum Laude, BBA-Magna Cum Laude, Masters in
     Management, Taught Appraisal and Real Estate Course for five years
9    at the College level, Appointed to the Advisory Committee for the
     Real Estate Curriculum at the College of Southern Nevada, part of
10   the University of Nevada system, and appointed to the Education
     Commission for the Appraisal Division for the State of Nevada.

11
12   68.    CW 3 from Washington reports:

13   I worked for RELS for approximately 11 years.  *I quit a couple of*
     *years ago due to the growing pressure to inflate values.*  I still have
     the letter I sent to the president, and divisional manager outlining the
14   reason I was quitting was increased pressure to inflate values. Since I
     quit I have been blacklisted from completing any appraisals for Wells
15   Fargo and RELS.  For several years I worked for RELS I was in the
     top 10 producers nation wide.

16
17   69.    CW 4 from Pennsylvania reports:

18   I was assigned to the Wells Fargo Team.  I lasted only 6 weeks
     before I'd had enough. I cannot ethically agree with the hiring of
     people with any form of mortgage industry background to review
19   reports. Paying an appraiser ½ of the actual fee, and then not
     properly disclosing this via the settlement statement would appear to
20   be a RESPA violation.

21   70.    CW 5 from Illinois reports:

22   About a year ago, I was pressured to evaluate my appraisal for a
     higher value that the customer of Wells Fargo thought should be
23   higher.  This happened several times.  I checked the box that said that
     I had been pressured and I have not heard from them since.  I
24   discussed with them on the phone my position and they suggested
     my fees were too high.  I have not worked for them for a long time.
25   Am I blacklisted?

26   71.    CW 6 reports from Illinois:

27   I am sure we are on that black list in Illinois, when we refused to do
     drive bys with values placed on the orders for refinance not
28   purchases.  The orders stated that if property didn't make value as

FIRST AMENDED CLASS ACTION COMPLAINT          - 16 -

drive by appraiser had to go back and do full order minus the fee of the drive by. We refused to follow this procedure because we didn't allow our appraiser to see the number for the drive by following USPAP and Illinois law. After the first order they have not sent us another since this policy went in effect and we refuse to follow it.

72.    CW 7 from Virginia reports:

I have done a large number of appraisals for Wells Fargo / RELS in the past. I was blacklisted (or taken off the upper tier of appraisal vendors) for not succumbing to a Wells Fargo Branch Manager request for a higher value on a refinance loan.

73.    CW 8 from Indiana reports:

I had previous[ly] performed FHA and conventional appraisals for RELS approximately 2 years ago. However, I ended the relationship after being threaten by my account representative. This young lady told me I had to do what RELS and the loan officer said or I would not be paid. What they were asking be to do was an out and out violation of USPAP and guidelines set forth by HUD/FHA. I quickly ended my relationship after this incident.

74.    CW 9 from Oregon reports:

I am a real estate appraiser and have had a connection with RELS/ValueIT for 12 years having done a number of appraisal reports for them over the years for Norwest Mrg. and then Wells Fargo. During that time I was blacklisted twice, once in 1999 and again in 2007. . . . In good times of increasing values this was no particular problem but, in the times leading into recessions it became a problem to get an appraisal approved if it did not meet the needs of the lender which was usually a conflict over a valuation where I tried to reflect current market conditions as they existed at the time.

**J.    The Wells Fargo Brokerage Network**

75.    Wells Fargo has a network of contracted mortgage brokers that participate in their Broker's First® program and complete home mortgage loans through Wells Fargo. Brokers become authorized as Wells Fargo Approved Brokers by submitting a mortgage broker application package and entering into a broker agreement with Wells Fargo. These contracted brokers are provided access to Wells Fargo's Broker's First® and Direct Express℠ computer systems, which are designed to allow the mortgage broker to submit loan information and receive qualified loan decisions and instant feedback on first mortgages, piggyback submissions, or home equity decisions.

FIRST AMENDED CLASS ACTION COMPLAINT          - 17 -

76.     On information and belief, Wells Fargo's Real Estate Settlement Service, RES Direct, manages, *inter alia*, the process of approving brokers.  Under the Real Estate Settlement Procedures Act (RESPA), settlement service providers are prohibited from requiring the use of other settlement service providers in order to ensure that conflicts of interest and backroom deals do not drive up settlement costs or corrupt the home purchase process.  However, RESPA has an exception that specifically allows lenders to require the use of a particular appraiser.[10]  Cognizant of this loophole, RES Direct pressures the brokers to use Rels Valuation for their appraisal needs or causes brokers to use Rels Valuation by default.  Wells Fargo's pressure of independent mortgage brokers to use Rels Valuation for their appraisal needs furthers Wells Fargo's scheme to manipulate the appraisal process to advance Wells Fargo's financial goals.  Once brokers use Rels Valuation, Rels has confirmed that, "Rels Valuation, under direction from Wells Fargo, does NOT allow the broker any choice, recommendation, etc. in selecting who will appraise their property."

77.     Wells Fargo needs its network of authorized brokers knowingly or unknowingly complicit in their scheme with Rels Valuation to pressure appraisers to inflate property values and maximize profits from the loan.   A broker, who never holds the loan after funding, has no incentive to ensure that the appraisal is an accurate assessment of the property's true market value, he or she just wants the deal to close.

78.     The process of securitizing loans and selling them to the secondary market changed the mortgage industry and has diminished the broker's and the lender's incentive to ensure the appraisal backing the loan is accurate.  Because lenders' profits are determined by the quantity of loans that they successfully close, and not the quality of those loans, the lender has an incentive to pressure appraisers to reach values that will allow the loan to close – without regard to whether the appraisal accurately reflects the home's actual value.  Likewise, the independent broker is not tied

---

[10] Since, absent the mass marketing of loans to the secondary market, a lender would have an interest in making sure an appraisal accurately reflects home value, this exception conceptually would make sense as the last thing a lender would want is an inflated appraisal.  However, since the lender no longer owns the loan, whether it is adequately collaterized has become "someone else's problem" and the synergy no longer exists.  Unfortunately, RESPA has not been changed to reflect the current state of affairs.

1       to a particular lender, but instead has relationships with multiple lenders and seeks to comply with

2       the lender's wishes and conditions in order to service clients and maximize their profits.

3       **K.     Investigations and Legal Action Relating to Wells Fargo's Practices**

4            79.     Wells Fargo has been the subject of numerous investigations for deceptive practices

5       that undermine the integrity of the mortgage origination process.

6            80.     In March 2008, the Illinois attorney general issued fair lending subpoenas to Wells

7       Fargo and Countrywide to determine whether these companies steered minority borrowers into

8       higher cost or otherwise inappropriate home loans in violation of fair lending and civil rights

9       laws.[11]

10           81.     The city of Baltimore sued Wells Fargo in January 2008 alleging that Wells Fargo

11      engaged in a pattern of predatory lending practices in Baltimore's poorest neighborhoods, leading

12      to foreclosure rates that nearly doubled the city-wide average.[12]

13           82.     In June 2004, the Association of Community Organizations for Reform Now

14      (ACORN) filed three lawsuits against Wells Fargo & Co. and Wells Fargo Financial, Inc. charging

15      the company with a broad range of unfair and deceptive lending practices, including misleading

16      borrowers about the real terms and conditions of their loans, "bait and switch" sales tactics, and

17      routinely failing to inform borrowers with good credit that they can qualify for credit at

18      significantly better rates and fees than those charged them by Wells Fargo.  Wells Fargo & Co.

19      ultimately settled the class action.[13]

20                         **V.     CLASS ACTION ALLEGATIONS**

21           83.     Plaintiffs bring all claims herein as class claims pursuant to Rule 23 of the Federal

22      Rules of Civil Procedure.  The requirements of subparts 23(a) and 23(b)(2), and (b)(3) are met with

23      respect to the Class defined below.

24

25          [11] Press Release, Office of the Illinois Attorney General Lisa Madigan, Illinois Attorney
26      General Sues 14th Company for Mortgage Rescue Fraud (Aug. 28, 2008),
http://www.ag.state.il.us/pressroom/2008_08/20080828.html.

27          [12] http://www.huffingtonpost.com/2008/01/10/suit-wells-fargo-lenders_n_80839.html.
            [13] http://www.acorn.org/fileadmin/Reports/McCain_Report.pdf,
28      http://www.allbusiness.com/legal/banking-law-fair-lending/5664042-1.html.

**A.   Class Definition**

84.   Plaintiffs bring this action on behalf of themselves and on behalf of all state-licensed or state-approved appraisers nationwide who have been blacklisted or otherwise removed as an approved appraiser by Wells Fargo and/or Rels Valuation.  Excluded from the proposed Class are any individuals or corporations employed or controlled by Wells Fargo and/or Rels Valuation, and any person or entity related to it, and all governmental entities and any appraiser who has been delisted by any regulatory authority or who is not a state-licensed or state-approved appraiser.

**B.   Numerosity**

85.   The Class is so numerous that joinder of all members is impracticable.  Class members number in the hundreds or more.  The precise number of Class members and their addresses are unknown to the Plaintiffs, but can be obtained from Defendants' records.

**C.   Commonality**

86.   There are questions of law or fact common to the Class, including at least the following:

(a)   Whether Defendants created and maintained a "Suspended List," "Blacklist" or any other list specifying appraisers that are no longer approved to perform appraisals in connection with Wells Fargo loans or removed such appraisers from a list of approved appraisers;

(b)   Whether Defendants pressured appraisers into producing appraisal reports that misstated the value of the subject properties or were not in conformance with USPAP and blacklisted those who refused to do so;

(c)   Whether Defendants failed to give notice to an appraiser whom they disapproved to perform appraisals in connection with Wells Fargo loans or, if they gave notice, whether the notice was insufficient in providing fair procedures;

(d)   Whether Defendants failed to provide appraisers whom they blacklisted or removed from the list of approved appraisals with any means of challenging those actions or seeking relief from those actions, thus depriving the appraisers of fair procedures;

(e)   Whether Defendants' wrongful conduct resulted in economic damage to Plaintiffs and members of the Class, and the amount of said damages; and

1          (f)     What relief should be imposed in favor of the Plaintiffs and the Class.

2    **D.     Typicality**

3          87.     Plaintiffs' claims are typical of the claims of the other members of the Class.

4    Plaintiffs have the same interests in this matter as all other members of the Class, and their claims

5    are substantially identical to and typical of the claims of all members of the Class.  Plaintiffs do not

6    have interests antagonistic to or in conflict with those of the members of the Class.

7    **E.     Adequacy**

8          88.     Plaintiffs are committed to pursuing this action and have retained competent counsel

9    experienced in class actions.  Plaintiffs will fairly and adequately represent the interests of the

10   Class members.

11   **F.     The Prerequisites to Maintaining a Class Action for Injunctive Relief are Apparent**

12         89.     The prerequisites to maintaining a class action for injunctive relief exist:

13               a.     If injunctive relief is not granted, great harm and irreparable injury to

14   Plaintiffs and the members of the Class will continue; and

15               b.     Plaintiffs and the members of the Class have no adequate remedy at law for

16   the injuries which are threatened to recur, in that, absent action from this Court, Defendants will

17   continue to act illegally and cause damage.

18         90.     The prosecution of separate actions by members of the Class would create a risk of

19   establishing incompatible standards of conduct for Defendants – for example, one court might

20   decide that the challenged actions are illegal and enjoin them, while another court might decide that

21   those same actions are not illegal.  Individual actions may, as a practical matter, be dispositive of

22   the interests of the Class.

23         91.     Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs

24   seek, *inter alia*, equitable remedies with respect to the Class as a whole.

25   **G.     Common Questions Predominate, and the Class Action Device Is Superior**

26         92.     The common questions of law and fact enumerated above predominate over

27   questions affecting only individual members of the Class, and a class action is the superior method

28   for fair and efficient adjudication of the controversy.  The likelihood that individual members of

the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. To Plaintiffs' knowledge, no similar litigation is currently pending by other members of the Class. Plaintiffs' counsel, highly experienced in class actions, foresee little difficulty in the management of this case as a class action.

## VI.    FIRST CAUSE OF ACTION

### VIOLATION OF AND CONSPIRACY TO VIOLATE
### COMMON LAW DUTY TO PROVIDE FAIR PROCEDURES

93.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

94.    This cause of action for violation of the common law duty to provide fair procedures, and for conspiracy to violate the common law duty to provide fair procedures, is asserted against the Defendants on behalf of Plaintiffs and the Class.

95.    Defendant Wells Fargo is headquartered in the State of California. On information and belief, the actions and underlying decisions of Defendants alleged herein emanated from and occurred within the State of California. California law applies to the claims of Plaintiffs and all Class members because the State of California has an overriding interest in regulating the conduct of Defendants. Wells Fargo planned and implemented Defendants' wrongful scheme in California, and many of the wrongful acts emanated from Wells Fargo's California offices.

96.    California Civil Code section 1090.5(a) states, "No person with an interest in a real estate transaction involving an appraisal shall improperly influence or attempt to improperly influence, through coercion, extortion, or bribery, the development, reporting, result, or review of a real estate appraisal sought in connection with a mortgage loan." Further, section 1090.5(c) states, "If a person who violates this section is licensed under any state licensing law and the violation occurs within the course and scope of the person's duties as a licensee, the violation shall be deemed a violation of that state licensing law."

97.    Moreover, in a notice dated February 4, 2009, California's Department of Financial Institutions stated, "It is the jointly held intention of the Commissioners of the Department of Real

1   Estate (DRE), the Department of Corporations (DOC), the Department of Financial Institutions

2   (DFI), as well as the Director of the Office of Real Estate Appraisers (OREA), to provide outreach

3   to their respective licensees for the purpose of informing those licensees that the following acts

4   may constitute evidence of a violation of California law, and Civil Code section 1090.5 in

5   particular, and should be avoided when engaging the services of a licensed real estate appraiser."

6   The notice then states that the unlawful acts include "allowing the removal of an appraiser from a

7   list of qualified appraisers, or the addition of an appraiser to an exclusionary list of disapproved

8   appraisers, used by any entity, without prior written notice to such appraiser, which notice shall

9   include written evidence of the appraiser's illegal conduct, a violation of the Uniform Standards of

10  Professional Appraisal Practice (USPAP) or state licensing standards, substandard performance,

11  improper or unprofessional behavior or other substantive reason for removal."  The notice further

12  states that its list of acts violating Civil Code sectin 1090.5 is "intended to alert licensees of

13  practices that could potentially lead to disciplinary action."  The notice describes behavior that

14  violates California law before or after the date it was issued.  Thus, because Wells Fargo is licensed

15  in California by the Department of Financial Institutions, removing appraisers without giving prior

16  notice violates section 1090.5(a) and constitutes a violation of the state licensing laws.

17       98.    Defendants wield significant power over the economic lives of appraisers due to

18  Wells Fargo's market power.  Wells Fargo Home Mortgage boasts that it is the nation's number

19  one originator and number two servicer of residential mortgages.  Wells Fargo has more than 1,200

20  home mortgage 'stores' and serves all 50 states.  Thus, because appraisers who are blacklisted by

21  Defendants suffer substantial economic harm, they have the right not to be removed from the

22  approved list for reasons that are arbitrary, capricious and/or contrary to public policy and the right

23  to a procedure that permits them to challenge their removal from the approved list.

24       99.    Defendants' failure to give any notice or to give meaningful notice to an appraiser

25  who is removed from the list of approved appraisers, and to give the appraiser the opportunity to

26  challenge that action and to seek relief from that action, deprives appraisers of fair procedures that

27  are necessary to protect them from potentially devastating economic harm.

28

FIRST AMENDED CLASS ACTION COMPLAINT          - 23 -

010098-11  331412 V1

100.     As described above, plaintiff Sound Appraisal was removed from the list of approved appraisers or placed on a blacklist or both without notice and without being provided fair procedures.  As a direct result, Sound Appraisal lost substantial business.  Before it was blacklisted in 2007, approximately 25% to 35% of Sound Appraisal's business came from Wells Fargo and Rels Valuation – 21.77% in 2004, 25.29% in 2005, and 36.95% in 2006.  And in 2007, 22.93% of Sound Appraisal's business for the entire year came from Rels Valuation even though Sound Appraisal was blacklisted halfway through that year.  Ever since being blacklisted by Defendants in 2007, Sound Appraisal's income from Rels Valuation is $0.  Moreover, being blacklisted has caused substantial harm to the reputation of Sound Appraisal.

101.     As described above, plaintiff Savage Appraisal Services was removed from Defend-ants' list of approved appraisers or placed on a blacklist or both without notice and without being provided fair procedures.  As a direct result, Savage Appraisal Services lost substantial business.  Savage Appraisal Services' total income was $179,142 in 2006, $209,394 in 2007, and $133,582 in 2008.  In each of those years, Savage Appraisal Services was paid approximately $23,000 by Rels for appraisal work, which constituted more than ten percent of its income each year.  Since it was blacklisted, Savage Appraisal Services' income from Rels Valuation has been $0.  Moreover, being blacklisted has caused substantial harm to the reputation of Savage Appraisal Services.

102.     Similarly, all members of the Class were removed from Defendants' list of approved appraisers or placed on a blacklist or both without fair notice and without otherwise being provided fair procedures to know why they were removed and to seek relief from their removal.  Thus, Defendants are liable for violating the common law duty to provide fair procedures and for conspiring to violate that duty.

103.     Defendants' unlawful conduct has directly and proximately caused Plaintiffs and members of the Class to be injured in that they have lost a substantial amount of business by being excluded from the list of approved appraisers without being provided fair procedures.  In addition, Plaintiffs seek an injunction requiring Defendants to cease their wrongful conduct

104.     The acts and omissions of Defendants alleged herein were intended to cause injury to Plaintiffs and the Class members and constitute despicable conduct carried on by Defendants

FIRST AMENDED CLASS ACTION COMPLAINT                  - 24 -

with a willful and conscious disregards of the rights of Plaintiffs and the Class members, thus constituting malice within the meaning of California Civil Code § 3294(c)(1).  The acts and omissions of Defendants alleged herein also subjected Plaintiffs and the Class members to cruel and unjust hardship in conscious disregard of their rights, thus constituting oppression within the meaning of Civil Code § 3294(c)(2).  As a result, Plaintiffs and the Class members are entitled to an award of punitive damages.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and designating Plaintiffs as representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory and punitive damages in favor of Plaintiffs and the Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Entering an injunction barring Defendants from engaging in the unlawful conduct alleged herein;

D.     Awarding Plaintiffs and the Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Such other and further relief as the Court may deem just and proper.

## VIII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED:  October 29, 2009.

HAGENS BERMAN SOBOL SHAPIRO LLP
JEFF D. FRIEDMAN
715 Hearst Ave., Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAGENS BERMAN SOBOL SHAPIRO LLP


By ___s/ Steve W. Berman_____
        Steve W. Berman (*pro hac vice*)
        Thomas E. Loeser (202724)
        Genessa Stout
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com
genessa@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

# CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the Electronic Mail Notice List.

HAGENS BERMAN SOBOL SHAPIRO LLP

By:  _s/ Steve W. Berman_____
Steve W. Berman (*pro hac vice*)

**Electronic Mail Notice List**

- **Gayle M. Athanacio**
  gathanacio@sonnenschein.com
- **Steve W. Berman**
  steve@hbsslaw.com
- **Brooks Russell Brown**
  bbrown@goodwinprocter.com
- **Elizabeth Ferrick**
  eferrick@sonnenschein.com
- **Jeff D. Friedman**
  jefff@hbsslaw.com
- **Charles A. Newman**
  cnewman@sonnenschein.com

FIRST AMENDED CLASS ACTION COMPLAINT                - 27 -

010098-11 331412 V1